61

United States District Court
Southern District of Texas
Brownsville Division

United States District Court
Southern District of Texas
FILED

FEB 1 5 2001

Michael N. Milby
Clerk of Court

DANIEL E. DAVIS, et al,       §
    plaintiffs           §
                 §
v.                    §          Civil Action No. B-00-003
                 §
FAVELLE FAVCO CRANES USA, INC.,   §
et al.,                 §
    defendants        §

## Defendant FFC Parties' Supplemental
## Motion for Partial Summary Judgment and Supporting Memorandum

Gary Gurwitz
State Bar No. 08631000
Charles C. Murray
State Bar No. 14719700
Southern Dist. ID No. 1194
818 Pecan/P. O. Box 3725
McAllen, Texas 78501/78502
(956) 682-5501 (phone)
(956) 686-6109 (fax)

Willem Schuurman
Brian K. Buss
VINSON & ELKINS, L.L.P.
2700 One American Center
600 Congress Ave.
Austin, Tx 78701-3200

February 15, 2001

# Table of Contents

1. Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. Davis does not contest that the patent would belong to FFC USA but for the alleged draft 1997 Shareholders' Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . 2

3. The 1997 draft Shareholders' Agreement is ineffective and grants no rights to Davis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   3.1 The statute of frauds precludes enforcement of Davis' alleged agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      3.1.1 The statute of frauds applies to the alleged agreement . . . . . . . . 4

      3.1.2 The statute of frauds requires a signed writing, and hence no agreement exists as a matter of law . . . . . . . . . . . . . . . . . . . . . 5

      3.1.3 "Part performance" would not preclude application of the statute of frauds (even if pleaded) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   3.2 As a matter of law, the parties did not intend the 1997 draft Shareholder's Agreement to become binding absent final agreement and signature of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   3.3 In any event, FFC USA is not named as a party to the draft Shareholders' Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4. Nor do the 1999 drafts of the Shareholders' Agreement not require a different result . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   4.1 The 1999 document is but discussion points in a series of unsigned, nonfinal drafts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   4.2 The 1999 draft document does not meet the statute of frauds . . . . . . . 14

5. Alternately, FFC USA has shop rights to, and trade secrets interests in, the crawler cranes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CVisPDF - www.tavisx.com

## Table of Authorities

Cases

Bendalin v. Delgado,
  406 S.W.2d 897 (Tex. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Bratcher v. Dozier,
  162 Tex. 319, 346 S.W.2d 795 (Tex. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Chevalier v. Lane's, Inc.,
  147 Tex. 106, 13 S.W.2d 530 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Choi v. McKenzie,
  975 S.W.2d 740 (Tex. App.–Corpus Christi 1998, pet. denied) . . . . . . . . . . . . . . . . .  4

Collins v. Allied Pharmacy Management, Inc.,
  871 S.W.2d 929 (Tex. App.–Houston [14th Dist.] 1994, no writ) . . . . . . . . . . . . . . . .  5

CVD, Inc. v. Ratheon Co.,
  769 F.2d 842 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Davis v. Alwac International, Inc.,
  369 S.W.2d 797 (Tex. Civ. App.–Beaumont 1963, writ ref'd n.r.e.) . . . . . . . . . . . . . .  3

Diamond v. Diehr,
  450 U.S. 175,  101 S.Ct. 1048, 1056, 67 L.Ed.2d 155 (1981) . . . . . . . . . . . . . . . . . .  2

M.R.S. Datascope Inc. v. Exchange Data Corp.,
  745 S.W.2d 542 (Tex. App.–Houston [1st Dist.] 1988, no writ) . . . . . . . . . . . . . . . . .  5

McElmurry v. Arkansas Power & Light Co.,
  995 F.2d 1576 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Moore v. Dilworth,
  142 Tex. 538, 179 S.W.2d 940 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Rubber-Tip Pencil Co. v. Howard,
  87 U.S. 498,  22 L.Ed. 410, 20 Wall. 498 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Scaife v. Associated Air Center, Inc.,
  100 F.3d 406 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12

3

*Simmons & Simmons Construction Co. v. Rea,*
155 Tex. 353, 286 S.W.2d 415 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*T.O. Stanley Boot Co. v. Bank of El Paso,*
847 S.W.2d 218 (Tex. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Dubilier Condenser Corp.,*
289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114,
*modified,* 289 U.S. 706, 77 L.Ed. 1462 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Wiley v. Bertelsen,*
770 S.W.2d 878 (Tex. App.–Texarkana 1989, no writ) . . . . . . . . . . . . . . . . . . . . . . . 6

*Young v. Ward,*
917 S.W.2d 506 (Tex. App.–Waco 1996, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5


Statutes
Tex. Bus. & Com. Code § 26.01(a) (West 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5


Other
Restatement (2d) of Contracts § 17(1) (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4

CMxPDF - www.twsIo.com

## Defendant FFC Parties' Supplemental
## Motion for Partial Summary Judgment and Supporting Memorandum

Defendants Favelle Favco Cranes USA, Inc. ("FFC USA"), Favelle Favco Cranes (M) SDN BHD ("FFC Malaysia"),  and Favelle Favco Holdings SDN BHD ("FFC Holdings") (collectively "FFC Parties") file this supplemental motion for summary judgment, and would show:

1.     *Summary.*  Davis' relies strictly on the existence, validity, and enforceability of a draft 1997 Shareholders Agreement unsigned by any FFC Party to deny that FFC USA has any rights in U.S. Patent No. 6,003,252 (the "252 patent") and the crawler cranes at issue in this suit and to assert that FFC USA had a three-year "license" only.   Davis does not deny that the patent would belong to FFC USA but for the alleged draft1997 Shareholders Agreement because of his fiduciary duties to the company.  Davis also does not deny that, unless the royalty in the draft somehow translates into a patent license and then one which terminates after three years, FFC USA may continue to make and use the crawler cranes at issue.

No valid, enforceable agreement exists because: 1)  the statute of frauds bars enforcement of contracts which cannot be performed within one year; and 2) as a matter of law, the parties did not intend to be bound absent signed agreements.   Davis has pleaded no exception to the statute of frauds.   Even part performance (assuming such were pleaded) would be unavailable as an exception to the statute of frauds since Davis' conduct is not unequivocally referable to the alleged draft agreement, and indeed, in many respects conflicts with such alleged draft agreement.

Alternately, FFC USA is entitled as a matter of law to "shop rights." Shop rights is the term used for the employer's interest in a patented invention when an employee owns an invention, and apply when the employer funded the development of the invention or allowed the employer to introduce the invention in its business. There is no dispute that all funds for the development of the patent at issue were paid by, or on behalf of, FFC USA. and that Davis allowed FFC USA to introduce the crawler cranes into its product mix, and even promoted such crawler cranes on behalf of FFC USA.

2.     *Davis does not contest that the patent would belong to FFC USA but for the alleged draft 1997 Shareholders' Agreement.* Davis does not contest that he owed a fiduciary duty to FFC USA.[1] Nor does he deny, as established in Defendant Favco USA's Motion for Partial Summary Judgment ("FFC USA's MSJ"), incorporated herein, that the crawler cranes at issue:

- were not patentable at the time that Davis became president and managing director of FFC USA[2] (see FFC USA MSJ § B(8));

- were developed with funds contributed solely by or on behalf of FFC USA ( see FFC USA MSJ § B(12));

---

[1] The law of fiduciary duties has been extended to areas related to intellectual property. In the intellectual property arena, one of the obligations a fiduciary duty imposes on an officer of a company is to assign to the company any inventions conceived or developed by him or her during employment. *Davis v. Alwac,* 369 S.W.2d 797, 801 (Tex. Civ. App.–Beaumont 1963, writ ref'd n.r.e.). *See also* FFC USA MSJ at 18. This rule has been adopted in many jurisdictions. *Kennedy* v. *Wright,* 676 F.Supp. 888, 891 (C.D. Ill. 1988); *Lefiell v. United States,* 162 Ct. Cl. 865 (1963) (president, general manager and principal stockholder of company who used its money and facilities in developing and obtaining patent held to be alter ego and to hold patent in constructive trust for company).

[2] An idea of itself is not patentable. *Diamond v. Diehr,* 450 U.S. 175, 184, 101 S.Ct. 1048, 1056, 67 L.Ed.2d 155 (1981); *Rubber-Tip Pencil Co. v. Howard,* 87 U.S. 498, 506, 22 L.Ed. 410, 20 Wall. 498 (1874). Further design and engineering work is necessary.

2

- were developed while Davis was president of FFC USA  (see FFC USA MSJ § B(11));

- were promoted by Davis on behalf of FFC USA; and

- relate to the business of FFC USA  (see FFC USA MSJ § B(2), (4)).

*See generally* Plaintiff's Response to Defendant Favelle Faco Cranes USA, Inc.'s Motion for partial Summary Judgment.  As such the patent – although issued in Davis' name – clearly belongs to FFC USA under applicable Texas law and Davis is required to assign the patent to FFC USA.  *Davis v. Alwac International, Inc.,* 369 S.W.2d 797, 802 (Tex. Civ. App.–Beaumont 1963, writ ref'd n.r.e.).  Indeed, Davis himself recognized this point when he signed agreements  as president and/or managing director of FFC USA that stated that FFC USA would own all of the drawings, specifications, designs, and work product done or accomplished pursuant such agreements and would own any patents issued on the crawler cranes being developed.  See FFC USA MSJ § B(10).[3]

3.      *The 1997 draft Shareholders' Agreement is ineffective and grants no rights to Davis.* Davis' "defense" is predicated entirely on the 1997 draft Shareholders' Agreement

---

[3]  For example, after the date of the alleged 1997 Shareholder's Agreement and prior to Davis' patent application dated August 5, 1998:

- The agreement between FFC USA, FFC Malaysia, and ECCON – signed by Davis on behalf of FFC USA – states that "FAVCO shall be the sole owner and the sole party to secure . . . patents on all specifications, designs, drawings, and work product generated and produced by ECCON in performing the design and development services in relation to the Crawler Crane design . . . ." FFC USA MSJ Ex. A4.  The ECCON agreement was signed on November 22, 1997 (*id.*).

- The agreement between FFC USA and Keith J. Orgeron, signed by Davis on behalf of FFC USA on January 18, 1998, states that "[a]ny ideas, patents, copyrights, drawings, etc., produced by Consultant [Orgeron] under this Agreement shall be the sole property of the Company [FFC USA] . . . ." FFC USA MSJ Ex. A9.

Further, the work done by James Rusk and Rusk Engineering was done for FFC USA pursuant to letter agreements dated May 29, 1998 and June 3, 1998.  Amended Joint Pretrial Order ("Pretrial Order") § 6 at p. 24; 1 Davis Depo at 45 (FFC USA MSJ Ex. A).  The patent applied for by Davis used the drawings produced by Rusk. Davis Depo. at 45.  Davis admits that the crawler cranes at issue in this litigation are those worked on by Orgeron, ECCON, and Rusk.  1 Davis Depo. at 197 (FFC USA MSJ Ex. A).

between Davis and FFC Malaysia.  See FFC USA MSJ Ex. A2.  Davis' contentions with regard to the 1997 draft, however, do not establish any enforceable agreement between the parties, do not entitle Davis to any affirmative relief, and do not establish any defense to the claims asserted by the FFC Parties:

3.1    *The statute of frauds precludes enforcement of Davis' alleged agreement.*  Even assuming the existence of an "agreement" (which the FFC Parties dispute), the statute of frauds bars any claim that the draft 1997 Shareholders Agreement is binding on the parties.[4]  Davis does not deny that the alleged agreement was never signed by any FFC Party.

3.1.1 *The statute of frauds applies to the alleged agreement.*  Under the Texas Business and Commerce Code, a promise or agreement is not enforceable unless the promise or agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him. TEX. BUS. & COM. CODE § 26.01(a) (West 2000).  The provisions of section 26.01 apply in numerous instances, including to "an agreement which is not to be performed within one year from the date of making the agreement." *Id.* § 26.001(b)(6). Whether a contract falls within the statute of frauds generally is a question of law. *Choi v. McKenzie,* 975 S.W.2d 740, 743 (Tex. App.–Corpus Christi 1998, pet. denied).  *See Bratcher v. Dozier,* 162 Tex. 319, 346 S.W.2d 795, 796 (Tex. 1961).

---

[4]  See Defendants' Favelle Favco Cranes, U.S.A., Inc.'s Answer and Counterclaim ¶ 26; Defendant Favelle Favco Cranes (M) SDN BHD's Answer and Counterclaim ¶ 25; Amended Pretrial Order § 5(B)33.

CVisPDF - www.fsvisa.com

The alleged shareholder's agreement cannot be performed in one year. The very clause on which Davis relies for his claimed interest provides that FFC Malaysia will pay a royalty to Davis for three years:

> 7.1    The First Party [FFC Malaysia] shall <u>for a period of three years</u> from the date of this Agreement pay to the Second Party [Davis] a royalty fee of 1% of the sale price for the sale of each crane manufactured or assembled pursuant to the Second Party's patented invention . . . .

1997 Draft Shareholders Agreement ¶ 7.1 (FFC USA MSJ Ex. C32) (emphasis added). Further, the draft provides that Davis shall not compete with FFC Malaysia during the agreement and for a period of three years thereafter. *Id.* ¶ 5.1. The agreement, as a matter of law, could not be performed[5] within one year and is subject to the statute of frauds.

      3.1.2  *The statute of frauds requires a signed writing, and hence no agreement exists as a matter of law.*  As discussed above, the statute of frauds requires that an agreement subject to its terms be  (1) in writing; and (2) <u>signed</u> by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him. TEX. BUS. & COM. CODE § 26.01(a) (West 2000).  It is undisputed that the 1997 draft

---

[5] Texas courts draw a distinction between "performance" of a contract and its termination. *Chevalier v. Lane's, Inc.*, 147 Tex. 106, 13 S.W.2d 530, 532 (1948). The statute by its terms relates to "performance." Hence, the mere possibility of termination within a year because of death or other fortuitous event does not render the statute of frauds inapplicable. *Chevalier*, 13 S.W.2d at 532-33; *Young v. Ward*, 917 S.W.2d 506, 509-11 (Tex. App.–Waco 1996, no writ) (collecting cases); *M.R.S. Datascope Inc. v. Exchange Data Corp.*, 745 S.W.2d 542, 544 (Tex. App.–Houston [1st Dist.] 1988, no writ); *Collins v. Allied Pharmacy Management, Inc.*, 871 S.W.2d 929, 934 (Tex. App.–Houston [14th Dist.] 1994, no writ) (employment contract for three years was within statute even though under agreement employee could be terminated at any time for cause). The fact that the draft agreement contained various termination provisions based on unanticipated events therefore would not preclude application of the statute of frauds. Further, as discussed above, the agreement that Davis would not compete extends for three years after termination, again precluding the possibility of "performance" of the contract within one year.

5

Shareholders Agreement was never signed by any FFC Party. Therefore, as a matter of law, the application of the statute of frauds bars enforcement of the alleged agreement.

3.1.3 *"Part performance" would not preclude application of the statute of frauds (even if pleaded).* Part performance may under limited circumstances remove a contract from application of the statute of frauds.[6] However, for "part performance" to constitute an exception to the statute of frauds, the "performance" must be <u>unequivocally</u> referable to the alleged agreement. *Wiley v. Bertelsen,* 770 S.W.2d 878, 882 (Tex. App.–Texarkana 1989, no writ) (ranch manager's performance of duties could be related to monthly salary as opposed to promise to pay interest in proceeds from eventual sale of ranch, and did not take contract out of the statute of frauds). Davis' "performance" is not unequivocally referable to the 1997 draft Shareholders Agreement or the royalty provision therein. Davis had an employment contract with FFC Holdings to be the managing director of FFC USA and to perform work at its facility in the United States, which became FFC USA. See FFC USA MSJ Ex. A3. Further, Coburn International, Ltd., a company owned by Davis, and not Davis himself, purchased a 10 percent interest in FFC USA. See FFC USA MSJ § B(1). Pursuant to that ownership interest, Davis (through the corporation he owned) would benefit as a shareholder in FFC USA's financial success, including but not limited to business resulting from the development of the crawler cranes. FFC USA was in the business to sell and service cranes other than crawler cranes and to manufacture and sell parts for cranes other than crawler cranes. Cheam Aff. p. 3. Davis' actions with regard to the crawler cranes are at least as potentially referable to the employment

---

[6] Davis does not plead "part performance." Assuming *arguendo* that his references to "reliance" are meant to reference such doctrine, part performance does not take the alleged agreement at issue out of the statute of frauds.

6

agreement and/or his ownership interest in the company as they are to the alleged draft

1997 agreement. Such actions therefore cannot be said to be "unequivocally referable"

to that draft agreement, and cannot suffice to take the alleged draft agreement out of the

statute of frauds.

Further, Davis' conduct (and also FFC Malaysia's conduct, although that is

irrelevant to the statute of frauds analysis) is in many respects <u>inconsistent with</u> the alleged

shareholders agreement:

> • Paragraph 7.1 of the 1997 draft Shareholders Agreement provides that FFC
> Malaysia will pay a one percent royalty on cranes manufactured pursuant to Davis'
> patented inventions (which patents, at the time of the draft, had as yet not even
> been applied for). <u>Davis</u>, as president and/or managing director of FFC USA,
> without authorization[7], caused certain payments to be made:
>> ▸ by FFC USA, <u>not FFC Malaysia</u>;
>> ▸ to Davisco, <u>not to Davis</u> himself;
>> ▸ in an amount equal to four percent of certain sales of cranes, <u>not one
>> percent</u>; and
>> ▸ at a time <u>prior to the issuance of the patent</u> – whereas the draft specifically
>> referred to Davis "patented" invention. In other words, no payments were
>> even due before there was a patented invention in existence, and because
>> no patent had issued, it was impossible to determine whether or not the
>> machines sold came within the terms of the proposed royalty and therefore
>> whether or not a "royalty" was owed.[8]
>
> Cheam Aff. p. 2-3.
>
> • Paragraph 1.4 of the 1997 draft Shareholders Agreement provides that <u>Davis</u> will
> have a ten percent interest in the new company (FFC USA). See FFC USA MSJ
> Ex. A3. Instead, the interest was acquired by Coburn International, Ltd. See FFC
> USA MSJ § B(1).

---

[7] The FFC Parties had no knowledge of the payments until after examination of the books of FFC USA subsequent to Davis' discharge as president of FFC USA. Cheam Aff. at 2.

[8] The patent at issue did not come into existence until December 1999, many months after Davis had paid the four percent "royalty" to Davis Co. and after Davis had been terminated by FFC USA. What is more, since there was no patented invention when Davis made these payments to Davis Co., there was no way of determining whether or not the cranes which were sold were cranes which would be covered by the patented invention and would, therefore, be cranes in respect to which royalties were payable. Cheam Aff. p. 2-3. FFC USA manufactures and sells some types of cranes that would <u>not</u> be subject to the patents at issue, further obscuring the issue of whether "royalty" would have been due on the alleged sales. Cheam Aff. at 3.

• Davis alleges that the draft 1997 Shareholders Agreement reflects a three year license to FFC USA. Plaintiff's Response to FFC USA MSJ at 7. However, no such license is referenced in the agreement (and, indeed, none could then exist since no patent had yet been applied for, much less issued). Further:

> ► The patent applications filed by Davis expressly disclaim the existence of any such license agreement[9];
>
> ► Correspondence dated March 1999 from attorney Al Payne (then purporting to represent Davis individually), insists that neither FFC Malaysia nor FFC USA had a license, and accuses FFC USA and FFC Malaysia of infringing on Davis' patent[10] (even though no patent had issued at that time) (FFC USA MSJ Ex. I); and

---

[9] Such application includes a Verified Statement (Declaration) Claiming Small Entity Status, signed by Davis, which states in part: "I [Davis] have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who could not be classified as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e)."

[10] The letter from Payne of behalf of Davis states that "Muhibbah has refused to enter a license agreement as provided by Mr. Davis." The letter further provides:

> Therefore, other than the display of cranes at CONEXPO, any use whatsoever by Muhibbah or any related company, including particularly Favelle Favco Cranes (USA) Inc., of Mr. Davis' proprietary crawler crane designs or machines embodying those designs will be an infringement of his valuable property rights. Such illegal activity includes, by way of example and without limitation, the offer for sale, taking of orders, sale, or Muhibbah or any related company in any way holding itself out as having any rights or interest in or to the proprietary crawler crane designs or machines embodying those designs.

FFC USA MSJ Ex. I.

8

➤ Davis admits in his deposition that he had no shareholders agreement with FFC USA and had <u>no license agreement with anyone</u>.[11] Davis Depo. at 146-47.

• FFC Malaysia – the other party to the alleged agreement – did not perform at all under the alleged agreement.   Paragraph 1.4 of the draft provides that <u>FFC Malaysia</u> is to acquire 90% of the company.  FFC USA MSJ Ex. A3.  Instead, FFC Holdings acquired the interest.  Further, no "royalty payments" were made by FFC Malaysia, as described above.

For these independent reasons, neither Davis nor FFC Malaysia can be said to have performed under or relied upon the draft of the alleged agreement.

Furthermore, the draft 1997 Shareholders Agreement certainly makes no mention of any license.  Apart from the reference of a royalty of one percent payable for three years, it does not contain any single additional reference to provisions which are usual and invariable in license agreements.  More importantly, it does not state that any "license" will terminate after three years so that FFC USA will lose its entire investment (of <u>over $10 million</u>, see FFC USA MSJ at 11) in the crawler crane project because it will have no

---

[11]

Q:   But the basis for your claim that crawler cranes cannot be made after August of 2000, the crawler cranes that are the subject of the patent, is Exhibit 2, which is between you and Favco Malaysia?
A:   The Shareholders' Agreement, yes.
Q:   And you have no such Agreement with Favco USA?
A:   No.
Q:   Is that correct?
A:   That's correct.
. . . .
Q:   Did you eve enter into a licensing agreement with anyone to make these cranes that are the subject of the patents in dispute?  Did you ever enter into a licensing agreement with anyone?
A:   I had one sent to Mac.
Q:   But there was none ever signed and agreed to?
A:   No.
Q:   Isn't that correct?
A:   That's correct.
Q:   So you have no licensing agreement with anyone?
A:   No.
Q:   Is that right?
A:   That's correct.

Davis Depo. at 146-47 (FFC USA MSJ Ex. A).

9

further right to make, use or sell the crawler cranes which were developed, made and exploited exclusively by FFC USA, exclusively using FFC USA's funds, premises and equipment, and exclusively using engineers paid for and contracted to FFC USA.

Davis' contention that the draft 1997 Shareholders Agreement somehow contains a license limited to three years also is entirely inconsistent with his conduct in negotiating and concluding contracts on behalf of FFC USA with ECCON, with Orgeron, and with Rusk which provide that all of the plans, specifications, technology, drawings and work product will belong exclusively to FFC USA. (See n. 3 above). These agreements, all negotiated and signed by Davis on behalf of FFC USA, prevent Davis himself from exploiting the crawler cranes at any time because everything is owned by FFC USA. If the draft shareholders agreement somehow contains a license limited to three years, this would mean that after three years neither FFC nor Davis can exploit the subject matter of the over $10 million investment by FFC USA.

3.2    *As a matter of law, the parties did not intend the 1997 draft Shareholder's Agreement to become binding absent final agreement and signature of the parties.* Even if the statute of frauds did not otherwise bar Davis' claims, the alleged "agreement" still would be unenforceable. As FFC USA's MSJ establishes:

• The transmittal letter to Davis enclosing the draft Shareholders' Agreement clearly denominated the enclosed documents as drafts. FFC USA's MSJ Ex. C32; Affidavit of Cheam Tek Siong ("Cheam Aff.") p. 2 (attached hereto). The document itself is marked "Draft." Cheam Aff. p. 2 & Ex. 1.

• Further, the transmittal letter expressly provides: "Kindly be reminded that the abovementioned documents would need to be reviewed by US lawyers (in particular, Texas Lawyers)." Cheam Aff. Ex. 1; FFC USA MSJ Ex. 32.

• The draft document also contains spaces for the signature of the parties. *Id.*

10

CUtePDF - www.tevistx.com

• No FFC party ever signed the draft Shareholders' Agreement or agreed to the terms in the draft. Cheam Aff. Ex. 1.

• No FFC party ever saw or received any copy of the draft Shareholders Agreement signed by Davis until after the institution of this litigation, when it was attached to a pleading filed by Davis. Cheam Depo at 50 (FFC USA MSJ Ex. C); Mac Depo at 40 (FFC USA MSJ Ex. D); Cheam Aff. p. 2.

• The parties referred to in the draft agreement are Davis and FFC Malaysia. Cheam Aff. Ex. 1.

See FFC USA's MSJ § B(6) at 6-7. Davis does not deny these facts or provide any evidence to the contrary. Because the 1997 draft Shareholder's Agreement was submitted as a "draft," the transmittal letter expressly referenced the need for review by attorneys, the draft contained blanks, and the draft -- although it contained spaces for the signature of the parties -- was never signed by any FFC party, there can be no viable contention that the draft Shareholder's Agreement, or any of the provisions contained therein, became a contract binding on anyone.

Generally, for a bargain to exist there must be consideration and a manifestation of mutual assent to the exchange. RESTATEMENT (2D) OF CONTRACTS § 17(1) (1981). If an agreement has been reduced to writing, an assent to the writing must be made manifest. *Scaife v. Associated Air Center, Inc.,* 100 F.3d 406, 410 (5th Cir. 1996). Manifestation of assent commonly consists of signing and delivery. *Id.* at 411. If Davis had not believed signatures were necessary, there would have been no reason for him to sign the document.

Texas law recognizes parties may intend to be bound by contract only by execution of formal documents. *See generally Simmons & Simmons Construction Co. v. Rea,* 155 Tex. 353, 286 S.W.2d 415, 417 (1955); *Scaife v. Associated Air Center, Inc.,* 100 F.3d 406,

11

410 (5th Cir. 1996). This issue is independent of the statute of frauds. In *Scaife,* for

example, (which did not involve the statute of frauds) the parties traded unexecuted drafts

of a contract for repair services; the drafts each incorporated suggestions made by the last

party. On the last draft, one party (AAC) was supposed to sign and return the document,

but did not. The other party (Scaife), in the belief that AAC had agreed to the terms of the

draft, arranged to send its representative to sign the document. *Scaife,* 100 F.3d at 407-

08. When the document was never signed and no work was performed, suit resulted. The

Fifth Circuit affirmed[12] summary judgment for the defendant on the ground that the parties

never entered into a binding contract. *Id.* at 410-11. The court pointed out:

> When reviewing written negotiations, the question of whether
> an offer was accepted and a contract was formed is primarily
> a question of law for the court to decide. . . . If an agreement
> has been reduced to writing, as it was in this case, an assent
> to the writing must be manifested. Manifestation of consent
> commonly consists of signing and delivery.
>
>         . . .
>
> [W]e agree with the district court that the parties
> intended to manifest their assent to this agreement though a
> formal written contract signed by both parties. We hold that no
> contract was ever formed and, as a result, summary judgment
> was appropriate in this case.

*Id.* at 410-11 (internal quotations and citations omitted).    As in *Scaife,* the draft

Shareholders' Agreement never became the contract of the parties. The draft thus does

not provide a defense to FFC USA's claim, and no fact issue is raised in that regard.

    3.3    *In any event, FFC USA is not named as a party to the draft*

*Shareholders' Agreement.*  Further, FFC USA is not named as a party to the draft

Shareholders' Agreement.  Rather, the proposed signatories are FFC Malaysia and Davis.

---

[12] The court vacated the district court decision in part on other grounds.

12

Nothing in the "agreement" could diminish FFC USA's rights in connection with the patent and in connection with ownership of the crawler cranes. Davis had no shareholders agreement with FFC USA. 1 Davis Depo. at 146-47.

     4.    *Nor do the 1999 drafts of the Shareholders' Agreement not require a different result.* Davis also contends that a 1999 draft of discussion items for the <u>still</u> unfinalized shareholder's agreement represents some proof of the agreement. That argument also lacks merit.

     4.1    *The 1999 document is but discussion points in a series of unsigned, nonfinal drafts.* Davis points to an unsigned discussion document relating to the still nonfinal shareholder's agreement as evidence that the parties did in fact reach an agreement in 1997. See [Davis] Defendants' First Amended Counterclaim ¶ 2.08 & Exhibit B. The 1999 draft document does refer to Davis as the owner of the patent. *Id.* However, this document on its face is but a list of discussion points for a potential agreement, and is not itself an agreement nor does it constitute a recognition of any ownership rights by Davis in the patent. The handwritten note to Davis on the document references "the issues to be addressed." *Id.* The very paragraph to which Davis refers contains blanks for both the amount of the proposed royalty and its term, critical items apparently yet to be even discussed. *Id.* To be legally binding, a contract "must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex. 1992) (citing *Bendalin v. Delgado,* 406 S.W.2d 897, 899 [Tex. 1966]). As stated in *Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex. 1966):

13

> 'A court cannot enforce a contract unless it can determine
> what it is. It is not enough that the parties think that they have
> made a contract; they must have expressed their intentions in
> a manner that is capable of understanding.'    1 Corbin.
> Contracts, 2nd ed. 1963, § 95. Thus, to be enforceable, a
> contract must be sufficiently certain to enable the court to
> determine the legal obligations of the parties thereto.

*See also Moore v. Dilworth,* 142 Tex. 538, 179 S.W.2d 940, 942 (1944).

Further, the 1999 list of discussion points is but one document in a series of drafts exchanged by the parties involving a proposed purchase by Davis of a controlling interest in FFC USA, a purchase which would involve a total change in the relationship of the parties and the status of FFC USA. The drafts reflect varying terms as the negotiations changed. Ownership of the patents was but one of many terms subject to the negotiations. Later drafts of the proposed shareholder's agreement, for example, state that Davis is the inventor of the patent, but <u>do not</u> describe him as the owner. Cheam Aff. p. 1-2. The subsequent drafts refer to crawler cranes never designed or manufactured, and to many other details of the proposed buyout which changed from draft to draft. *Id.*

4.2    *The 1999 draft document does not meet the statute of frauds.*  The 1999 series of drafts are themselves unsigned and cannot supply the requisites to satisfy the statute of frauds. As such, they do not allow Davis to avoid the statute of frauds. See discussion above.

5.    *Alternately, FFC USA has shop rights to, and trade secrets interests in, the crawler cranes.*  Even if the court determines that Davis is the owner of the '252 patent and any related patents, FFC USA still is entitled to "shop rights." A "shop right" arises in situations where a patent is owned by an employee, but the employee has used the resources and facilities of the employer to conceive or reduce the invention to practice.

14

*See, e.g., McElmurry v. Arkansas Power & Light Co.,* 995 F.2d 1576, 1580-81 (Fed. Cir. 1993). Because the employee has used the employer's resources in developing the invention, it is only fair and equitable that the employer have a right to use the invention, and thus the employer is entitled to a "shop right." *United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 188-89, 53 S.Ct. 554, 77 L.Ed. 1114, *modified,* 289 U.S. 706 (1933). The "shop right" doctrine thus provides that an employee who uses his employer's resources to conceive an invention or to reduce it to practice must afford to his employer a nonexclusive, royalty free, nontransferable licenses to practice the invention without liability for infringement, even though the employee obtains a patent thereon. *Id.; McElmurry,* 995 F.2d at 1580-81. The "shop right" is an equitable right created at common law under principles of equity and fairness. *See id.*

The undisputed facts in the summary judgment record show that, as president of FFC USA, Davis used FFC USA's funding, resources, and personnel to develop the crawler cranes at issue, which subsequently were marketed and sold under the FFC USA name. See FFC USA MSJ at pp. 23-27. Given these undisputed facts, unless there is an express agreement to the contrary, FFC USA at minimum is entitled to shop rights in the '252 patent and any related patents. *Id.* As discussed above, there is no enforceable agreement to the contrary. In particular, as regards shop rights, there was never any license agreement with FFC USA or any other FFC Party. Davis admits there was never any license agreement with anyone (see n. 9 above) and his actions in signing contracts which state that FFC USA is the owner of everything (see n. 3 above) is inconsistent with Davis' alleged ownership and his license claims.

15

Further, it is undisputed that FFC USA owns all of the design drawings, trade secrets, and all other confidential information and technology related to the crawler cranes. Trade secrets and confidential information are a separate and independent type of intellectual property from patents. *See CVD, Inc. v. Ratheon Co.*, 769 F.2d 842, 850 (1st Cir. 1985). The summary judgment record is clear that FFC USA owns all of such trade secrets and confidential information. See FFC USA MSJ at pp. 28-29. Contracts between FFC USA and the design team, which are signed by Davis as president and/or managing director of FFC USA, clearly state that all of the confidential and proprietary information are the property of FFC USA. *Id.* Even if the draft 1997 Shareholders Agreement is valid, it says nothing about ownership of trade secrets and thus does not detract from any ownership rights FFC USA has in them.

6.    *Conclusion.*   Because of the statute of frauds and other reasons, the 1997 draft Shareholders Agreement is ineffective and grants no rights to Davis. Davis does not contest that, but for such alleged agreement, the patent must be assigned to FFC USA. The statute of frauds therefore defeats Davis' claims and requires Davis to assign any patents to FFC USA. Alternately, FFC USA is entitled to a judgment awarding it shop rights and declaring that it is the ownership of the trade secrets at issue.

16

Wherefore, premises considered, FFC USA requests that its motion for summary judgment be granted. The FFC USA requests such other and further relief to which it may be entitled, at law or in equity.

Respectfully submitted,

Gary Gurwitz
State Bar No. 08631000
Southern Dist. ID No. 1194
818 Pecan/P. O. Box 3725
McAllen, Texas 78501/78502
(956) 682-5501 (phone)
(956) 686-6109 (fax)

Attorney in charge for defendant

Of counsel:

Charles C. Murray
State Bar No. 14719700
Southern Dist. ID No. 1214
818 Pecan/P. O. Box 3725
McAllen, Texas 78501/78502
(956) 682-5501 (phone)
(956) 686-6109 (fax)

Willem Schuurman
Brian K. Buss
VINSON & ELKINS, L.L.P.
2700 One American Center
600 Congress Ave.
Austin, Tx 78701-3200

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DANIEL E. DAVIS                     §
                                    §
vs.                                 §          CIVIL ACTION NO. B-00-003
                                    §
FAVELLE FAVCO CRANES USA, INC.,     §
ET AL.                              §

---

## AFFIDAVIT OF CHEAM TEK SIONG

---

THE STATE OF TEXAS        §
                          §
COUNTY OF HIDALGO         §

BEFORE ME, the undersigned notary public, on this day personally appeared CHEAM TEK

SIONG, who being by me duly sworn on oath stated that he is above the age of 18 and is authorized

in all respects to make this affidavit; that he has not been convicted of a felony and is competent to

make this affidavit; that he has read the following affidavit, and it is true and correct, and that every

statement contained herein is within his personal knowledge.

> I am the Group General Manager of Favelle Favco Holdings SDN BHD ("Holdings")
> and Director in Charge of USA Operations of Favelle Favco Cranes USA, Inc. ("FFC
> USA").

> The document attached as Exhibit 3 to the Affidavit of Daniel Davis filed in
> connection with Plaintiff's Response to Defendant FFC USA's Motion for Partial
> Summary Judgment was an early draft in a series of approximately 10 different drafts
> of documents involving the attempted purchase by Daniel Davis, ("Davis"), of all or
> substantially all of the stock of FFC USA" from Holdings.  These drafts were
> exchanged over a period of several months and the terms changed depending upon
> the status of the negotiations. Davis was proposing to purchase the stock for several
> million dollars (the precise amount was never agreed upon) and he was negotiating
> to buy up to 70% of the stock with an option to buy more (the exact amount was
> never agreed upon).  A review of these drafts show that the purchase price changed,

the amount of stock to be purchased changed, how the company was to be run changed, capitalization of the company changed, the name of the new company to be the successor company changed, the number of directors to be appointed by each party changed, the models of the crawler cranes changed (including some models for which there were no manufacturing plans or specifications and which have not been and are not being made), and various other terms being negotiated changed. The draft paragraph that named Davis as the inventor and owner was changed to identify Davis as the inventor only and provided for a royalty to be paid to the owner who was not identified in the draft documents. The period of the licensing in the drafts changed from 3 to 10 years and from non-exclusive to exclusive in FFC USA. The negotiations concerning licensing Favelle Favco Cranes (M) Sdn Bhd, ("FFC Malaysia"), was changed from draft to draft.

Since Davis was negotiating to buy control of FFC USA, it did not matter to Holdings or to Mac Ngan Boon who was named as owner of the patent, or whether there was a license or not, because Davis would own most or all of FFC USA, and if he wanted his own company to pay himself, or some other owner of the patent, a fee that was his business. Holdings essentially was to be bought out.

The terms of the proposed buyout of FFC USA by Davis were never finally agreed upon. Further, Davis could not raise the necessary money. The drafts were never signed by anyone.

Attached hereto as Exhibit 1 is a true and correct copy of a draft of a Shareholders Agreement and other documents sent to me by Michael Chen & Lee by letter on June 10, 1997. (These documents are also Exhibit 36 on Defendants' Trial Exhibit List filed on January 31, 2001.) It was this clean copy that I instructed Katherine Wong to send to Davis on the same day (June 10, 1997). The copy of the Shareholders Agreement attached to the letter of Michael Chen & Lee has "# DRAFT" typed in the upper right-hand corner of the first page. The first time I ever saw any signature by Davis on the draft Shareholders Agreement, was when it was attached as an Exhibit to a pleading filed by Davis in this case while it was in state court. The pleading was filed on November 1, 1999. The copy attached to the pleading does not have "# DRAFT" in the upper right-hand corner.

Davis was discharged as President and Managing Director of FFC USA on September 8, 1999. Sometime after that date, while reviewing the financial records of FFC USA, I discovered that Davis caused to be issued to Davisco, Inc. three checks, copies of which are attached hereto as Exhibits 2A, 2B and 2C. (These checks are also Exhibits 63, 64 and 65 on Defendants' Trial Exhibit List). These checks each amount to four percent (4%) of the sales price of a particular crawler

FFC
vs.
DAVIS

AFFIDAVIT OF CHEAM TEK SIONG
PAGE 2

crane. Neither I, Mac Ngan Boon, nor any director of FFC USA was aware that Davis had caused these checks to be written. Davis unilaterally withdrew the money from the account of FFC USA, decided the amount of each check, and decided to pay it to Davisco, Inc., an entity unknown to anyone except Davis and which had nothing to do with the patent in issue, the design, manufacture or sale of any crawler crane, or the operation and management of FFC USA.

The business of FFC USA involves the manufacture and sale of cranes other than crawler cranes and the manufacture and sale of parts for and servicing of cranes other than crawler cranes.

Further affiant sayeth not.

_____
Cheam Tek Siong

SWORN TO AND SUBSCRIBED TO BEFORE ME on the _13_ day of February, 2001, to certify which witness my hand and official seal.

DIANE HARGROVE
Notary Public,
State of Texas My
Comm. Exp. 08-03-2002

Notary Public in and for the STATE OF TEXAS
My Commission expires: 8-3-02

---

FFC
vs.
DAVIS

**AFFIDAVIT OF CHEAM TEK SIONG**
**PAGE 3**

李 李 律 師 行

# MICHAEL CHEN & LEE

ADVOCATES & SOLICITORS

5TH FLOOR, BANGUNAN BANGKOK BANK,
NO. 105, JALAN TUN H. S. LEE,
50000 KUALA LUMPUR.
TEL: 03-2328424 (8 LINES)

FAX: 03-2302832

| PARTNERS | ASSISTANTS | |
|---|---|---|
| DATO MICHAEL CHEN | WINSTON CHEN E-MENG | REBECCA T. H. LIAN |
| Y.M. CHIN (MISS) | FRANCIS S. W. NG | LIM FANG SIN |
| GAN SUAT KHIM (MISS) | ARTHUR M. W. WANG | KUAN WAI YIN |
| | LEE KEAN KHEY | KUTBUDDIN BIN ASGAR ALI |
| | PAULINE LEE AI LEEN | AU SENG HENG |

Our Ref: 9720980 (WEM)
Your Ref:

10th June 1997

Favelle Favco Cranes (M) Sdn Bhd
No 9 Ground Floor,
Jalan SS 15/4,
47500 Subang Jaya,
Selangor Darul Ehsan.


Attention: Mr Cheam


Dear Sirs

Re: Shareholders Agreement
_____

Please find enclosed herewith the following draft documents
for your perusal:-

1.    Shareholders Agreement;

2.    Loan Agreement;

3.    Memorandum of Deposit; and

4.    Power of Attorney.

Kindly be reminded that the abovementioned documents would
need to be reviewed by US lawyers (in particular, Texas
Lawyers).

Regards,

_Michael Chen & Lee_

WC/il
encs

EXHIBIT 1

DEFENDANT EXHIBIT 36

## SHAREHOLDERS' AGREEMENT                    # DRAFT

THIS AGREEMENT is made the ..... day of ..... 19.. Between:-

1.   **FAVELLE FAVCO CRANES (M) SDN. BHD.**, a company incorporated in Malaysia with its registered office at ..... ("the First Party") of the one part; and

2.   **DANIEL E. DAVIS]** (Passport No. .....) of .... ("the Second Party") of the other part.

IT IS AGREED as follows:-

1.1   The parties hereto shall within .... days from the date of this Agreement form a corporation in the State of Texas, United States of America ("the Company").

1.2   The Constitution of the Company shall be in the form and content of the draft annexed hereto and initialled by the parties for the purposes of identification. In the event of a conflict between the provisions of this Agreement and the Constitution of the Company, the provisions of this Agreement shall prevail and the parties shall cause the necessary amendments to be made to the Constitution.

1.3   The Company shall have an initial authorised share capital of United States Dollars Three Million (US$3,000,000/-) divided into 3,000,000 ordinary shares of the par value of United States Dollars One (US$1) per share. The initial issued and paid up capital of the Company shall be United States Dollars Five Hundred Thousand (US$500,000/-).

1.4   Unless otherwise varied by written agreement, the issued and paid up capital of the Company shall be held by the parties in the following proportions:

The First Party 90 %

The Second Party 10 %

1.5   If the Second Party is desirous of disposing any or all of his shares, the First Party hereby agrees to take up the said shares within thirty (30) days of being so notified by the Second Party. If the First Party is desirous of disposing any or all of his shares, it must first make the offer to the Second Party and if the Second Party does not take up all or any of the said shares within thirty (30) days of being so offered, then the First Party may sell them to a third party and in any event in accordance with the terms of the Company's Constitution PROVIDED that if the First Party is desirous of disposing more than 50% of its total shareholdings in the Company it may not sell them to a third party unless the third party also make an offer to the Second Party to purchase all his shares. The parties hereto hereby agree that the purchase price for

the sale and purchase of shares pursuant to this Clause 1.5 shall be determined in accordance with Clause 6.4.2.

1.6   Any party will have a right of pre-emption in case any shares are issued whether from the unissued authorised capital or from any increase in the authorised capital.

2.1   The composition of the board of directors of the Company ("Board") shall be as follows:

The First Party .....

The Second Party .....

2.2   All resolutions of the Board shall be approved by a simple majority of the Board.

3.1   All matters raised at a meeting of the Company shall, unless otherwise required by the laws of the State of Texas, be decided by a simple majority of the shareholders present at the meeting.

4.1   The parties hereto agree that unless otherwise varied in writing, the business of the Company shall be restricted and confined to the following:-

(a)   sales and marketing arm for Favelle Favco Cranes (M) Sdn. Bhd. ("FFC") in the United States of America, Mexico, Central and South America;

(b)   buy parts and materials for FFC and arrange for the shipping thereof to Malaysia or such other location as designated by FFC;

(c)   if requested by FFC, buy used crawler cranes and or foundation equipment for Asia and or the Middle East;

(d)   quote manitex offshore spare parts and establish parts supplier in the United States of America;

(e)   quote new manitex offshore pedestal cranes;

(f)   fabricate towers and booms and Kroll tower cranes for FFC;

(g)   sell the whole of the West Manitowoc cranes in Mexico, central and south America; and

(h)   finalise, conceptualise, design and manufacture Excavator Upper and Variable Gauge Lower for the manufacture of Lattice and Box Boom Crawler Crane.

5.1   The Second Party hereby agrees with the First Party that he shall not, during the subsistence of this Agreement and for a period of three years after the determination of this Agreement for

27

whatever reasons, directly or indirectly enter into any agreement, arrangement, partnership or otherwise in competition with the business carried on or proposed to be carried on by the Company unless the termination of this Agreement is pursuant to Clauses 5.2.2 or 6.3.

6.1   This Agreement shall continue in full force and effect until terminated in accordance with the provisions of this clause.

6.2   Either of the parties to this Agreement shall be entitled to terminate this Agreement immediately by notice in writing to the defaulting party ("Defaulting Shareholder(s)") if any of the events set out below shall occur. The said events are:-

   6.2.1   If the Defaulting Shareholder(s) shall commit any material breach of any of its obligations under this Agreement and shall fail to remedy such breach (if capable of remedy) within fourteen (14) days after being given notice by the other parties hereto so to do; or

   6.2.2   If one or more parties hereto (being a Company) shall go into liquidation whether compulsory or voluntary (except for the purposes of a bona fide reconstruction or amalgamation with the consent of the other parties hereto such consents not to be unreasonably withheld) or if one or more of the parties hereto shall have an administrator appointed or if a receiver administrative receiver or manager shall be appointed over any part of the assets or undertakings of that party or if a petition shall be presented or an order made for the appointment of a trustee in bankruptcy; or

   6.2.3   If one (1) party acquires all the shares of the Company.

6.3   This Agreement shall terminate immediately if an effective resolution is passed to wind up the Company or if a liquidator is otherwise appointed (but without prejudice to any rights of the parties hereto may have against the other party prior to such termination).

6.4.1   If either of the parties hereto shall serve a valid notice of termination under Clause 6.2 that party ("the Terminator(s)") shall be entitled by that notice to require the Defaulting Shareholder(s) ("the Terminatee(s)") either to purchase all (but not some only) of his or its shares in the Company of the Terminator(s) or to sell to the Terminator all (but not some only) of the shares of the Terminatee(s) in the Company in either case at a price determined in accordance with the provisions of Clause 6.4.2. Upon exercise of any such right by the Terminator(s) it and the Terminatee(s) shall become bound respectively to sell or purchase on the terms set out below. If in a valid termination notice to such power of sale or purchase is exercised by the Terminator(s) the parties shall procure that the Company shall be immediately wound up.

6.4.2    The purchase price of the shares to be bought and sold pursuant to Clauses 6.4.1 and 1.5 shall be their fair value as agreed between the parties to such sale and purchase or in default of agreement within fourteen (14) days after the service of the notice of termination such sum shall be certified (at the request of either such parties) by the auditors for the time being of the Company to be the fair value of such share on the date when the termination notice was served. In so certifying the auditors are irrevocably instructed to value the ordinary shares to be bought and sold as the same proportion of the market value of the Company as a whole on that date as the relevant ordinary shareholding bears to the whole issued ordinary share capital of the Company on that date but otherwise they shall take into accounts all such circumstances as shall seem to them relevant.  In so acting such auditors are instructed to act as experts and not as arbitrators and their decision shall (save in respect of manifest error) be final and binding on the parties to such sale and purchase for all purposes and their costs shall be borne in equal shares by such parties.

6.4.3    Completion of the sale and purchase of shares pursuant to the provisions of Clause 6.4.1 shall take place at the registered office of the Company on the 3rd business day after the price payable for such shares has been agreed or determined in accordance with the provisions of Clause 6.4.2 (or such other time and/or place in respect of which the provisions of 6.4.4, 6.4.5, 6.4.6 and 6.4.7 shall then have effect).

6.4.4    At any completion of the sale and purchase of shares pursuant to Clause 6 in return for bankers draft drawn on a United States clearing bank (or such other means of payment which is agreed by the seller) for the full amount of the purchase money for the shares being bought and sold and such other amounts as are referred to in Clause 6.4.5 the seller shall deliver to the purchaser duly executed share transfers for the shares being sold in favour of the purchaser or as it may direct together with the relevant share certificate(s).

6.4.5    The parties hereto shall exercise all voting and other rights available to them to ensure the implementation of the preceding provision of this clause and that any provisions contained in the articles of association of the Company restricting transfers of shares shall be waived or suspended to allow such sales and purchases to proceed as provided above and the shareholders shall procure the registration of any transfer of any shares in the Company pursuant to this Agreement accordingly.

7.1 The First Party shall for a period of three years from the date of this Agreement pay to the Second Party a royalty fee of 1% of the sale price for the sale of each crane manufactured or assembled pursuant to the Second Party's patented invention, namely, the Excavator Upper and Variable Guage Lower for the making of a Latice and Box Boom Crawler Crane, and whether or not the sale took place before or after the termination of this Agreement.

4/

8.1 This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, United States of America and the parties expressly submit to the non-exclusive jurisdiction of the courts of that country.

**IN WITNESS WHEREOF** the parties hereto have hereunto caused their respective duly authorised representatives to set their hands the day and year first above written.

```
SIGNED by              )
for and on behalf of   )
FAVELLE FAVCO CRANES   )
(M) SDN. BHD. in the   )
presence of:           )
```

```
SIGNED by the said     )
DANNIEL E. DAVIS       )
in the presence        )
of:-                   )
```

**THIS AGREEMENT** is made the ..... day of ..... 19.. Between:-

1.   FAVELLE FAVCO CRANES (M) SDN. BHD., a company incorporated in Malaysia with its registered office at ..... ("the Lender") of the one part; and

2.   DANIEL E. DAVIS] (Passport No. .....) of .... ("the Borrower") of the other part.

WHEREAS :

(A)   The Borrower is desirous of subscribing for ..... ordinary shares of USS.../- (hereinafter referred to as "the said Shares") in the issued share capital of ....., a company incorporated in the State of Texas, United States of America with its registered office at ..... (hereinafter referred to as "the Company") at a total subscription price of United States Dollars ..... (USS.....) only.

(B)   At the request of the Borrower, the Lender has agreed to grant to the Borrower a loan of United States Dollars ..... (USS.....) only to assist the Borrower in subscribing for the said Shares.

NOW THEREFORE the parties agree as follows:

1.   **THE AMOUNT OF LOAN**

1.1   The Lender hereby agrees to lend to the Borrower United States Dollars ..... (USS.....) (hereinafter referred to as "the Loan") upon the security, terms and conditions hereinafter contained. The Loan shall be disbursed and paid directly to the Company upon being so notified by the Borrower.

2.   **INTEREST**

2.1   The Loan shall be interest free.

3.   **REPAYMENT**

3.1   Subject as hereinafter provided the Borrower shall repay the Loan within ..... from the date of disbursement of the same.

4.   **SECURITY**

4.1   In order to secure the due and punctual payment of the Loan, the Borrower agrees to charge all of the said Shares to the Lender and therefore agrees to execute the following documents ("Security Documents") simultaneously with the execution of this Agreement:-

(a)   Memorandum of Deposit

(b)   Power of Attorney

(c)   and other documents as the Lender may from time to time request to perfect his security hereunder.

4.2   The foregoing Security Documents and the promises and obligations of the Borrower and rights of the Lender contained therein shall constitute an integral and principal part of this Agreement and shall not be terminated or cancelled by whatever reason until the Loan has been fully paid pursuant to Clause 3 hereof.

5.    REPRESENTATIONS AND WARRANTIES

5.1    The Borrower hereby represents and warrants that he is a ..... citizen holding Passport No...... and that he shall be the legal and beneficial owner of the said Shares.

6.    TAXES

6.1    The ..... shall bear and promptly pay all present or future taxes, fees, charges or duties assessed or imposed by the Government of the State of Texas, United States of America or by any other government or taxing authority levied, assessed or payable with respect to the execution or performance of this Agreement, or any agreement referred to herein, and the payment of the indebtedness. In the event the Borrower is required to withhold any taxes from payments due hereunder, then:

(i)    the Borrower shall pay such taxes on behalf of the Lender or reimburse the Lender the amount thereof plus any amount required to be withheld as a consequence of such payment or reimbursements; or

(ii)    the amount of such payment due shall be increased so that the Lender receives the amount that it would have otherwise received had such taxes not been withheld. The Borrower shall promptly provide the Lender with official receipts or other evidence satisfactory to the Lender establishing payment of such taxes.

7.    EVENTS OF DEFAULT

7.1    Upon the occurrence of any of the following events (each of such events being hereinafter individually referred to as an "Event of Default"):-'

(a)    failure by the Borrower to pay the Loan upon demand for repayment of the Loan being made by the Lender;

(b)    failure by the Borrower to perform or breach by the Borrower of any obligation hereunder or under any of the Security Documents or any other agreement referred to herein, which failure has not been corrected within fourteen (14) days;

(c)    should any of the representations, warranties or covenants contained herein or in any certificate required to be provided hereunder or pursuant to any agreement referred to herein be or be shown to be untrue, inaccurate or misleading;

(d)    should the Borrower no longer be eligible to own the Shares;

(e)    a finding by any court or other government agency that any of the Security Documents-are null and void or otherwise unenforceable;

(f)    the Borrower committing any act of bankruptcy or the filing of any petition against the Borrower for bankruptcy, and the Borrower failing to have any such petition filed by any other party discharged within thirty (30) days from the date of filing (or such longer period acceptable to the Lender);

(g)    the Borrower applying for or consenting to the appointment of a receiver or trustee for bankruptcy, admitting in writing its inability to pay its debts; or the entering of any court order or judgement confirming the bankruptcy or insolvency of the Borrower, or upon death or incapacity of the Borrower; or

(h)    if in the Lender's sole opinion the Borrower is not capable of performing any of its obligations under this Agreement or any Security Document;

then immediately upon any such Event of Default the Loan shall become due and payable and the Lender may take whatever action it deems necessary pursuant to this Agreement, the Security Documents or any other agreement or document referred to herein or therein or in accordance with applicable laws and regulations, to secure the payment of the Loan.

8.    **GENERAL**

8.1    (a)    **Assignment**

The Borrower shall not be entitled to assign its rights or obligations hereunder, except with the prior written consent of the Lender.

(b)    **Cost and Expenses**

The ...... agrees to pay any and all expenses (including legal fees and stamp duty) incidental to the execution and enforcement of any of the provisions of this Agreement or any of the Security Documents or any other agreement referred to herein or therein.

(c)    **Changes, amendments, modifications**

Any changes, amendments or modifications to this Agreement shall be valid only if agreed in writing and signed by both parties hereto.

(d)    **Severability**

If one or more of the provisions hereof shall be invalid, illegal or unenforceable in any respect under any applicable law or decision, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected or impaired in any way. The Borrower shall in any such event execute such additional documents as the Lender may request in order to give effect to such invalid, illegal or unenforceable provision hereof.

(e)    **Notices**

(aa)    All notices and/or communications to either party under the terms of this Agreement shall be in writing and addressed to their addressee at their address stated herein or such addresses as the parties may specify from time to time by written notice.

Notice and/or Communication may be in any of the following manners and shall be deemed to have been received as follows:-

If by personal delivery, when delivered.

If by post, seven (7) days after posting, postage prepaid.

If by fax, when sent provided that a copy of the notice sent by fax shall be immediately posted to the addressee of the notice sent by fax.

3/V

(f)     **Governing Law and Jurisdiction**

This Agreement and the performance hereof shall be governed by the laws of the State of Texas, United States of America and the parties hereto submit to the non-exclusive jurisdiction of the Courts of that country.

IN WITNESS WHEREOF the parties hereto have hereunto set their hands the day and year first above written.

To    :    **FAVELLE FAVCO CRANES (M) SDN. BHD.**
           [address]


1.   I, **DANIEL E. DAVIS** (Passport No......) of ..... have this
..... day of ....., 199.. deposited with and charged to **FAVELLE
FAVCO CRANES (M) SDN. BHD.**, a company incorporated in Malaysia
and having its registered address at ..... (hereinafter referred
to as "the Lender") the securities mentioned in the Schedule
hereto (hereinafter referred to as "the charged securities") to
be retained by the Lender as security for payment to the Lender
on demand of all sums of monies (whether principal, interest,
fees or otherwise) whatsoever which are or any time may be or
become due or owing to the Lender from me under or in connection
with the Loan Agreement dated the ..... th day of ..... 199..
entered into between the Lender and me (hereinafter referred to
as "the Loan Agreement") for the grant of a Loan of an amount in
United States Dollars ..... (US$..... ), as set out in the Loan
Agreement.


2.   The charge hereby created shall affect and the charged
securities subject hereto shall include in addition to the
securities mentioned in the Schedule hereto any securities
substituted therefor and or additional thereto and all dividends
or interest paid or payable after the date hereof and all shares
(and the dividends or interest thereon) rights, monies or
property accruing or offered at any time by way of redemption,
bonus preference, option or otherwise to or in respect of any
securities hereby charged.


3.   If any monies hereby secured shall not be duly paid by me
on demand the Lender may forthwith without notice to me sell,
assign, transfer or otherwise dispose of the charged securities
or any of them at such price and upon such conditions and to such
persons as the Lender in its absolute discretion may think fit
and may apply the net proceeds in or towards the discharge of the

¹/₇

Case 1:00-cv-00003   Document 61   Filed in TXSD on 02/15/2001   Page 36 of 47

costs incurred thereon and of the monies hereby secured and the residue (if any) shall be paid to me or to any other person legally entitled thereto.

4.    Any dividends, interest or other payments which may be received or receivable by the Lender in respect of the charged securities may be retained by it and held in suspense for so long as the Lender thinks fit and shall be utilised by the Lender towards discharge of any money or liabilities due or incurred by me to the Lender.  Notwithstanding any such payment, in the event of any proceedings in or analogous to bankruptcy, liquidation, composition or arrangement being brought against me, the Lender may prove for and agree to accept any dividend or composition in respect of the whole or part of such money and liabilities in the same manner as if this security had not been created.  If I shall fail to pay further secure or satisfy to the Lender on demand any money or liability hereby secured they may be applied by it as though they were proceeds of sale hereunder.

5.    Immediately upon the execution of this Memorandum of Deposit and at any time or times hereafter prior to the discharge of all the moneys hereby secured the Lender may without notice to me register all charged securities held by the Lender in the Lender's name or in the name of its nominee or nominees.  I or my successors-in-title will upon demand and at my or their own cost execute and undertake to do all such transfers, assurances and things for assuring and vesting the full legal title to the charged securities or any of them to and in the Lender's name or that of its nominees or any purchaser.

6.    I declare that I have and shall have a good title to the charged securities and a good right to deposit with and/or transfer the charged securities to the Lender or its nominees and the Lender or its nominees may exercise at the Lender's discretion (in our name or otherwise) at any time whether before or after any demand for payment hereunder and without any further

- 3 -

consent or authority on my part in respect of any of the charged securities and all the powers given to a trustee in respect of securities or property subject to a trust and any powers or rights which may be exercised by the person or persons in whose name or names the securities are registered under the terms thereof or otherwise.

7.   Without prejudice to the rights and obligations hereby created any dividends, interests or other monies payable in respect of the charged securities which may be received by me after the power of sale hereunder has arisen shall be held in trust for the Lender and paid over to it on demand.

8.   This security shall not be considered as satisfied by any conditional payment or satisfaction of the whole or any part of any sum or sums of money owing as aforesaid or by any payment made to be held in suspense but shall be a continuing security and extend to cover all or any sum or sums of money which shall for the time being constitute the balance due from me to the Lender on any account or otherwise as hereinbefore mentioned.

9.   It shall be lawful for the Lender at any time or times hereafter during the continuance of this security without any notice to or any further consent or concurrence by me to sell, realise the charged securities or any of them in such manner and upon such terms and conditions generally as they shall think fit and to apply the net proceeds of any such sale in or towards the discharge of the moneys hereby secured.  The Lender shall not be responsible for any loss from or through any brokers or others employed in the sale of the charged securities or for any loss or depreciation in value of any of such charged securities arising from or through any cause whatsoever.

10.  This security shall be in addition to and shall not be in any way prejudiced or affected by any collateral or other security now or hereafter held by the Lender for all or any part

- 4 -

of the moneys hereby secured nor shall such collateral or other security or any lien to which the Lender may be otherwise entitled (including any security, charge or lien prior to the date of these presents on the charged securities) or the liability of any person or persons not parties hereto for all or any part of the moneys hereby secured be in any way prejudiced or affected by this security. The Lender shall have full power at their discretion to give time for payment to any such other person or persons without prejudice to my liability hereunder. All moneys received by the Lender from me or any person or persons liable to pay the same may be applied by the Lender to any account or item of account or any transaction to which the same may be applicable.

11.  The security hereby created shall not be discharged or in any way affected by:-

(i)  any time, indulgence, waiver or consent at any time given or settlement with any other guarantor or any other person;

(ii) any amendment to any provision of the Loan Agreement or to any other security, guarantee or indemnity;

(iii) the making or absence of any demand on any guarantor or any other person for payment;

(iv) the enforcement or absence of enforcement of the Loan Agreement, any other security, guarantee or indemnity;

(v)  the release of, exchange, modification or abstaining from perfecting or enforcing any security, guarantee or indemnity;

(vi) a bankruptcy, petition or order being made against me; or

- 5 -

(vii)     the illegality, invalidity or unenforceability of or any defect in any provision of the Loan Agreement, any other security, guarantee or indemnity or any of the obligations of any party thereunder.

12.  The security hereby created shall not be affected by any failure by the Lender to take any security or by any invalidity of any security taken or by any existing or future agreement by it as to the application of any advances made or to be made to me or by the availability to and the use by me of any grounds of defence enabling me to rebut or deny any liability to the Lender whether on the basis of fact or law.

13.  I hereby represent to the Lender that the mortgaged securities are legally and beneficially owned by me and are fully paid-up and that I shall not withdraw the mortgaged securities and I have not and shall not mortgage, charge, pledge or otherwise encumber or assign, transfer or otherwise deal with or grant or allow to arise any third party rights over or against the whole or any part thereof, or purport so to do without the prior consent of the Lender.

14.  I and my successors-in-title during the continuance of this security will pay all calls or other payments due in respect of any of the charged securities and in the event of default the Lender may if it thinks fit make such payments on my behalf.  Any sums so paid by the Lender shall be repayable by me or my successors-in-title and pending such repayment shall be a charge on the securities subject hereto.

15.  A certificate by an officer of the Lender as to the money and liabilities for the time being due or incurred to the Lender from or by me or any judgment obtained against or admission by me of any sum owing pursuant to the Loan Agreement shall, in the absence of manifest error, be conclusive evidence against me in any legal proceedings.

5/7

- 6 -

16. The security hereby created is in addition to any other guarantee or security given by me or any other third party or parties pursuant to the Loan Agreement now or hereafter.

17. I hereby agree to execute a Power of Attorney in favour the Lender containing such terms and conditions as the Lender may stipulate.

18. All words and expressions defined in the Loan Agreement shall have the same meanings when used herein.

19. This Memorandum shall be governed by and construed in all respects in accordance with the laws of the State of Texas, United States of America and the Borrower hereby submits to the non-exclusive jurisdiction of the Courts of that country.

Dated this          day of                              199   .

```
SIGNED by                    )
DANIEL E. DAVIS              )
(Passport No... )            )
in the presence of:-         )
```

6/7

## SCHEDULE

## LIST OF CHARGED SECURITIES

..... shares in ...... a company incorporated in the State of Texas, United States of America with its registered office at ..... .

7/7

**BY THIS POWER OF ATTORNEY** given on the ..... day of ..... 199.. , I, **DANIEL E. DAVIS** (Passport No......) of ..... (hereinafter referred to as "the Borrower") pursuant to the Memorandum of Deposit dated the ..... day of ..... 199.. (hereinafter referred to as "the Memorandum of Deposit") do hereby irrevocably constitute and appoint **FAVELLE FAVCO CRANES (M) SDN. BHD.**, a company incorporated in Malaysia with its registered office at ....., my Attorney for and on my behalf and in my name or otherwise with the following powers and authorities exercisable in the United States of America:-

1.   To sign, execute and deliver any deed or contract or other document including share transfer forms relating to and where necessary to complete the transfer and registration of the shares that are covered by or subject to the Memorandum of Deposit from time to time (hereinafter referred to as "the said Shares").

2.   To sell, transfer, exchange or otherwise dispose of all or any part of the title to and interest in and any rights attaching to all or any of the said Shares for such consideration (which may comprise or include shares or debentures) and upon such terms and generally in such manner as the Attorney may in its absolute discretion think fit and for this purpose to enter into any contract for such sale or disposition on such terms (including the giving of such warranties and indemnities) and subject to such conditions as the Attorney shall in its absolute discretion think fit.

3.   To receive all dividends including without limitation shares in the form of bonus, dividends or however described (hereinafter referred to as "the Dividends") from time to time paid or to be paid by the Company in respect of the said Shares and to sign and deliver any receipts to the Company for the Dividends as may be required.

4.   To receive or authorise the receipt of the consideration for such sale, transfer, exchange or disposition as is referred to in (2) above for the Attorney's own benefit.

5.   To execute and deliver all and any other or further instrument of transfer and other documents that the Borrower is at any time and from time to time obliged to execute pursuant to the Memorandum of Deposit and to effect all such registration and do all such other things as may be necessary or as may seem to the Attorney advisable in order properly to give effect thereto and to execute all such documents and to do all such other acts and things in relation to all or any stock or shares the subject of any such further or other trust, as the Attorney is by this Deed entitled or empowered to execute or do in relation to the Said Shares.

6.   With full power from time to time and at any time to appoint one or more substitutes to exercise all or any of the rights, powers and authorities hereby conferred on the Attorney on such terms and conditions as the Attorney shall think fit, and to revoke any such appointment, and to delegate to an agent or agents the exercise of any such right, power or authority.

AND the Borrower undertakes to indemnify the Attorney and any substitute or agent of the Attorney acting hereunder against all costs, claims, expenses and liabilities incurred by the Attorney or such substitute or agent in connection with the exercise in good faith of any right, power or authority hereby granted or purported to be granted, and agrees that this Power of Attorney shall be irrevocable until all obligations of the Borrower shall have been discharged.

AND in favour of the Attorney or his substitute or agent hereunder, and any person, firm or company dealing with any of them and the successors and assigns of any of them or any such person, firm or company, all acts done and documents executed or signed by the Attorney or such substitute or agent in the exercise or purported exercise of any power conferred or purported to be conferred by this Deed shall for all purposes be valid and binding on the Borrower and his successors-in-title, personal representatives, administrators and permitted assigns. The Borrower undertakes from time to time and at all times to ratify and confirm whatsoever the Attorney or any duly appointed substitute or agent shall lawfully do or cause to be done in exercise or purported exercise of any of the rights, powers and authorities conferred hereby.

The Deed is governed by and shall be construed in accordance with the laws of the State of Texas, United States of America.

IN WITNESS WHEREOF I the said Borrower have hereunto set my hand and seal this         day of                    199    .

SIGNED, SEALED and DELIVERED        )
by the said DANIEL E. DAVIS         )
(Passport No......)                 )
in the presence of:-                )


Witness my hand.


                                    Advocate & Solicitor

1981

32:115/1110
BRANCH 313

FAVELLE FAVCO CRANES (USA) INC.
P O BOX 3049   PH 956-428-7488
HARLINGEN, TX 78551

DATE 6/7/99

PAY TO THE
ORDER OF   Devices, Inc.                    $ 10,560.00

Ten thousand five hundred sixty and 00/100 —————————— DOLLARS

CHASE   Chase Bank of Texas, N.A.
1814 W. Tyler
Harlingen, TX 78550

FOR _____

⑈00198⑈ ⑉⑈⑈⑈001150⑈ ⑈3130606765⑈

DEFENDANT'S
EXHIBIT
63

EXHIBIT
2A

**FAVELLE FAVCO CRANES (USA) INC.**
P.O. BOX 3045   PH 956-428-7485
HARLINGEN, TX 78551

DATE  6/24/99

PAY TO THE
ORDER OF  Davis Co. Inc                                    $ 10,560.00

Ten thousand & five hundred sixty + 00/100                        DOLLARS

CHASE  Chase Bank of Texas, N.A.
384 W. Tyler
Harlingen, TX 78550

FOR

⑈002022⑈ ⑆11001150⑇ 313060620515⑈

DEFENDANT'S
EXHIBIT
64

EXHIBIT
2B

FAVELLE FAVCO CRANES (USA) INC.
P O BOX 3049  PH 956-428-7188
HARLINGEN, TX 78551

2107

32-115/1110
BRANCH 313

DATE 7/14/99

PAY
TO THE
ORDER OF  Dewco, Inc                                    $ 13,200.00

Thirteen thousand two hundred and 00/100 ———————  DOLLARS

CHASE  Chase Bank of Texas, N.A.
1914 W. Tyler
Harlingen, TX 78550

FOR _____

Shirl F Sullivan

⑅00 2107⑅  ⑈111001150⑈  ⑈3130606 7615⑈

DEFENDANT'S
EXHIBIT
65

EXHIBIT
2C

## Certificate of Service

I certify that on February 15, 2001, a true and correct copy of the foregoing document was sent to all counsel of record, as follows:

| Attorney: | For: | Served by: |
|---|---|---|
| Ernesto Gamez<br>Victor Quintanilla<br>LAW OFFICES OF ERNEST GAMEZ, P.C.<br>777 E. Harrison St.<br>Brownsville, Tx 78520 | plaintiff | hand delivery |

Gary Gurwitz

18