103

United States District Court
Southern District of Texas
FILED

AUG 0 3 2001

Michael N. Milby, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC., and  FAVELLE CRANES | § | |
| (M) SDN BHD | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC. and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT FFC PARTIES' SECOND MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS:**

COME NOW, DANIEL E. DAVIS, DAVISCO INC., and COBURN INTERNATIONAL LTD., Plaintiffs in the above-styled and numbered civil action, and file this their **Response to Defendant FFC Parties' Second Motion for Summary Judgment,** and in support thereof, would show this Honorable Court the following:

# I.

## OBJECTION AND EXCEPTION TO DEFENDANTS' ARGUMENT AND EVIDENCE

1.01    Plaintiffs deny each and every argument made by Defendant FFC Parties in their Second Motion for Summary Judgment and Supporting Memorandum.  Plaintiffs assert that the evidence obtained in discovery conducted to date indicates that reasonable inferences could be drawn from said evidence to establish the existence of genuine issues of material fact which would preclude the granting of Defendant FFC Parties' Second Motion for Summary Judgment.

1.02    Plaintiffs object and except to the evidence Defendants presented in their Second Motion for Summary Judgment and Supporting Memorandum and further contend that there exist genuine issues of material fact and that Defendants FFC Parties are not entitled to judgment as a matter of law against the Plaintiffs.

## II.

## SUMMARY JUDGMENT EVIDENCE

2.01 Plaintiffs rely on the following Summary Judgment evidence in support of their Response to Defendant FFC Parties' Second Motion for Summary Judgment:

(a)    a copy of the **Employment Contract** between Favelle Favco Holdings and Daniel E. Davis, **dated June 23, 1997**, attached hereto as **Exhibit "A"** and incorporated herein by reference the same as if fully copied and set forth at length;

(b)    copies of excerpts from the **Oral and Videotaped Deposition of Daniel E. Davis (Volume I)**, taken on **May 11, 2000**, attached hereto as **Exhibit "B"**, and incorporated herein by reference the same as if fully copied and set forth at length;

(c)    copies of excerpts from the **Oral and Videotaped Deposition of Daniel E. Davis (Volume II)**, taken on **May 12, 2000**, attached hereto as **Exhibit "C"**, and incorporated herein by reference the same as if fully copied and set forth at length;

2

(d)     copies of excerpts from the **Oral Deposition of Cheam Tek Siong,** taken on **July 11, 2000,** attached hereto as **Exhibit "D",** and incorporated herein by reference the same as if fully copied and set forth at length;

(e)     copies of excerpts from the **Oral Deposition of Mac Ngan Boon,** taken on **July 12, 2000,** attached hereto as **Exhibit "E",** and incorporated herein by reference the same as if fully copied and set forth at length;

(f)     copies of excerpts from the **Oral Deposition of Greta Sullivan,** taken on **August 17, 2000,** attached hereto as **Exhibit "F",** and incorporated herein by reference the same as if fully copied and set forth at length;

(g)     the **Affidavit of Daniel E. Davis**, signed on **February 21, 2001**, attached hereto as **Exhibit "G",** and incorporated herein by reference the same as if fully copied and set forth at length;

(h)     a copy of the **Defendants' First Amended Counterclaim,** filed on **November 6, 2000** in the 197th Judicial District Court of Cameron County, Texas, attached hereto as **Exhibit "H",** and incorporated herein by reference the same as if fully copied and set forth at length.  (**NOTE:** This First Amended Counterclaim was filed by the Plaintiffs herein when they were Defendants in the previous state court case.);

(i)     a copy of the **Internal Memorandum** Cheam Tek Siong to Daniel E. Davis, dated **May 12, 1997,** regarding the Shareholders' Agreement, attached hereto as **Exhibit "I",** and incorporated herein by reference the same as if fully copied and set forth at length;

(j)     a copy of the **Facsimile Message** from Katherine Wong to Daniel E. Davis, dated **May 20, 1997,** regarding the Shareholders' Agreement, attached hereto as **Exhibit "J",** and incorporated herein by reference the same as if fully copied and set forth at length;

(k)     a copy of a **letter** from Daniel E. Davis to Mac Ngan Boon, **dated May 28, 1997** regarding the Shareholders' Agreement, attached hereto as **Exhibit "K",** and incorporated herein by reference the same as if fully copied and set forth at length;

(l)     a copy of a **letter** from Michael Chen & Lee, advocates and solicitors, to Cheam Tek Siong c/o Favelle Favco Cranes (M) SDN BHD, regarding the Shareholders' Agreement, **dated June 10, 1997,** attached hereto as **Exhibit "L",** and incorporated herein by reference the same as if fully copied and set forth at length;

3

CVisPDF - www.fasiss.com

(m)     a copy of the **Shareholders' Agreement** between Favelle Favco Cranes (M) SDN BHD and Daniel E. Davis, signed by Daniel E. Davis on **August 16, 1997,** attached hereto as **Exhibit "M"**, and incorporated herein by reference the same as if fully copied and set forth at length;

(n)     the **Affidavit of Willie C. Jones (Bill Jones),** signed on **July 31, 2001,** attached hereto as **Exhibit "N",** and incorporated herein by reference the same as if fully copied and set forth at length;

(o)     the **Affidavit of Joe Conway,** signed on **August 1, 2001,** attached hereto as **Exhibit "O",** and incorporated herein by reference the same as if fully copied and set forth at length;

(p)     a copy of a **letter** from Daniel E. Davis to Mac Ngan Boon, regarding Favelle Favco Cranes USA, Inc., **dated January 20, 1999,** attached hereto as **Exhibit "P",** and incorporated herein by reference the same as if fully copied and set forth at length;

(q)     the **Affidavit of Daniel E. Davis**, signed on **August 3, 2001,** attached hereto as **Exhibit "Q",** and incorporated herein by reference the same as if fully copied and set forth at length; and

(r)     the **Affidavit of Greta L. Sullivan,** signed on **August 3, 2001,** attached hereto as **Exhibit "S",** and incorporated herein by reference the same as if fully copied and set forth at length.

2.02    Pursuant to **Rule 201 of the Federal Rules of Civil Procedure**, Plaintiffs hereby move this Honorable Court to take judicial notice of all pleadings, documents and evidence on file in this civil action.

## III.

## BRIEF BACKGROUND SUMMARY

3.01    Plaintiff Daniel E. Davis (hereinafter referred to as **"Mr. Davis"**) was previously employed as the President and Managing Director of Favelle Favco Cranes USA, Inc. (hereinafter referred to as **"FFC USA"**) at its plant in Harlingen, Cameron County, Texas. (See **Davis Deposition** , Vol. I, **Exhibit "B"**, page 17, lines 4-7; and **Defendants' First Amended**

4

**Counterclaim, Exhibit "H",** pages 4 and 8).  Mr. Davis was employed by FFC USA from on or about **September 4, 1997** through **September 8, 1999.**

3.02    Prior to his employment with FFC USA, Mr. Davis was employed by the Manitowoc Company as an officer and Managing Director. (See **Davis Deposition,** Vol. I, **Exhibit "B",** page 33, lines 5-9).  The period of employment was between 1994 and 1997.  (See **Davis Affidavit, Exhibit "G",** page 2).  The Manitowoc Company was in the business of building ice machines and building cranes and shipbuilding.  (See **Davis Deposition,** Vol. I, **Exhibit "B",** page 33, lines 18-21). At Manitowoc, Mr. Davis was responsible for marketing and selling crawler cranes in Indonesia, Singapore, Thailand, Korea, Vietnam and the whole Southeast Asia area. (See **Davis Affidavit, Exhibit "G",** page 2).

3.03    Mr. Davis and Defendant Favelle Favco Holdings entered into an Employment Contract on **June 23, 1997** by which he was hired as the President and Managing Director of FFC USA, and Mr. Davis agreed to bring to FFC USA a line of new and unique crawler cranes **(i.e. "Davis Crawler Cranes").** (See **Employment Contract, Exhibit "A"; Davis Deposition,** Vol. I, **Exhibit "B",** page 21, lines 7-18; and **Defendants' First Amended Counterclaim, Exhibit "H",** pages 4 and 8).

3.04    The said Employment Contract was for a term of thirty-six (36) months.  (See **Employment Contract, Exhibit "A",** page 1).  The Employment Contract was executed by Mr. Davis, Mac Ngan Boon, as well as Cheam Tek Siong. (See **Employment Contract, Exhibit "A",** page 6; **Davis Deposition,** Vol. I, **Exhibit "B",** page 22, lines 16-25; **Cheam Deposition, Exhibit "D",** page 197, lines 13-16); **Mac Deposition, Exhibit "E",** page 46, lines 5-15, and page 47, lines 1-6); and **Defendants' First Amended Counterclaim, Exhibit "H",** page 8).  Mr. Mac is the

5

Ch&PDF - www.fastio.com

Managing Director of Muhibbah Engineering.  (See **Mac Deposition, Exhibit "E"**, page 14, lines 13-15).  Mr. Cheam is the General Manager of the Favelle Favco Group.  (See **Cheam Deposition, Exhibit "D"**, page 26, lines 7-8, page 66, lines 7-8).

3.05    Pursuant to the Employment Contract, Mr. Davis was to be compensated at a monthly salary of **EIGHT THOUSAND AND NO/100THS DOLLARS ($8,000.00)**, and provided Mr. Davis with a company car, worker's compensation benefits, and a health insurance plan.  (See **Employment Contract, Exhibit "A"**, pages 2, 3, and 4).

3.06    The said Employment Contract contains specific provisions which allow  Defendant Favelle Favco Holdings to terminate it under certain circumstances.  These specific provisions are contained in the section entitled **"Termination by Employer"**.   (See **Employment Contract, Exhibit "A"**, pages 1 and 2).  On the one hand, Defendant Favelle Favco Holdings could terminate the contract if it gave written notice of termination **"for its convenience"**.  (See **Employment Contract, Exhibit "A"**, Section 2(b)(1), page 1).  On the other hand, Defendant Favelle Favco Holdings could terminate the contract by discharging Mr. Davis **"for cause"**.  (See **Employment Contract, Exhibit "A"**, Section 2(b)(2), page 2).

3.07    According to the method of termination, Mr. Davis would  be entitled to certain salary and/or benefits upon termination  of said Employment Contract.  For example, if Defendant Favelle Favco Holdings gave written notice of  termination for its convenience (including medical discharge as provided in Article 10 thereof), Mr. Davis shall be entitled to any accrued salary and home leave, and other benefits which may have accrued prior to the date of termination and, in addition, Defendant Favelle Favco Holdings shall pay cost of return transportation and expenses.  (See **Employment Contract, Exhibit "A"**, Section 2(b)(1), page 1).  If Defendant Favelle Favco

6

Holdings discharged Mr. Davis for cause, Mr. Davis shall be entitled to salary, home leave and other benefits accrued prior to the date of termination and, in addition, Defendant Favelle Favco Holdings shall pay cost of return transportation and expenses as prescribed in Appendix "A". **(See Employment Contract, Exhibit "A"**, Section 2(b)(2), page 2). The Employment Contract defines the term "discharge for cause". (See **Employment Contract, Exhibit "A",** Section 2(b)(2), page 2).

3.08    Plaintiffs contend that on or about **September 8, 1999,** Mr. Davis was terminated from his employment with FFC USA **without cause.** (See **Defendants' First Amended Counterclaim, Exhibit "H",** pages 7 and 8). As a result of said termination, Mr. Davis suffered damages, which include, but are not limited to loss of wages, loss of car allowance, and loss of health insurance coverage. Accordingly, Mr. Davis seeks to recover these said damages from Defendants, jointly and severally. (See **Defendants' First Amended Counterclaim, Exhibit "H"**, page 9; and **Davis Deposition,** Vol. II, **Exhibit "C",** page 43, lines 1-12).

## IV.

## SUMMARY JUDGMENT STANDARD

4.01 Rule 56(c) of the Federal Rule of Civil Procedure requires that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue," the nonmovant must "go beyond the pleadings by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

7

designating 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

4.02 The court's review of the record on summary judgment focuses not on whether "some evidence has been introduced by the party having the burden of proof," but on "whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

4.03 "When the record--taken as a whole--could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue for trial." *Davis v. Chevron*, 14 F.3d 1082, 1084 (5th Cir. 1994) (*citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In deciding whether a genuine issue as to material fact precludes summary judgment, the Court must consider all evidence together with all inferences to be drawn therefrom in light most favorable to the party opposing the motion. *Pierzynowski v. P.D. City of Detroit*, 941 F.Supp 633, 641 (E.D. Mo. 1996).

4.04 Summary Judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). The party making a summary judgement motion has the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings and discovery documents which demonstrate the

8

absence of a genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

*Colson v. Crohman*, 174 F.3d 498, 506 (5th Cir. 1999).  If the moving party meets this burden, the

non-movant then must designate specific facts showing there is a genuine issue of trial to survive

summary judgement.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Little v.*

*Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

4.05    In deciding whether a genuine issue as to material fact precludes summary judgment,

the Court must consider all evidence together with all inferences to be drawn there from in light most

favorable to the party opposing the motion.  Every reasonable inference from the evidence will be

indulged in favor of the non-movant, and any doubts will be resolved in the favor on the non-movant.

*Nixon v. Mr. Property Management Co.*, 690 S.W.2d, 546 548-49 (Tex. 1985).

## V.

## BASIS FOR DEFENDANTS FFC PARTIES' SECOND MOTION FOR SUMMARY JUDGMENT

5.01    The basis for Defendants FFC Parties' Second Motion for Summary Judgment are

two-fold: **(1)** Summary Judgment as to Plaintiffs' breach of employment contract claim is appropriate

since Mr. Davis was discharged for cause; and **(2)** Summary Judgment as to Plaintiffs' fraud in the

inducement of contract claim is appropriate since such claim is inconsistent with the breach of

employment contract claim.  (See Defendant FFC Parties' Second Motion for Summary Judgment

and Supporting Memorandum).

5.02    Plaintiffs hereby respond to the points raised by the Defendants in the order that they

have made them in their Second Motion for Summary Judgment.

# VI.

## THE FFC PARTIES MISSTATE THE LAW BY MIXING THE CONTRACT CLAIMS WITH THE FRAUD CLAIMS WHEN THEY ARE INDEPENDENT CLAIMS

6.01    The FFC Parties misstate the law by mixing the contract claims with the fraud claims when both claims are independent claims.  It is well-established law that an independent legal duty, separate from the existence of any contract, exists for fraud to induce an agreement. *Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41,47 (Tex. 1998); *American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex. 1990). This court's prior rulings are of no effect on the fraud claims because the fraud claims are independent from all the other claims.

6.02    Further, the FFC Parties present **no facts** upon which to base their Second Motion for Summary Judgment for breach of contract, fraud or for tortious interference with contractual relations, the later which Mr. Davis has not elected to abandon as correctly stated in Defendants' Second Motion for Summary Judgment.  Particularly, Defendants rely on Mr. Cheam's statement that "His [Davis'] discharge was for good cause." And that is it, that is the evidence. Without more, such broad statements are without basis in fact. Without more, such broad statements cannot support any motion, summary judgment or contract, because it does not prove or disprove any element of any claim.  The same is true for the short, one or two line deposition questions relied upon by the FFC Parties to support their motion for summary judgment on the claim of fraudulent inducement. There is simply no evidence before the court that would rise to the level of requiring Mr. Davis to step

forward with his evidence. Rather, the FFC Parties are relying on the fact that this court granted summary judgment on the prior claims. And, because the court had done so in the past that casts a shadow on the remaining claims and this court will do the same for the breach of contract, fraud and tortious interference with contractual relations claims. Such analysis is not legally correct.

<p style="text-align:center">VII.</p>

### THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER MR. DAVIS WAS TERMINATED FOR CAUSE

7.01    As mentioned beforehand, on **June 23, 1997,** Mr. Davis signed an Employment Contract with Defendant **Favelle Favco Holdings** to be Managing Director and President of Favelle Favco Cranes USA, Inc. in Harlingen, Texas.  (See Employment Contract, **Exhibit "A"; Davis Deposition,** Vol. I, **Exhibit "B"**, page 21, lines 7-8; and **Defendants' First Amended Counterclaim, Exhibit "H"**, pages 4 and 8 ).  This Employment Contract was drafted by the Defendants, with Mr. Cheam Tek Siong's assistance, by "cut and paste" using a previous sample contract.  (See **Cheam Deposition, Exhibit "D",** page 198, lines 15-18; and **Mac Deposition, Exhibit "E"**, page 46, lines 18-21).  Defendants do not contest the fact the said Employment Contract was entered into between Mr. Davis and Defendant Favelle Favco Holdings on June 23, 1997.  (See **Second Amended Joint Pretrial Order Regarding Breach of Contract and Fraud Issues,** filed on July 20, 2001, page 14, Section 6, item (1)).

7.02    While Defendants argue in their Second Motion for Summary Judgment that Mr. Davis was "not working in the best interest of the company" and such conduct served to terminate him for cause, they conveniently disregard the deposition testimony in this case.    For example, Mr.

<p style="text-align:center">11</p>

Cheam testified in his deposition that Mr. Davis committed the Defendants to the purchase of several Caterpillar units. (See **Cheam Deposition, Exhibit "D"**, page 111, lines 2-7). This was one of the reasons why Mr. Davis was terminated, i.e. for mismanagement. **(See Cheam Deposition, Exhibit "D", page 111, lines 13-17).** The Defendants found out about these comittments to purchase the Caterpillar units in August of 1999. (See **Cheam Deposition, Exhibit "D",** page 114, lines 12-13). Mr. Cheam testified that when the Defendants found out about these said comittments, it was too late to cancel the orders. (See **Cheam Deposition, Exhibit "D",** page 125, lines 9-14; page 128, lines 1-2, and 19-21; and page 130, lines 3-6, and 12-13). However, Mr. Cheam testified that he did not contact Caterpillar to find out whether any of the purchase orders (reflecting 61 Caterpillar units) could be set back or canceled. (See **Cheam Deposition, Exhibit "D",** page 127, lines 6-11; and page 130, lines 17-21).

7.03    The Defendants also conveniently ignore the deposition testimony of Greta Sullivan. Ms. Sullivan is a former employee of the Defendants. She did general accounting for Favco. (See **Sullivan Deposition, Exhibit "F",** page 8, lines 3-5). Ms. Sullivan was responsible for accounts payable, accounts receivable, payroll, and general ledger. (See **Sullivan Deposition, Exhibit "F",** page 10, lines 10-14). As to the purchase orders involving Caterpillar, Ms. Sullivan testified that as long as Mr. Yee (second in command to Mr. Davis at FFC USA) was on the premises, she was sure that at least a representative from Malaysia was aware of the Caterpillar orders. (See **Sullivan Deposition, Exhibit "F",** page 48, lines 20-23). Ms. Sullivan further testified that she did not believe that either Mr. Cheam or Mr. Mac did not know about the Caterpillar purchase orders. (See **Sullivan Deposition, Exhibit "F",** page 51, lines 12-18).

CVisPDF - www.cvisiontech.com

7.04    Plaintiffs contend that since the Defendants never confirmed whether the purchase orders could not be set back or canceled, the Defendants did not have any grounds to discharge or terminate Mr. Davis for cause, i.e. for "not working in the best interest of the company". As such, Plaintiffs contend that Defendants' argument or assertion that Mr. Davis was discharged for cause must fail.   In the alternative, Plaintiffs contend that the determination of whether Mr. Davis was discharged or terminated for cause presents a genuine issue of material fact for the trier of fact or jury to resolve.

<div align="center">

**VIII.**

</div>

<div align="center">

**THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE DEFENDANTS ENGAGED IN FRAUD IN THE INDUCEMENT**

</div>

8.01    Plaintiffs contend in their pleadings that at the time fo the signing of the Employment Contract, the Defendants knowingly made false representations as to material facts or knowingly concealed all or part of material information from Plaintiffs with the intent of inducing Mr. Davis to enter and/or sign said Employment Contract.  (See **Defendants' First Amended Counterclaim, Exhibit "H",** Section 3.23, page 16).  Plaintiffs further contend that the Defendants knew the representations made to Mr. Davis were false when they made them or made them recklessly without any knowledge of their truth and as positive assertions. (See **Defendants' First Amended Counterclaim, Exhibit "H",** Section 3.23, page 16).  Plaintiffs further contend that the Defendants, by and through their agents, employees, and/or representations, made said representations with the intention that they be acted upon by Plaintiffs, including Mr. Davis.  Mr. Davis did, in fact, act and signed the said Employment Contract in reliance upon Defendants' representations.   (See **Defendants' First Amended Counterclaim, Exhibit "H",** Section 3.23, page 16).

<div align="center">

13

</div>

8.02    In their pleadings, Plaintiffs further contend that the Defendants made the following representations or knowingly concealed the following information, including, but not limited to:

    (1)    Mr. Davis was to be employed as Managing Director and President of FFC USA;

    (2)    Mr. Davis was to be paid his salary, home leave benefits, and other benefits accrued if he was discharged for cause;

    (3)    Mr. Davis would have a ten percent (10%) ownership in FFCUSA;

    (4)    Mr. Davis would receive a royalty fee of one percent (1%) of the sale price for the sale of each crane manufactured or assembled pursuant to his patented invention, namely, the Excavator Upper and Variable Gauge Lower for the making of a lattice and box boom Crawler Crane, and whether or not the sale took place before or after the termination of the Shareholders' Agreement;

    (5)    Mr. Davis would be acknowledged as the inventor of and owner of the trade secrets to the Davis Crawler Cranes; and

    (6)    Mr. Davis would be acknowledged as the owner of all technology and drawings associated with the Davis Crawler Cranes.

(See **Defendants' First Amended Counterclaim, Exhibit "H"**, Section 3.24, pages 16 and 17).

## IV.

## THE FFC PARTIES FRAUDULANTLY INDUCED DAVIS TO ENTER THE EMPLOYMENT CONTRACT AND TO COME TO WORK WITH FFC USA

### A. THE LAW

9.01    A fraud cause of action requires "[1] a material misrepresentation, [2] which was false, [3] and which was either known to be false when made or was asserted without knowledge of its truth, [4] which was intended to be acted upon, [5] which was relied upon, and [6] which

caused injury." *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990), *cert. denied*, 498 U.S. 1048, 112 L. Ed. 2d 775, 111 S. Ct. 755 (1991). A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Schindler v. Austwell Farmers Coop.*, 841 S.W.2d 853, 854 (Tex. 1992). The FFC Parties made representations with the intent to deceive Mr. Davis and with no intention of performing as represented. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *Stanfield*, 462 S.W.2d at 272; *see also T.O. Stanley Boot Co.*, 847 S.W.2d at 222; *Crim Truck & Tractor*, 823 S.W.2d at 597. Moreover, the evidence is relevant to the FFC Parties' intent at the time the representations were made. *Spoljaric*, 708 S.W.2d at 434.

## B. THE FACTS

9.02    Prior to May 1997, the FFC Parties and Mr. Davis agreed to create FFC USA, owned 90% by the former and 10% by the later. (See **Davis Affidavit, Exhibit "G"**, page 3). The oral agreement provided that the FFC Parties would put $3,000,000.00 into FFC USA. (See **Davis Affidavit, Exhibit "G"** and **Shareholders' Agreement, Exhibit "M"**, page 1), and Mr. Davis would put $60,000 into FFC USA and bring the crawler cranes (See **Davis Affidavit, Exhibit "G"**) which he had already developed and engineered, but had not built. (See **Conway Affidavit, Exhibit "O"**). Mr. Davis was to retain ownership of any patents, and would license the Davis crawler crane designs to FFC USA for a nominal royalty of 1% for the first 3 years as an incentive for FFC USA to pay for building the crawler cranes Davis had already designed and engineered. (See **Davis Affidavit, Exhibit "G"** and **Shareholders' Agreement, Exhibit "M"**, page 1)

9.03    On May 12, 1997, Mr. Cheam faxed to Mr. Davis stating that the Shareholders Agreement was being prepared as previously agreed to between Davis and the FFC Parties. (See **Internal Memorandum, Exhibit "I"**). On May 20, 1997, Ms. Katerine Wong faxed to Mr. Davis the Shareholders Agreement which was prepared by the FFC Parties. (See **Facsimile Message, Exhibit "J"**). On May 28, 1997, Davis wrote Mac a letter changing some of the terms of the Shareholders Agreement. (See **May 28, 1997 letter, Exhibit "K"**). For example, some of

Davis' changes provided that the FFC Parties would capitalize or "be paid by you [the FFC Parties]" to FFC USA $3,000,000 to be sure the company has sufficient money to operate (See **May 28, 1997 letter, Exhibit "K"**) and Mr. Davis was to retain ownership of the patents, and would license the Davis crawler crane designs to FFC USA for a nominal royalty of 1% for the first 3 years as an incentive for FFC USA to pay for the building of the first crawler cranes built under the Davis design and engineering.(See **Davis Affidavit, Exhibit "G"; May 28, 1997 letter, Exhibit "K"**; and **Shareholders' Agreement, Exhibit "M", page 1**). On June 10, 1997, the attorneys for the FFC Parties sent a Shareholders' Agreement to Mr. Davis incorporating the changes requested by Davis. (See **June 10, 1997 letter, Exhibit "L"**). Relying on Mr. Mac having reviewed the Shareholders' Agreement, Mr. Cheam having reviewed the Shareholders' Agreement, and now the FFC Parties' lawyers sending him the Shareholders' Agreement incorporating his requested changes, Mr. Davis signed the Employment Contract on June 23, 1997. (See **Employment Contract, Exhibit "A"**). On August 16, 1997, Davis signed the Shareholders Agreement prepared by the FFC lawyers and sent it to the FFC Parties. (See **Shareholders' Agreement, Exhibit "M"**). On many occasions, Davis requested a copy of the executed Shareholders' Agreement. (See **Davis Affidavit (2), Exhibit "Q"**). Mr. Davis was never told there was a problem with the Shareholders' Agreement, but rather it was coming, not to worry, we have a deal, etc. (See **Davis Affidavit (2), Exhibit "Q"**). On January 20, 1999, Mr. Davis wrote Mr. Mac a letter clarifying the agreement that they had made and his reliance on the representations in the Shareholders' Agreement. (See **January 20, 1999 letter, Exhibit "P"**). Even though the Shareholders' Agreement was prepared by the FFC Parties, reviewed by Mr. Cheam, reviewed by Mr. Mac, rewritten by FFC lawyers, changed to include funding requirements ($3,000,000.00) and that Mr. Davis would retain ownership of his crane designs and engineering, and that FFC Parties would license the designs from Mr. Davis, the FFC Parties never signed their own Shareholders' Agreement. Further, the FFC Parties sought to take the patent rights they knew to be Mr. Davis'. (See **June 10, 1997 letter, Exhibit "L"**). Even as late as several months before Mr. Davis was fired, the FFC Parties were instructing their attorney Dennis Sanchez to prepare a document that would sell the FFC USA company to Mr. Davis. The sale document expressly stated that Davis was the owner of the patent. And, there were 11 drafts

16

of the sale document with all 11 drafts expressly acknowledging that Davis owned the patent. Even more amazing, Sanchez, Davis and Mac discussed that the patent was Davis'. **(Davis Affidavit (2), Exhibit "Q")**. Mac knew that the patent was Davis' from the beginning, and continued to know it, and admit it, until shortly before firing Davis. *Id.*

9.04    Further, within months after FFC USA was formed, the FFC Parties refused to fund the company as they had agreed. (See **Shareholders' Agreement, Exhibit "M"; Sullivan Affidavit, Exhibit "S" and Davis Affidavit (2), Exhibit "Q"**). The total lack of financial support by the FFC Parties required Davis to take money out of his own pocket to make payroll for FFC USA on several occasions.  (See **Sullivan Affidavit, Exhibit "S"  and Davis Affidavit (2), Exhibit "Q"**). However, the FFC Parties did do enough to coerce Davis into their intentional, premeditated scheme. They allowed Davis to purchase 10% of the company, they made Davis Managing Director, they started the company and opened a facility. But, the FFC Parties never allowed FFC USA to prosper because they refused to timely pay vendors. Eventually, FFC USA was on a "COD basis" with its vendors and its business was essentially stymied. (See **Sullivan Affidavit, Exhibit "S"**). Davis was spending a significant part of his time pacifying vendors that demanded payment. (See **Davis Affidavit (2), Exhibit "Q"**).

9.05    Amazingly, as soon as Mr. Davis was discharged and/or terminated, the FFC Parties had enough money to pay vendors, hire salesmen, etc. (See **Sullivan Affidavit, Exhibit "S"**).

## ANALYSIS

9.06    A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act. *Stanfield v. O'Boyle*, 462 S.W.2d 270, 272 (Tex.1971); *Turner v. Biscoe*, 141 Tex. 197, 199, 171 S.W.2d 118, 119 (Tex. Comm'n App. 1943, opinion adopted).  Mr. Mac reviewed the Shareholders' Agreement at Mr. Davis' request, Cheam reviewed the Shareholders Agreement at Mr. Davis' request, and then the FFC Parties' lawyers sent the Shareholders Agreement to Mr. Davis incorporating his requested changes. (See **Employment Contract, Exhibit "A"**). The FFC

17

Parties promised to do the things listed in the Shareholders' Agreement, but those promises were made with the intention, design and purpose of deceiving, and with no intention of performing the acts listed in the Shareholders' Agreement. The FFC Parties did do enough to deceive Mr. Davis into their intentional, premediatated scheme. The FFC Parties never intended to support FFC USA while Mr. Davis was in charge. Rather, the FFC Parties intended, even before Mr. Davis signed the Employment Contract, to use their superior economic position to place Mr. Davis in a weak financial situation so they could string Mr. Davis along and force him to give up his crawler crane designs that he had conceived and engineered. The FFC Parties intentional, premediatated scheme was to usurp Mr. Davis' crawler crane design, and to claim it for their own.

9.07    Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony. *See Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41,47 (Tex. 1998); *Benoit v. Wilson,* 150 Tex. 273, 281, 239 S.W.2d 792, 796-797 (1951). Regardless of the evidence presented, the element of intent must be tried to the jury. Intent is "uniquely" within the realm of the jury, and not appropriate for this court to make.

9.08    While a party's intent is determined at the time the party made the representation, intent is typically inferred from the party's subsequent acts after the representation is made. *Chicago, T. & M.C. Ry. Co. v. Titterington,* 84 Tex. 218, 223, 19 S.W. 472, 474 (1892); *see Smith v. Jungkind*, 252 S.W.2d 596, 599 (Tex.Civ.App. -- Austin 1952, writ ref'd). Even though the Shareholders' Agreement was prepared by the FFC Parties, reviewed by Mr. Cheam, reviewed by Mr. Mac, rewritten by FFC lawyers, changed to include funding requirements ($3,000,000.00) and that Mr. Davis would retain ownership of his crane designs and engineering, and that FFC Parties would license the designs from Davis, the FFC Parties never signed their own Shareholders' Agreement. Even as late as several months before Mr. Davis was fired, the FFC Parties were instructing their attorney Dennis Sanchez to prepare a document that would sell the FFC USA company to Mr. Davis. The sale document expressly stated that Mr. Davis was the owner of the patent. And, there were 11 drafts of the sale document with all 11 drafts expressly acknowledging that Davis owned the patent. Even more amazing, Sanchez, Davis and Mac

18

discussed that the patent was Davis'. **(Davis Affidavit (2), Exhibit "Q")**. Mac knew that the patent was Davis' from the beginning, and continued to know it, and admit it, until shortly before firing Davis. *Id.*

9.09    Further, within months after FFC USA was formed, the FFC Parties refused to fund the company as they had agreed. (See **Shareholders' Agreement, Exhibit "M"; Sullivan Affidavit, Exhibit "S" and Davis Affidavit (2), Exhibit "Q")**. The severe lack of financial support by the FFC Parties required Mr. Davis to take money out of his own pocket to make payroll for FFC USA on several occasions.  (See **Sullivan Affidavit, Exhibit "S"  and Davis Affidavit (2), Exhibit "Q")**. The FFC Parties never allowed FFC USA to prosper because they refused to timely pay vendors. Eventually, FFC USA was on a "COD basis" with its vendors and its business was essentially stymied. (See **Sullivan Affidavit, Exhibit "S")**. Mr. Davis was spending a significant part of his time pacifying vendors that demanded payment. (See **Davis Affidavit (2), Exhibit "Q")**.  Amazingly, as soon as Mr. Davis was fired, the FFC Parties had enough money to pay vendors, hire salesmen, etc. (See **Sullivan Affidavit, Exhibit "S")**.

9.10    Failure to perform is evidence of the promissor's intent not to perform when the promise was made, and is a circumstance to be considered with other facts to establish intent. *Titterington*, 19 S.W. at 474; *King v. Wise*, 282 S.W. 570, 573 (Tex. Comm'n App. 1926, judgmt adopted). It was the FFC Parties' Shareholders' Agreement. But, they never signed it. However, they prepared it, reviewed it, rewrote it, had their lawyers redo it, and led Mr. Davis into believing they would do the things they repeatedly represented and promised in the Shareholders Agreement. Mr. Davis relied on those repeated promises when he signed the Employment Contract, paid $60,000.00 to capitalize FFC USA and brought his fully engineered crawler crane designs to FFC USA.

9.11    Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Maulding v. Niemeyer*, 241 S.W.2d 733, 737 (Tex.Civ.App. - - El Paso 1951) (orig. proceeding); *Turner v. Biscoe*, 171 S.W.2d at 119. "Slight circumstantial evidence" of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *Niemeyer*, 241 S.W.2d at 738. The Shareholders'

CVisPDF - www.fastio.com

Agreement was prepared by the FFC Parties, reviewed by Mr. Cheam, reviewed by Mr. Mac, rewritten by FFC lawyers, changed to include funding requirements ($3,000,000.00) and that Mr. Davis would retain ownership of his crane designs and engineering, and that FFC Parties would license the designs from Mr. Davis. But the FFC Parties never signed their own Shareholders' Agreement. The FFC Parties instructed their attorney Dennis Sanchez to prepare a document that would sell the FFC USA company to Mr.Davis that expressly stated that Mr. Davis was the owner of the patent. There were 11 drafts of the sale document with all 11 drafts expressly acknowledging that Mr. Davis owned the patent. Mssrs. Sanchez, Davis and Mac discussed that the patent was Mr. Davis'. (See **Davis Affidavit (2), Exhibit "Q"**). Further, within months after FFC USA was formed, the FFC Parties refused to fund the company as they had agreed. (See **Shareholders' Agreement, Exhibit "M", and Sullivan Affidavit, Exhibit "S" and Davis Affidavit (2), Exhibit "Q"**). The severe lack of financial support by the FFC Parties required Mr. Davis to take money out of his own pocket to make payroll for FFC USA on several occasions. (See **Sullivan Deposition, Exhibit "F"**, page 43, lines 15-25; **Sullivan Affidavit, Exhibit "S" and Davis Affidavit (2), Exhibit "Q"**). The FFC Parties never allowed FFC USA to prosper because they refused to timely pay vendors. Eventually, FFC USA was on a "COD basis" with its vendors and its business was essentially stymied. (See **Sullivan Affidavit, Exhibit "S"**). Davis was spending a significant part of his time pacifying vendors that demanded payment. (See **Davis Affidavit (2), Exhibit "Q"**). Amazingly, as soon as Davis was fired, the FFC Parties had enough money to pay vendors, hire salesmen, etc. (See **Sullivan affidavit, Exhibit "S"**).

      9.12    Courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise. *Stone v. Williams*, 358 S.W.2d 151, 155 (Tex. Civ. App. -- Houston 1962, writ ref'd n.r.e.). *See also O'Boyle*, 462 S.W.2d at 272. (Denial of a promise coupled with failure to perform the promise is some evidence of fraudulent intent). The Shareholders' Agreement was prepared by the FFC Parties, reviewed by Mr. Cheam, reviewed by Mr. Mac, rewritten by FFC lawyers, changed to include funding requirements ($3,000,000.00) and that Mr. Davis would retain ownership of his crane designs and engineering, and that FFC Parties would license the designs from Mr. Davis. But the FFC Parties refused to sign their own Shareholders' Agreement. The FFC Parties refused to perform the promises they made in their

own Shareholders' Agreement.

9.13    The present fraud claim has "[1] a material misrepresentation [the misrepresentations in the Shareholders' Agreement], [2] which was false [funding, licensing and patent ownership], [3] and which was either known to be false when made or was asserted without knowledge of its truth [Mr. Mac knew Mr. Davis owned the engineered designs and that he would not appropriately fund the company], [4] which was intended to be acted upon [the terms of the Shareholders' Agreement were completed before the Employment Contract was executed], [5] which was relied upon [Mr. Davis signed the Employment Contract, paid $60,000.00 to capitalize FFC USA and brought his fully engineered crawler crane designs to FFC USA], and [6] which caused injury [Mr. Davis lost his money, job and patent]." *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990), *cert. denied*, 498 U.S. 1048, 112 L. Ed. 2d 775, 111 S. Ct. 755 (1991).


## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, since Defendant FFC Parties have failed to establish that they are entitled to judgment as a matter of law for all the reasons stated herein, and because Defendant FFC Parties have failed to establish that there are no fact issues present in this civil action, Plaintiffs urge and respectfully pray that upon final hearing, Defendant FFC Parties' Motion for Partial Summary Judgement be denied in its entirety, and that the Court grant Plaintiffs such other and further relief at law or in equity to which Plaintiffs may show themselves justly entitled.

Respectfully Submitted,

**LAW OFFICES OF
ERNESTO GAMEZ, JR, P.C.**

777 E. Harrison Street
Brownsville, Texas 78520
Telephone No.: (956) 541-3820
Facsimile   No.: (956) 541-7694

BY: _____

       **ERNESTO GAMEZ, JR.**
State Bar No. 07606600
Federal Id. No. 8645

**ATTORNEY-IN-CHARGE   FOR
PLAINTIFFS**

**\*VICTOR      QUINTANILLA**
State Bar No. 00786181
Federal Id. No. 16073

**(\* SIGNED WITH PERMISSION OF
ATTORNEY IN-CHARGE)**

## CERTIFICATE OF SERVICE

I, **VICTOR QUINTANILLA,** hereby certify that on this 3rd day of August, 2001 a true

and correct copy of **Plaintiffs' Response to Defendant FFC Parties' Second Motion for**

**Summary Judgment** was served **VIA CM RRR 7099 3220 0006 2779 6849** (with Exhibits) and

**Via Facsimile (956) 686-6109** (without Exhibits) on Attorney-in-Charge for Defendants, Hon.

Gary Gurwitz, **ATLAS & HALL, L.L.P.,** P.O. Drawer 3725, 818 Pecan, McAllen, Texas

78502.

_____
**VICTOR QUINTANILLA**

22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "A"
# Employment Contract
# (June 23, 1997)

THIS EMPLOYMENT CONTRACT, made and entered into, between FAVELLE FAVCO HOLDINGS (herein sometimes " Employer ") and Daniel E. Davis (hereinafter " Employee ") employed as a Managing Director to perform on behalf of Employer work at its facility in USA, herein provides for the employment of Employee on the following terms and conditions to which Employer and Employee hereby agree :

1.  **ASSIGNMENT OF WORK**

Employee shall be employed in the above named country by Employer in the classification above specified. Employee expressly represents to Employer that he is fully qualified to perform that class of work and that he is bondable.

Employer may require Employee to render services in a classification other than that specified above, provided that Employee's salary rate shall not be reduced below that provided herein. However, if Employee is not, in the sole judgement of Employer's Managing Director qualified to perform the work falling within the classification stated above, this Employment Contract may be terminated by Employer or the parties may agree in writing upon the assignment of Employee to a classification of work carrying a lower salary rate.

2.  **TERM OF AGREEMENT**

This Employment Contract is for a period of thirty-six (36) months, except as provided in the following subparagraphs (a) and (b). Employee's actual assignment in USA will take place approximately

(a) Renewal of Agreement

This agreement shall be automatically renewed for a term of twelve (12) months unless either party gives the other written notice received three (3) months prior to the expiration of this Employment Contract.

(b) Termination by Employer

(1) If Employer gives written notice of termination for its convenience (including medical discharge as provided in Article 10 hereof), this Employment Contract shall terminate upon the date specified in that notice, Employee shall thereupon be entitled to any accrued salary and home leave, and other benefits which may have accrued prior to that date and, in addition, Employer shall pay cost of return transportation and expenses. However, should the Employer give notice of termination for its convenience prior to completion of this contract, the Employee will receive twenty four (24) months base salary or payment of Employee's base salary through the end of this Contract, whichever is less. This separation payment will be the full and final settlement of all wages due Employee.



1

069070

3

(2) If Employer discharges Employee for cause, this Employment Contract shall terminate at the moment of discharge, and Employee shall thereupon be entitled to salary, home leave and other benefits accrued prior to that date and, in addition, Employer shall pay cost of return transportation and expenses as prescribed in Appendix "A" hereto. Discharge for cause shall include but not be limited to incompetence; participation in any black market activity; wilful or grossly negligent misconduct the use of narcotics trafficking in illicit drugs or other contraband; the contraction of venereal diesel insubordination; failure to observe safety rules after written warning; refusal to work; engaging in conduct prejudicial to the interests of the Employer or the Governments of the United States or China; or any other act of substantial misconduct.

(c)    **Termination by Employee**

(1) If Employee has completed his scheduled assignment and elects not to reconstruct, Employee shall be paid return transportation to his point of origin.

(2) If Employee quits before completing his assignment, this Employment Contract shall terminate on the date the Employee quits. Payments of salary, home leave and other benefits therefore accrued will not be made until Employer is satisfied that all Employee's obligations to Employer have been fulfilled.

3.  **WAGES, ALLOWANCE AND HOURS**

(a) Employee shall be compensated at a monthly salary of US$8,000.00 .

(b) The compensation shall be payable monthly in US$ and deposited in the bank of Employer's choice for the account of the Employee. The Employer my make payments through a third party payroll administrator if the Company deems appropriate. Deductions will be made for required or authorised deductions.

(c) Income Tax imposed shall be the responsibility of the employee.

(d) The payments provided for in the foregoing subparagraph (a) shall constitute the entire compensation (except as otherwise provided in this Employment Contract) for the entire period of service unless otherwise agreed to in writing between the parties.

(e) Employee shall work such days, hours and shifts as may be required by Employer and shall be on 24 hour call in case of emergency as determined by Employer. Employee is aware that the workweek is Monday through the ensuing Friday, however, the workweek is subject to change as may be determined by Employer.

2

000071



4   ABSENCES

Deductions from Employee's compensation will be made in the event of unexcited absences, including but not limited to injury or illness occasioned by neglect of Employee, use of alcohol or narcotics, or other unexcited failure or refusal to work or other cause for which termination could result.

5   COMPANY VEHICLE

(a) Employer shall provide company car ·
(b) Employee shall be responsible for it's traffic offences fine.

6.   PERSONAL PROPERTY

Employer shall not be responsible for Employee's clothing or other personal effects, and any loss thereof or casualty thereto, whether occurring in transit or otherwise, shall be for the account of Employee. Employee and Employer specifically agree that in no event, notwithstanding the foregoing, shall Employer reimburse Employee for such losses or casualties in an amount exceeding $500.00 in the aggregate.

7.   COMPLIANCE WITH LAWS AND REGULATIONS

(a) Employee understands that he shall not engage in black market or other illegal transactions in currency or to the commodities and that he must conform to all laws and controls of the country in which he is working. Employer shall have no responsibility for the conduct of defence of any prosecution of Employee brought about by his alleged violation of those laws. If Employee is arrested by reason of any such alleged violation, upon his release by the authorities Employer may return him to point of origin at his own expense.

(b) Employee shall comply with such rules and regulations as Employer may establish from time to time with respect to personnel employed by Employer. Employee agrees to account for all property which may be issued to him to work and live in harmony with his co-workers employed on the work, and at all times to conduct himself in an orderly manner, which due regard to the comfort and convenience of his co-workers.

8.   COMPENSATION DURING ILLNESS OR INJURY

Employer will provide Worker's Compensation benefits. Workers' Compensation benefits will be provided for any injury or illness arising out of or in the course of employment tuned this Employment Contract, in accordance with provisions of the Employer's contract's with FAVELLE FAVCO CRANES HOLDING SDN BHD.

9   MEDICAL DISCHARGE OF EMPLOYEES

Should the health of Employee become impaired, as determined by Employer based upon such examinations and tests as Employer may require, and that impaired health is due to no fault of Employee, Employer may terminate Employee's services for Employer's convenience in accordance with the provisions of Article 2 hereof.

10. GROUP HOSPITAL-MEDICAL

Employee will be provided for a health plan in USA.

11. DISPOSITION OF EMPLOYEE'S REMAINS

If Employee dies during the term of this Agreement, Employer shall use its best efforts to dispose of Employee's remains in compliance with any known directives or desires of Employee and, lacking any such knowledge, in accordance with instruction of Employee's next of kin, and shall pay the cost of any necessary transportation of remains to the Point of Origin or any equally distant point indicated by the next of kin.

12. ALLOTMENT OF DEPOSITS

By execution of an appropriate instrument furnished by Employer, Employee may authorise all or any part of his earnings under this Contract to be paid to a designated beneficiary. Only one such authorisation shall be in effect any time; once such instrument has been executed by Employee and accepted in writing by Employer, it shall remain in effect until cancelled or superseded by another instrument similarly executed and accepted. Except as above provided or required by law, no allotments, assignments or transfers of any amounts payable to Employee hereunder will be accepted or recognised by Employer.

Employee shall also by execution of an appropriate instrument, arrange with Employer for the deposit by Employer of the portion of his salary payable in U.S Dollars in a bank designated by Employee in the United States for this purpose.

13. CLAIMS

Any claims arising out of this Contract or in connection with employment under this Contract, expect claims for Workers' Compensation as provided in Article 9 hereof, shall be submitted by Employee by written notice to Employer within sixty (60) days after such claim or claims arise. Such written notice shall set forth in detailed the nature of the claim and the amount claimed by Employee. The giving of such written notice in the manner and at the time herein provided shall be a condition precedent to any rights of action on any claim arising out of this Contract in connection with employment under this Contract and any such right of action shall be limited to the matter setter forth in said written notice. Any right of legal action for a determination a

4

claim under this section shall waived unless such legal action shall be commenced within six (6) months after termination of employment under this Contract.

On the termination of the Contract and payment to Employee of all amounts due to him hereunder, Employee shall execute and deliver to Employer upon form prepared by its, a receipt for said amounts and a release of all claims other than those claims which may have been submitted to Employer pursuant to the provisions hereof and which may still remain unsettled.

14. **POINT OF HIRE : CHOICE OF LAW**

The parties agree that this Employment Contract has been formed in the United States of America, which is Employee's point of hire, notwithstanding that his point of origin may be located elsewhere; and that this Employment Contract shall be interpreted and construed according to the laws of the United States of America, and more specifically, the State of Texas.

15. **PASSPORTS, VISAS, HEALTH REQUIREMENTS**

Employee shall obtain a passport. Any necessary visa in connection therewith will be the responsibility of the Employer. Medical examination, inoculations, and vaccinations, as specified by Employer, are also required. The cost of all such requirements, including 6th passport shall be borne by Employer.

16. **CERTIFICATE OF EMPLOYMENT**

EMPLOYEE HEREBY CERTIFIES THAT HE HAS READ THE FOREGOING EMPLOYMENT CONTRACT, AND THAT HE FULLY UNDERSTAND ITS TERMS AND CONDITIONS, AND EMPLOYEE FURTHER CERTIFIES THAT :

THE FOREGOING TERMS AND CONDITONS CONSTITUTE HIS ENTIRE EMPLOYMENT CONTRACT WITH FAVELLE FAVCO CRANES HOLDING SDN BHD AND THAT

NO STATEMENTS, PROMISES OR UNDERSTANDING, EITHER ORAL OR WRITTEN, HAVE BEEN MADE OTHER THAT THOSE STATED ABOVE.

THIS CONTRACT SHALL BE SUBJECT TO MODIFICATION ONLY BY WRITTEN INSTRUMENT SIGNED BY BOTH EMPLOYEE AND EMPLOYER.

000074

5

IN WITNESS WHEREOF, this Employment Contract is executed by the parties named herein.

MAC NGAN BOON

DANIEL E. DAVIS
23|6|97

WITNESSETH

CHEAM TEK SIONG
( 670329-10-5063 )

23/6/97 .

000075

6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "B"
# Oral and Videotaped Deposition of
# Daniel E. Davis (Vol. 1)
# (May 11, 2000)

1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3   DANIEL E. DAVIS                 *
                                     *
 4   VS.                             *   CIVIL ACTION NO. B-00-003
                                     *
 5   FAVELLE FAVCO CRANES, U.S.A.,   *
     INC., FAVELLE FAVCO CRANES      *
 6   (M) SDN BHD, FAVELLE FAVCO      *
     HOLDINGS SDN BHD and            *
 7   MUHIBBAH ENGINEERING            *

 8

 9

10
```

---

ORAL AND VIDEOTAPED DEPOSITION OF

DANIEL E. DAVIS

MAY 11, 2000

VOLUME I OF II

---

```
16          ORAL AND VIDEOTAPED DEPOSITION OF DANIEL E. DAVIS,

17   produced as a witness duly sworn by me at the instance of the

18   Defendants, taken in the above styled and numbered cause on

19   the 11th day of May, 2000, from 12:02 p.m. to 5:45

20   p.m. before Sindy Sanders, Certified Shorthand Reporter, No.

21   5974, in and for the State of Texas, reported by stenographic

22   method, at THE LAW OFFICES OF ERNESTO GAMEZ, JR., P.C., 777

23   E. Harrison Street, Brownsville, Texas, pursuant to the

24   Federal Rules of Procedure (and the provisions stated on the

25   record or attached therein.)
```

U. S. LEGAL SUPPORT, INC.   (956) 425-7600

**CERTIFIED COPY**

```
 1                    A P P E A R A N C E S

 2      FOR THE PLAINTIFF:

 3            Mr. Al W. Payne
              PAYNE & D'AMBROSIO, L.L.P.
 4            1700 West Loop South
              Suite 1230
 5            Houston, Texas   77027

 6            Mr. Victor Quintanilla
              THE LAW OFFICES OF ERNESTO GAMEZ, JR., P.C.
 7            777 E. Harrison Street
              Brownsville, Texas   78520
 8
        FOR THE DEFENDANTS:
 9
              Mr. Gary Gurwitz
10            Mr. Charles C. Murray
              ATLAS & HALL, L.L.P.
11            818 Pecan
              McAllen, Texas   78502
12
              Mr. Willem G. Schuurman
13            Mr. Brian K. Buss
              VINSON & ELKINS, L.L.P.
14            2700 One American Center
              600 Congress Avenue
15            Austin, Texas   78701-3200

16      ALSO PRESENT:

17            Mr. Cheam Tek Siong
              Mr. Eddie Vega/Ms. Marilu Gomez, The Videographers
18

19

20

21

22

23

24

25
```

U. S. LEGAL SUPPORT, INC.   (956) 425-7600

1    record by simply referring to Favco, is the reason I've taken

2    the time to do this little exercise.

3        A.   I understand.

4        Q.   Okay.  Mr. Davis, you became president, and I

5    believe, managing director of Favco USA in September of 1997;

6    is that correct?

7        A.   Yes.

8        Q.   At the time you took over those positions, what was

9    your deal with Favco USA or anyone else in connection with or

10   relative to assuming those positions?

11       A.   It's stated in my Employment Contract.

12       Q.   Just -- you tell me what it is.

13       A.   It's very long.  I mean --

14       Q.   Tell me the best that you can recall.

15       A.   I would have to look at the document to go over

16   everything.

17       Q.   So you have no recollection at this time of the

18   terms of the deal that you made in order to become president

19   and managing director of Favco USA?

20       A.   It was in the Shareholders' and Employment

21   Agreement, sir.

22       Q.   That's where the terms were?

23       A.   Yes.

24       Q.   So if we can identify those two documents, then you

25   believe they will tell us the deal that you had to go to work

1      A.   That's correct.

2      Q.   And where were you when it was signed?

3      A.   I was either in Singapore or Malaysia.

4      Q.   Okay.

5           (Deposition Exhibit No. 3 was marked for

6    identification.)

7      Q.   (By Mr. Gurwitz) Let me hand you Deposition Exhibit

8    3 and ask you if that's a copy of the Employment Contract

9    that you mentioned.

10     A.   Yes.

11     Q.   And what is the date of that?

12     A.   23/6/97.

13     Q.   Okay.

14     A.   June -- okay.

15     Q.   Yeah.  Give us the actual date.

16     A.   June 23rd.

17     Q.   Give us the month and the --

18     A.   June 23rd, '97.

19     Q.   Okay.  And in some of the contracts, especially if

20   they're European or Asian contracts, they do their months and

21   their days backward from us -- or we do ours backward

22   from them?

23     A.   That's correct.

24     Q.   So the first numbers would be the days?

25     A.   That's correct.

1        Q.   The second number would be the month?

2        A.   Correct.

3        Q.   And the last number would be the year?

4        A.   Correct.

5        Q.   Okay.  But this is the Employment Contract that you

6  talked about?

7        A.   That's correct.

8        Q.   Okay.  So between these two documents -- Exhibit 3,

9  the Employment Contract, and Exhibit 2, the Shareholders'

10  Contract -- the entire terms of the deal that you struck

11  pursuant to which you became president and managing director

12  -- is that right?  Managing director --

13        A.   Correct.

14        Q.   -- of Favco USA, that contained that agreement?

15        A.   That's correct.

16        Q.   Okay.  The Employment Agreement was signed where?

17        A.   It could have been signed -- let me see.  It was

18  probably signed in Malaysia, most likely.

19        Q.   I'm sorry?

20        A.   Most likely signed in Malaysia.

21        Q.   Okay.  And the signatories to this document are

22  whom?

23        A.   Mac Ngan Boon and Cheam Tek Siong.

24        Q.   And?

25        A.   Daniel E. Davis.

1      A.   That's correct.  Yes.

2      Q.   That was not a new concept, the concept of a

3  crawler crane?

4      A.   No.

5      Q.   Now, before you became president and managing

6  director of Favco USA, where did you work?

7      A.   Prior?

8      Q.   Yeah.  Immediately prior?

9      A.   Oh, immediately prior?  Manitowoc Cranes.

10     Q.   Okay.  And where were you stationed?

11     A.   Singapore.

12     Q.   And what were your duties?

13     A.   Managing director.

14     Q.   Of Manitowoc --

15     A.   The Manitowoc Company.

16     Q.   The Manitowoc Company?

17     A.   Yes.

18     Q.   And what was the business of the Manitowoc

19  Company?

20     A.   Building ice machines and building cranes and

21  shipbuilding.

22     Q.   Okay.  In connection with one of the purposes

23  listed in the Shareholders' Agreement (h), which is finalize,

24  conceptualize, design and manufacture crawler cranes, were

25  you doing any of that type of thing while you were an

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "C"
# Oral and Videotaped Deposition of
# Daniel E. Davis (Vol. II)
# (May 12, 2000)

Case 1:00-cv-00003   Document 103   Filed in TXSD on 08/03/2001   Page 38 of 150

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DANIEL E. DAVIS                      *
                                     *
VS.                                  *   CIVIL ACTION NO. B-00-003
                                     *
FAVELLE FAVCO CRANES, U.S.A.,        *
INC., FAVELLE FAVCO CRANES           *
(M) SDN BHD, FAVELLE FAVCO           *
HOLDINGS SDN BHD and                 *
MUHIBBAH ENGINEERING                 *

ORAL AND VIDEOTAPED DEPOSITION OF

DANIEL E. DAVIS

MAY 12, 2000

VOLUME II OF II

ORAL AND VIDEOTAPED DEPOSITION OF DANIEL E. DAVIS,

produced as a witness duly sworn by me at the instance of the

Defendants, taken in the above styled and numbered cause on

the 12th day of May, 2000, from 9:01 a.m. to 10:45

a.m. before Sindy Sanders, Certified Shorthand Reporter, No.

5974, in and for the State of Texas, reported by stenographic

method, at THE LAW OFFICES OF ERNESTO GAMEZ, JR., P.C., 777

E Harrison Street, Brownsville, Texas, pursuant to the

Federal Rules of Procedure (and the provisions stated on the

record or attached therein.)

**EXHIBIT B**

Page 2

A P P E A R A N C E S

1
2  FOR THE PLAINTIFF
3      Mr. Al W. Payne
       PAYNE & D'AMBROSIO, L.L.P.
4      1700 West Loop South
       Suite 1230
5      Houston, Texas  77027
6      Mr. Victor Quintanilla
       THE LAW OFFICES OF ERNESTO GAMEZ, JR., P.C.
7      777 E. Harrison Street
       Brownsville, Texas  78520
8
   FOR THE DEFENDANTS
9
10     Mr. Gary Gurwitz
       Mr. Charles C. Murray
       ATLAS & HALL, L.L.P.
11     818 Pecar
       McAllen, Texas  78502
12
       Mr. Willem G. Schuurman
13     Mr. Brian K. Buss
       VINSON & ELKINS, L.L.P.
14     2700 One American Center
       600 Congress Avenue
15     Austin, Texas  78701-3200
16
   ALSO PRESENT
17
       Mr. Cheam Tek Siong
18     Ms. Yolanda Gonzalez, The Videographer
19
20
21
22
23
24
25

Page 3

                 I N D E X                        PAGE
2  Appearances . . . . . . . . . . . . .              2
3  Stipulations . . . . . . . . . . . . .             4
4  DANIEL E. DAVIS
5      Examination by Mr. Gurwitz . . . . .           7
6  Witness's Signature/Correction Page . . .         77
   Reporter's Certificate . . . . . . . .            78
7
8
9            E X H I B I T   I N D E X
                                                   PAGE
   MARKED
10
   23   Defendant's First Set of Requests for Production  7
11
   24   Diagram, Weldment Boom Insert . . . .          11
12
   25   Diagram, Weldment Boom Insert . . . .          11
13
   26   Rusk Engineering Quote . . . . . . .           18
14
   27   Letter from Jim Rusk to Daniel Davis . .       21
15
   28   Letter Dated 9/13/99 From Al Payne to Whom It
16       May Concern Regarding Crawler Crane Design.   32
17
   29   Memo to Max Boon From Daniel Davis Regarding
18       Uppers, Lowers, Pemex . . . . .               55
19
20
21
22
23
24
25

Page 4

A G R E E M E N T S

1
2      ORAL AND VIDEOTAPED DEPOSITION OF DANIEL E. DAVIS,
3  who resides in Harlingen, Texas, taken herein by counsel for
4  Defendants, before Sindy Sanders, a Certified Shorthand
5  Reporter in and for the State of Texas, at the 12th day of
6  May, 2000, at THE LAW OFFICES OF ERNESTO GAMEZ, JR., P.C.,
7  777 E. Harrison Street, Brownsville, Texas, commencing at
8  9:02 a.m., pursuant to NOTICE and the following stipulations
9  and agreements.
10     IT WAS AGREED by and between counsel for the
11  Plaintiff and Defendants in the above-numbered and styled
12  cause that all formalities are specifically waived and that
13  the oral deposition of DANIEL E. DAVIS may be taken herein
14  forthwith before Sindy Sanders, a Certified Shorthand
15  Reporter in and for the State of Texas, said deposition being
16  taken with the same force and effect as though all the
17  requirements of the statutes and rules had been fully
18  complied with.
19     IT WAS FURTHER AGREED that no objections need be
20  made by any party at the time of taking of said deposition,
21  except objections as to the form of the question or the
22  responsiveness of the answer, which not made during the
23  deposition are waived, but if and when said deposition, or
24  any portion thereof, is offered in evidence on the trial of
25  this cause by any party hereto, it shall be subject to any

Page 5

1  and all other legal objections, such objections to be made at
2  the time of the tender, the same as though the witness were
3  on the stand personally testifying.
4      IT WAS FURTHER AGREED that the witness shall sign
5  the deposition transcript before any Notary Public or
6  official authorized to administer oaths and, at such time,
7  the witness has the privilege of reading over said transcript
8  and making any corrections that he or she finds to be
9  necessary, such corrections to be made in accordance with the
10  Texas Rules of Civil Procedure.
11     IT WAS ALSO AGREED that in the event the original
12  deposition transcript is not signed by the witness within 30
13  days of receipt and filed at the time of trial or any
14  hearing, that the original or a certified copy of said
15  transcript may be filed in court and used herein as though
16  the witness had signed said original transcript.
17     IT WAS FURTHER AGREED that after said deposition
18  transcript has been returned to the deposition officer, along
19  with changes, if any, made by the witness in accordance with
20  the Federal Rules of Procedure, that the original deposition
21  transcript, together with copies of all exhibits, will be
22  delivered to GARY GURWITZ for safekeeping and use in trial.
23     IT WAS FURTHER AGREED that after said deposition
24  transcript has been returned to counsel in accordance with
25  these stipulations and agreements, it will be treated by the

Page 42

1    A  People at -- well, it would be Mustang, for
2    instance.
3    Q.  Who at Mustang?
4    A  Jim Rusk -- I mean Rusty Yarbrough.
5    Q  And what did he tell you?
6    A  That he couldn't believe it.
7    Q.  Couldn't believe what?
8    A  That I was terminated.
9    Q.  What else he tell you?
10   A  That he didn't know why, when I had built what I
11   had built, and showed it, and it was a good product  And he
12   just couldn't understand why they would let me go.
13   Q.  Okay.  What else did he tell you?
14   A  That's it.
15   Q.  What did you say to him?
16   A  I didn't know.
17   Q.  And that was it?  That's the extent of the
18   conversation?
19   A.  I mean -- I mean, I didn't tape record it, so I
20   don't know.
21   Q.  You didn't tape record that conversation?
22   A  No, sir, I didn't.
23   Q.  But that's -- that, you take as damage to your
24   reputation?
25   A  That's correct.

Page 43

1    Q.  Okay.  You say you have suffered damage to your
2    business reputation.  I assume that's the same?
3    A  That's correct.
4    Q.  And then it says you have lost wages, lost income,
5    and lost royalties.
6    A  That's correct.
7    Q.  Let's take those one at a time.
8    A  Okay.
9    Q.  What wages have you lost?
10   A  My salary.
11   Q.  Okay.  That's under your Employment Contract?
12   A  That's correct.
13   Q.  What income?  Same thing?
14   A  Income off that and income off the sales of the
15   machines.
16   Q.  Okay.  Well, you say, "and lost royalties."
17   A  That's correct.
18   Q.  Is that the same as lost income?  Royalties?
19   A  Income off the profit of the company and also
20   income off the royalties.
21   Q.  You think the company made a profit?  You think the
22   company is profitable?
23   A  Not right now, it's not.
24   Q.  Well, then, if it's not profitable now, you haven't
25   lost income that hasn't been made?

Pa

1    A  You've lost it if -- if I would have been there,
2    could have had machine sales and then it would have been
3    profitable.
4    Q.  You were there?
5    A  No, I was gone.
6    Q.  You were there until September of '99?
7    A  After the machines had been tested and fully
8    developed.  Then I was gone.
9    Q.  How many machines were sold between September
10   1997 when the company started and September of 1999 when you
11   left?  How many machines.  I believe you've testified three
12   A.  Three or four.
13   Q.  Three or four?  Okay.
14   A  But you've got to remember, not since 1997,
15   Mr. Gurwitz.
16   Q.  Well, that's when the company started.
17   A.  That's not when we started building machines,
18   though.
19   Q.  I know.  But that's when you started the company?
20   A.  We started doing other business at the compan
21   other than building Caterpillar machines.
22   Q.  But you did hire engineers soon after that to sta
23   design work, including Eccon?
24   A  That's correct.
25   Q.  That was done in November of '97, I belie

Page

1    A.  That's correct.
2    Q.  Okay.  So you started hiring engineers?
3    A.  Uh-huh.
4    Q.  You started dealing with Caterpillar to get ther
5    start designing their power units?
6    A  That's correct.
7    Q.  And I believe you testified that in -- sometime
8    late 1998, the first power units were available for delivery
9    A.  They were delivered from Caterpillar to the
10   facility.
11   Q.  In late '98?
12   A.  That's correct.
13   Q.  Incidentally, those power units were made in Japan,
14   were they not?
15   A  Some of them were.
16   Q.  Most of them were, were they not?
17   A  That's correct.
18   Q.  And the booms are made where?  The Manitex boo
19   where are they made?
20   A  They're made in Georgetown, Texas.
21   Q.  And where are the wenches made?
22   A.  Wenches?  Which wenches?
23   Q.  Braden?
24   A.  Those are made in Oklahoma.
25   Q.  And what about the -- whatever it is that Robi

Page 42 - Page

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "E"
# Oral Deposition of
# Mac Ngan Boon
# (July 12, 2000)

CMPDF - www.fxsdd.com

Case 1:00-cv-00003   Document 103   Filed in TXSD on 08/03/2001   Page 42 of 150

FILED 4:58 O'CLOCK ___ M
AURORA DE LA GARZA DIST. CLERK

CAUSE NO. 1999-10-4467-C   NOV 0 7 2000

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES, USA, INC. | ) | IN THE DISTRICT COURT |
| | ) | DISTRICT COURT OF CAMERON COUNTY TEXAS |
| VS. | ) | CAMERON COUNTY, TEXAS |
| | ) | |
| DANIEL E. DAVIS, DAVISCO, INC., AND COBURN INTERNATIONAL, LTD. | ) | 197TH JUDICIAL DISTRICT |

*************************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO. B-00-003 |
| | ) | |
| FAVELLE FAVCO CRANES, USA, INC. | ) | |

*****************************************

ORAL DEPOSITION OF

MAC NGAN BOON

JULY 12, 2000

VOLUME 1

*****************************************

**CERTIFIED COPY**

REC
JUL 1 7 2000

    ORAL DEPOSITION of **MAC NGAN BOON**, produced as a

witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

*POCKRUS REPORTING SERVICE*
*MCALLEN 630-3331 * HARLINGEN 423-7703 * BROWNSVILLE 350-4940*

on the 12th day of July, 2000, from 10:10 a.m. to

3:48 p.m., before SUSAN POCKRUS, CSR in and for the State

of Texas, reported by oral stenography, at the offices of

Atlas & Hall, L.L.P., 818 Pecan Boulevard, McAllen,

Texas, pursuant to the Texas Rules of Civil Procedure and

the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS:
     Mr. Al Payne
     PAYNE & D'AMBROSIO, L.L.P.
     800 Wilcrest, Suite 160
     Houston, Texas   77042

     ---AND---

     Mr. Victor Quintanilla
     LAW OFFICES OF ERNESTO GAMEZ, JR., P.C.
     777 East Harrison
     Brownsville, Texas   78520


FOR THE DEFENDANTS:
     Mr. Gary Gurwitz
     ATLAS & HALL, L.L.P.
     818 Pecan Boulevard
     McAllen, Texas   78502

     ---AND---

     Mr. Bill Schuurman
     VINSON & ELKINS, L.L.P.
     One American Center, Suite 2700
     600 Congress Avenue
     Austin, Texas   78701-3200


ALSO PRESENT:
     Ms. Susan Pockrus, CSR
     Mr. Daniel E. Davis
     Mr. Cheam Tek Siong

1   other than at the University of Western Australia?

2       A.   I had my earlier pre-university education in

3   Malaysia.

4       Q.   Any other formal education?

5       A.   No.

6       Q.   And briefly, could you start with your position

7   now and just outline what your work experience has been?

8       A.   I started my career as an engineer in a

9   construction company called Namfatt Engineering.

10      Q.   What -- how do you spell that?

11      A.   N-a-m-f-a-t-t Engineering.

12      Q.   And that was when?

13      A.   In 1967.  And in 1972, I left to form Muhibbah

14  Engineering, and I've been the managing director of

15  Muhibbah Engineering since that date until now.

16      Q.   Okay.  And what did you do as an engineer for

17  Namfatt Engineering?

18      A.   I was a director of the company.  I was involved

19  in tendering -- tendering and securing of projects as far

20  as the implementation of the projects.

21      Q.   So you were involved in the day-to-day

22  operations of the engineering company?

23      A.   Yes.

24      Q.   And what did -- what did you build or construct

25  or do in the engineering company?

1    Q.   (BY MR. PAYNE)   Mr. Mac, I'm going to hand you

2  what's been marked Exhibit 33 and ask if you can identify

3  that.

4    A.   Yes.

5    Q.   And what is that, Exhibit 33?

6    A.   It's an employment contract.

7    Q.   And is that the employment contract with Danny

8  Davis?

9    A.   Yes.

10   Q.   And at the end of the employment contract it has

11 your signature?

12   A.   That's correct.

13   Q.   And did you sign on behalf of Favelle Favco

14 holdings?

15   A.   I must have.  That's what it says here.

16   Q.   Okay.  And did you have any input into this

17 employment contract?

18   A.   I can't remember.  But certainly, as was said

19 yesterday, Cheam said that Danny brought his Manitowoc

20 contract, and I think he and Danny sat down and produced

21 this employment contract.

22   Q.   Were you involved in any of those discussions

23 when they sat down and produced the employment contract

24 of Exhibit 33?

25   A.   I can't recall.

1    Q.    Now, you signed the employment contract --

2    A.    Uh-huh.

3    Q.    -- of Exhibit 33 on or about June 23rd, '97?

4    A.    Uh-huh.

5    Q.    Is that correct?

6    A.    Yeah.

7    Q.    And I noticed that Mr. Cheam witnessed the

8    signatures on June 23rd, '97.  There's a -- there's a

9    date under Mr. Davis' name, but there's not a date under

10   your name.  You did sign it on that date, didn't you?

11   A.    I think so.  I'm not -- I'm not too clear.

12   Q.    Do you remember what happened with the signing

13   of this?  Were you and Danny Davis together in the same

14   room with Mr. Cheam when this got signed?

15   A.    I don't really recall.

16   Q.    You don't --

17   A.    Maybe, maybe.

18   Q.    You don't remember?

19   A.    Yeah, I don't recall.

20   Q.    Okay.  Is there any other document or something

21   that would help you to refresh your recollection about

22   what the situation was when you signed this on June 23rd,

23   1997?

24   A.    Not that I can recall.

25   Q.    And this employment contract, Exhibit 33, was

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-184 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "F"
# Oral Deposition of
# Greta Sullivan
# (August 17, 2000)

CutePDF – www.fairdoc.com

CERTIFIED
COPY

| | | |
|---|---|---|
| 10:17:38 | 1 | CAUSE NO. 1999-10-4467-C |
| 10:17:38 | 2 | |
| 10:17:38 | 3 | FAVELLE FAVCO CRANES USA,  ) IN THE DISTRICT COURT |
| 10:17:38 | | INC.                       ) |
| 10:17:38 | 4 | )  |
| 10:17:38 | | VS.                        ) CAMERON COUNTY, TEXAS |
| 10:17:38 | 5 | ) |
| 10:17:38 | | DANIEL E. DAVIS, DAVISCO,   ) |
| 10:17:38 | 6 | INC., AND COBURN            ) |
| 10:17:38 | | INTERNATIONAL, LTD         ) 197TH JUDICIAL DISTRICT |
| 10:17:38 | 7 | |
| 10:17:38 | | AND |
| 10:17:38 | 8 | |
| 10:17:38 | | IN THE UNITED STATES DISTRICT COURT |
| 10:17:38 | 9 | FOR THE SOUTHERN DISTRICT OF TEXAS |
| 10:17:38 | | BROWNSVILLE DIVISION |
| 10:17:38 | 10 | |
| 10:17:38 | | DANIEL E. DAVIS            ) |
| 10:17:38 | 11 | ) |
| 10:17:38 | | VS.                        ) NO. B-00-003 |
| 10:17:38 | 12 | ) |
| :17:38 | | FAVELLE FAVCO CRANES USA,   ) |
| 10:17:38 | 13 | INC., AND FAVELLE FAVCO     ) |
| 10:17:38 | | CRANES (M) SDH BHD         ) |
| 10:17:38 | 14 | |
| 10:17:38 | 15 | |
| 10:17:38 | 16 | _____ |
| 10:17:38 | 17 | ORAL DEPOSITION OF |
| 10:17:38 | 18 | GRETA SULLIVAN |
| 10:17:38 | 19 | AUGUST 17, 2000 |
| 10:17:38 | 20 | _____ |
| 10:17:38 | 21 | |
| 10:17:38 | 22 | |
| 10:17:38 | 23 | |
| 10:17:38 | 24 | |
| 10:17:38 | 25 | |

| | | |
|---|---|---|
| 10:17:38 | 1 | ORAL DEPOSITION of GRETA SULLIVAN, produced as |
| 10:17:38 | 2 | a witness at the instance of the attorneys for |
| 10:17:38 | 3 | Favelle Favco Cranes USA, Inc., and Favelle Favco |
| 10:17:38 | 4 | Cranes (M) SDH BHD and duly sworn, was taken in the |
| 10:17:38 | 5 | above-styled and numbered cause on the 17th day of |
| 10:17:38 | 6 | August, 2000, from 11:30 a.m. to 12:51 p.m., before |
| 10:17:38 | 7 | Sydnee Schwab, Certified Shorthand Reporter in and |
| 10:17:38 | 8 | for the State of Texas, reported by computerized |
| 10:17:38 | 9 | stenotype machine, at the offices of Schwab Court |
| 10:17:38 | 10 | Reporting Service, 2900 Central Boulevard, Suite C, |
| 10:17:38 | 11 | Brownsville, Texas  78520, pursuant to the Texas and |
| 10:17:38 | 12 | Federal Rules of Civil Procedure and the provisions |
| 10:17:38 | 13 | stated on the record or attached hereto. |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
:17:38  1              A P P E A R A N C E S
:17:38  2   FOR FAVELLE FAVCO CRANES USA, INC., AND FAVELLE
:17:38      CRANES (M) SDH BHD
:17:38  3
:17:38            Charles C. Murray
:17:38  4         ATLAS & HALL, L.L.P.
:17:38            P. O. Box 3725
:17:38  5         McAllen, Texas  78502
:17:38  6   FOR DANIEL E. DAVIS, DAVISCO, INC., AND COBURN
:17:38      INTERNATIONAL, LTD:
:17:38  7
:17:38            Victor Quintanilla
:17:38  8         LAW OFFICES OF ERNESTO GAMEZ, JR., P.C.
:17:38            777 E. Harrison Street
:17:38  9         Brownsville, Texas  78520

:17:38 10

:17:38 11
```

```
:17:38 12                     INDEX

:17:38 13                                           PAGE

:17:38 14
:17:38     GRETA SULLIVAN
:17:38 15       Examination by Mr. Murray....................4
:17:38         Examination by Mr. Quintanilla.............31
:17:38 16       Examination by Mr. Murray..................58
:17:38         Examination by Mr. Quintanilla.............65
:17:38 17  Witness' Signature Page/Corrections.............69

:17:38 18  Reporter's Certificate.........................71

:17:38 19
```

```
:17:38 20                    EXHIBITS
:17:38
:17:38 21
```

```
:17:38    EXHIBIT           DESCRIPTION              PAGE
:17:38 22 No. 64    Affidavit by Greta Sullivan        11
:17:38    No. 65    Memo from Al Payne                  12
:17:38 23 No. 66    Employment contract                23
:17:38    No. 67    Employment contract                24
:17:38 24 No. 67A   Transfer of Employment             26
:17:38    No. 68    Memo from Sullivan to Sanchez       63
:17:38 25
```

| | | |
|---|---|---|
| 1:32:52 | 1 | Q   Was that in an accounting capacity? |
| 1:32:55 | 2 | A   Several.  At the end, yes, accounting. |
| 1:32:57 | 3 | Q   All right.  And what was your job at |
| 1:32:59 | 4 | Favco? |
| 1:33:00 | 5 | A   I did general accounting for Favco. |
| 1:33:03 | 6 | Q   Who was your immediate supervisor? |
| 1:33:05 | 7 | A   Well, at first it was Craig Davis and |
| 1:33:11 | 8 | then, through Craig, Danny Davis, and then after |
| 1:33:13 | 9 | Danny left a gentleman named Lee was there. |
| 1:33:18 | 10 | Q   Okay.  Let me make sure -- I understand |
| 1:33:23 | 11 | after Danny got fired that he wasn't there anymore |
| 1:33:28 | 12 | and then Lee was your supervisor, but I want to make |
| 1:33:30 | 13 | sure I understand before that.  Are you saying that |
| 1:33:32 | 14 | Craig Davis was your supervisor and then it went |
| 1:33:35 | 15 | from -- the line of authority went from Craig to |
| 1:33:37 | 16 | Danny? |
| 1:33:38 | 17 | A   That's correct. |
| 1:33:38 | 18 | Q   Okay.  And so that was the case up until |
| 1:33:41 | 19 | the point where Danny was fired. |
| 1:33:42 | 20 | A   That's correct. |
| 1:33:43 | 21 | Q   Who was it that hired you? |
| 1:33:44 | 22 | A   Craig. |
| 1:33:45 | 23 | Q   Had you known Craig or Danny Davis before? |
| 1:33:49 | 24 | A   No. |
| 1:33:51 | 25 | Q   Other than the employee/employer or |

| | | |
|---|---|---|
| :35:01 | 1 | Q    All right.  When did you leave Favco? |
| :35:10 | 2 | A    March of 2000. |
| :35:11 | 3 | Q    March of 2000.  And why did you leave? |
| :35:15 | 4 | A    I got a job offer. |
| :35:18 | 5 | Q    Was that a better job? |
| :35:20 | 6 | A    It was a better job, mm-hm. |
| :35:29 | 7 | Q    You said while you were at Favco your |
| :35:32 | 8 | responsibility was general accounting. |
| :35:34 | 9 | A    Yes. |
| :35:35 | 10 | Q    Were you the person responsible for the |
| :35:41 | 11 | accounting, that was something that took place under |
| :35:45 | 12 | your supervision? |
| :35:45 | 13 | A    Yes.  Yes, accounts payable, accounts |
| :35:49 | 14 | receivable, payroll and general ledger. |
| :35:53 | 15 | Q    Okay.  And now you're working for whom? |
| :36:05 | 16 | A    Campeche Seafood. |
| :36:07 | 17 | Q    Is that the better job offer that you got? |
| :36:10 | 18 | A    Yes. |
| :36:11 | 19 | Q    And is that in an accounting capacity as |
| :36:14 | 20 | well? |
| :36:15 | 21 | A    Yes. |
| :36:28 | 22 | Q    You have got a copy of an affidavit there, |
| :36:32 | 23 | and I'm not sure why it says Exhibit 2 on it.  That |
| :36:36 | 24 | was probably from some other attachment. |
| :36:40 | 25 | MR. MURRAY:  Victor, what's our next |

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 2:20:08  | 1  | first and then the most critical vendors to crane        |
| 2:20:11  | 2  | production, and then some of the other vendors we        |
| 2:20:14  | 3  | would just have to let slip and we would try to pay      |
| 2:20:18  | 4  | them when we could and --                                |
| 2:20:20  | 5  | Q    Okay.  And, in your opinion, what was the           |
| 2:20:25  | 6  | reputation of Favelle Favco USA with the vendors?        |
| 2:20:29  | 7  | A    We had a terrible -- we had a terrible              |
| 2:20:33  | 8  | reputation with the vendors, we did.                     |
| 2:20:38  | 9  | Q    Were there any lawsuits filed to collect            |
| 2:20:41  | 10 | money or any collections?                                |
| 2:20:43  | 11 | A    We got collection letters, and letters --           |
| 2:20:46  | 12 | threat letters from lawyers.                             |
| 2:20:49  | 13 | Q    Was that pretty common?                             |
| 2:20:50  | 14 | A    Yeah, it was common.  Yes, it was.                  |
| 2:20:54  | 15 | Q    All right.  Now, was there ever an                  |
| 2:20:59  | 16 | occasion during the time that you worked with Mr.        |
| 2:21:02  | 17 | Davis where Mr. Davis himself would take care of the     |
| 2:21:05  | 18 | payroll?                                                 |
| 2:21:06  | 19 | A    There were times at the beginning -- when           |
| 2:21:09  | 20 | I first came, there were a couple of times at the        |
| 2:21:11  | 21 | beginning when I first went to work for Favelle          |
| 2:21:14  | 22 | where Danny put in some money for payroll so that we     |
| 2:21:19  | 23 | could cover the payroll.                                 |
| 2:21:21  | 24 | Q    Out of his pocket.                                  |
| 2:21:22  | 25 | A    Out of his pocket, yes.                             |

| | | |
|---|---|---|
| 2:27:07 | 1 | of those units. |
| 2:27:09 | 2 | Q   And is it possible that from those |
| 2:27:12 | 3 | projected sales, that Mr. Davis would have needed to |
| 2:27:22 | 4 | have done these purchase orders from Caterpillar to |
| 2:27:28 | 5 | reach those or meet those projected sales? |
| 2:27:32 | 6 | A   Yes, the uppers and lowers were, of |
| 2:27:34 | 7 | course, are an integral crane design.  You can't -- |
| 2:27:40 | 8 | and also that is the single largest item cost-wise |
| 2:27:44 | 9 | for the production of those cranes. |
| 2:27:48 | 10 | Q   Could it be possible that administration |
| 2:27:51 | 11 | did not know that Mr. Davis was ordering these units |
| 2:27:58 | 12 | from Caterpillar? |
| 2:27:59 | 13 | MR. MURRAY:  Objection, form. |
| 2:28:00 | 14 | MR. QUINTANILLA:  What's your |
| 2:28:02 | 15 | objection, Counselor? |
| 2:28:02 | 16 | MR. MURRAY:  It calls for |
| 2:28:03 | 17 | speculation. |
| 2:28:04 | 18 | Q   (BY MR. QUINTANILLA)  If you know.  I |
| 2:28:05 | 19 | don't want you to speculate. |
| 2:28:07 | 20 | A   As long as Mr. Yee was on the premises, I |
| 2:28:11 | 21 | am sure that the Caterpillar orders were -- that at |
| 2:28:16 | 22 | least a representative from Malaysia was aware of |
| 2:28:21 | 23 | the Caterpillar orders. |
| 2:28:22 | 24 | Q   I mean, is it possible that -- well, let |
| 2:28:31 | 25 | me ask you this way.  Is there any reason, that you |

12:31:14  1    could be possible, though --

12:31:16  2              MR. MURRAY:  Objection, form.

12:31:16  3        Q    (BY MR. QUINTANILLA)  -- that Mr. Davis

12:31:19  4    was not keeping them informed or anyone else from

12:31:22  5    the plant was not keeping them informed?

12:31:25  6              MR. MURRAY:  Objection, form.

12:31:27  7              THE WITNESS:  I don't believe that

12:31:28  8    they were not informed.

12:31:30  9        Q    (BY MR. QUINTANILLA)  You wouldn't buy

12:31:31 10    that kind of argument, would you?

12:31:34 11              MR. MURRAY:  Objection, form.

12:31:34 12              THE WITNESS:  I do not believe that

12:31:36 13    they were not informed.  I surely do not.

12:31:40 14        Q    (BY MR. QUINTANILLA)  So is it your

12:31:45 15    belief that Mr. Yee was aware of these purchase

12:31:49 16    orders with Caterpillar?

12:31:50 17              MR. MURRAY:  Objection, form.

12:31:52 18              THE WITNESS:  Yes.

12:31:53 19        Q    (BY MR. QUINTANILLA)  After all, that's

12:31:54 20    what he was there for, wasn't it?

12:31:57 21        A    That's correct.

12:31:58 22        Q    Now, did Mr. Yee leave before you or vice

12:32:03 23    versa?

12:32:04 24        A    He left before me.

12:32:05 25        Q    What's your understanding as to the

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "G"
# Affidavit of Daniel E. Davis
# (February 21, 2001)

EXHIBIT

**K**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC., and  FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC. and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

<u>AFFIDAVIT OF DANIEL E. DAVIS</u>

STATE OF TEXAS          *

                                 *

COUNTY OF CAMERON  *

    **BEFORE ME**, the undersigned Notary Public, on this day personally appeared, **MR.**

**DANIEL E. DAVIS**, who being duly sworn on oath stated the following:

    " I am one of the Plaintiffs in the above-styled and numbered civil action. I am over the age

of twenty-one (21) years, have never been convicted of a felony or crime involving moral turpitude,

and am competent to make this affidavit; and have personal knowledge of each and every statement

contained herein.

I have approximately twenty (20) years experience in the crane industry. From the late 1970's until the mid 1980's, I worked as a crane operator and/or superintendent for various companies. I also worked as a crane consultant for Caltex-Indonesia for approximately 8 months. Thereafter, between approximately 1992 and 1994, I worked for ESSO Malaysia as a crane supervisor/consultant, manager of off-shore cranes maintenance personnel. I then worked for The Manitowoc Company as an officer and Managing Director between 1994 and 1997. At Manitowoc, I was responsible for marketing and selling crawler cranes in the Pacific Rim area. The Pacific Rim area covers Indonesia, Singapore, Thailand, Korea, Vietnam and the whole Southeast Asia area. I was also a Company Representative for the Manitowoc Company in Mainland China.

Between 1997 and 1999, I was the President of Favelle Favco Cranes USA, Inc. located in Harlingen, Cameron County, Texas. I am also a 10% shareholder in Favelle Favco Cranes USA, Inc.. Between June and August of 1997, I received a copy of the Shareholders' Agreement from Cheam Tek Siong (hereinafter Cheam) with the instructions from him that if the agreement met with my approval I was to sign it and forward it to him, or if other additions or modifications needed to be made, I was to make them and forward them to him for inclusion. I requested that the "Shareholder's Agreement" be amended to include a royalty to be paid to me for my crawler crane invention and any patent that would issue. The royalty provision was added as I requested. On August 16, 1997, I signed the Shareholders' Agreement with the royalty provision in it in Singapore in the presence of Willie C. Jones. I then forwarded a copy of the executed Shareholders' Agreement to Mr. Cheam via Singapore mail service, and I hand-delivered a copy of the signed "Shareholder's Agreement" to Favelle Favco Cranes Holdings Headquarters in Malaysia.

The main purpose of the Shareholders' Agreement was to create what became known as Favelle Favco Cranes USA, Inc., to which I would be a ten percent (10%) shareholder and to market my crawler crane design with me as the owner of any patent. I came to Favelle Favco with the design developed with the assistance of Jim Rusk, a professional engineer. I granted to Favelle Favco a three (3) year license to sell my crawler cranes while I was to receive a one percent (1%) royalty for the license. The royalty was only one percent (1%) because of the expense needed to began marketing my crawler crane design. After the three (3) year license, we would enter into another license agreement for a higher royalty.

Further, I accepted employment with Favelle Favco Cranes USA, Inc. with the understanding that I would bring with me my idea and developed concept for the patent crawler cranes as these matters were openly discussed with Jim Rusk and Richard Robey. In fact, that is one of the reasons, as stated by Mac Ngan Boon (hereinafter Mac), that he wanted me to form Favelle Favco Cranes USA, Inc.. Favelle Favco did not manufacture crawler cranes and I had already developed my new crawler crane concept. Further, preliminary sketches and designs regarding the crawler cranes were prepared prior to my employment with Favelle Favco Cranes USA, Inc.

I always believed that I had a valid Shareholders' Agreement with the Favco Defendants where I retained ownership in my now patented crawler crane designs. Without this agreement, I certainly would not have allowed Favelle Favco to market my crawler crane designs. I relied on Mr. Cheam's representations that if I found the Shareholders' Agreement to be agreeable to just sign the agreement and forward it to him. As mentioned beforehand, I did forward an executed Shareholders' Agreement to Mr. Cheam. Neither Mr. Cheam nor anyone representing Defendants Favco never signed the Shareholders' Agreement even though he instructed me to sign it and verbally

3

acknowledged to me that the agreement was signed but had been misplaced when they moved to new facilities

All the essential terms of the Shareholders Agreement came to pass (i.e. Favelle Favco Cranes USA, Inc. was formed), I purchased ten percent (10%) ownership interest in the company and I collected a one percent (1%) royalty on the patented cranes sold plus my three percent ( 3%) commission for making the sale of the cranes. I relied to my detriment that the Shareholders' Agreement was fully executed. Favelle Favco says they never signed the agreement, and that I have to assign my patent to the company or based upon the amount of money invested by the company in the patent, they get a shop right. While if I had this agreement it would limit the company to a three year license with absolutely no right to ownership or shop rights in the patent. I feel that I was intentionally misled and had a fraud committed against me because Favelle Favco failed to execute the agreement as promised.

Further, from August 16, 1997 until sometime in 1999, Favelle Favco never presented me with another Shareholders' Agreement. A new agreement was presented to me only because Caterpillar wanted a copy of the licensing agreement between me and Favelle Favco, (i.e. the Shareholders' Agreement).

The reason I signed the confidentiality agreements is because since I owned the patent and had licensed it to Favelle Favco, I felt that the designs belonged to me individually and because I was open and disclosed all company matters to Mr. Cheam and Mr. Mac. Lastly the shareholders agreement I signed on August 16, 1997 did not contain the phrase # DRAFT in the upper right-hand corner of the first page of said agreement.

4

Further affiant sayeth not.



DANIEL E. DAVIS

**SUBSCRIBED AND SWORN TO BEFORE ME** BY THE SAID DANIEL E. DAVIS on

this the 22nd day of February, 2001, to certify which witness my hand and official seal.

ELIZABETH R. RIVERA
Notary Public, State of Texas
My Commission Expires
**MARCH 1, 2003**

Notary Public, State of Texas
County of Cameron

5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "H"
# Defendant's First Amended
# Counterclaim
# (November 6, 2000)

CutePDF - www.fastio.com

**FILE**

CAUSE NO. 99-10-4467-C

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO, INC., | § | |
| and COBURN INTERNATIONAL LTD. | § | |
| | § | CAMERON COUNTY, TEXAS |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN | § | |
| BHD and FAVELLE FAVCO HOLDINGS | § | |
| SDN BHD | § | 197TH JUDICIAL DISTRICT |

FILED __ __ O'CLOCK __ M
AURORA DE LA GARZA DIST. CLERK
NOV 0 6 2000
DISTRICT COURT OF CAMERON COUNTY, TEXAS
DEPUTY

## DEFENDANTS' FIRST AMENDED COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, DANIEL E. DAVIS, DAVISCO, INC., and COBURN INTERNATIONAL LTD., Defendants in the above-styled and numbered cause of action, (hereinafter referred to as **"COUNTER-PLAINTIFFS"**), and complain of **FAVELLE FAVCO CRANES USA, INC., FAVELLE FAVCO CRANES (M) SDN BHD and FAVELLE FAVCO HOLDINGS SDN BHD** (hereinafter collectively referred to as **"COUNTER-DEFENDANTS"**) and for cause of action, would respectfully show the Court and Jury the following:

I.

## PARTIES TO COUNTERCLAIM

1.01    Counter-Plaintiff **DANIEL E. DAVIS** is a natural person residing in Harlingen, Cameron County, Texas.

1.02    Counter-Plaintiffs **DAVISCO, INC.** and **COBURN INTERNATIONAL, LTD.** are companies that are owned by Counter-Plaintiff **DANIEL D. DAVIS**.

1.03    Counter-Defendant **FAVELLE FAVCO CRANES USA, INC.** (hereinafter referred to as Counter-Defendant **"FFC USA"**), as indicated in Plaintiff's Original Petition filed in the above-styled and numbered cause, is a corporation organized and existing under the laws of the State of Texas, and has a principal place of business at 4 Mile East, FM 106, Port of Harlingen, Harlingen, Texas. This Counter-Defendant is being represented in this preceding by Hon. Gary Gurwitz and Hon. Charles C. Murray of **ATLAS & HALL, L.L.P.**, 818 Pecan, P.O. Box 3725, McAllen, Texas 785201, and a copy of this First Amended Counter claim may be served on said counsel.

1.04    Counter-Defendant **FAVELLE FAVCO CRANES (M) SDN BHD** (hereinafter referred to as Counter-Defendant **FFC MALAYSIA**) is a corporation, upon information and belief, formed and existing under the laws of Malaysia and may be served with a copy of this First Amended Counterclaim by and through its attorneys of record, Hon. Gary Gurwitz and Hon. Charles C. Murray, **ATLAS & HALL, L.L.P.**, 818 Pecan, P O. Box 3725, McAllen, Texas, 78501.

1.05 Counter-Defendant **FAVELLE FAVCO HOLDINGS SDN BHD** (hereinafter referred to as Counter-Defendant **FAVCO HOLDINGS**), is upon information and belief, a corporation formed and incorporated under the laws of Malaysia, and owns ninety percent (90%) of the stock in **FAVELLE FAVCO CRANES USA, INC.**. This Counter-Defendant may be served with a copy of this First Amended Counterclaim by and through its attorneys of record, Hon. Gary Gurwitz and Hon. Charles C. Murray, **ATLAS & HALL, L.L.P.**, 818 Pecan, P. O. Box 3725, McAllen, Texas, 78501.

## II.

## FACTUAL ALLEGATIONS

2.01    Counter-Plaintiff **DANIEL E. DAVIS** has developed his ideas and concepts concerning a new and unique line of crawler cranes (**Davis Crawler Cranes**).  This idea and/or concept was conceived by Counter-Plaintiff **DANIEL E. DAVIS** prior to his employment with Counter Defendants.   The unique crawler cranes conceived and developed by Counter-Plaintiff **DANIEL E. DAVIS** use a variable-gauge excavator bottom in conjunction with an enhanced standard excavator upper. Counter-Plaintiff **DANIEL E. DAVIS** diligently pursued the development of this concept of cranes.   Counter-Plaintiff **DANIEL E. DAVIS** has protected his manufacturing methodology and his crawler cranes as trade secrets.

2.02    Before Counter-Plaintiff **DANIEL E. DAVIS'** efforts many people tried to develop such crawler cranes and all have failed.   On information and belief, even the Counter-Defendants or their affiliated companies tried to make a crawler crane, but could not make it work and discontinued the project.   The unique concept of a variable-gauge excavator bottom in conjunction with an enhanced standard excavator upper was known to have distinct advantages: the ability to mass produce, short lead-time for manufacturing, parts availability worldwide, warranties, distribution network, etc.  However, before Counter-Plaintiff **DANIEL E. DAVIS,** no one was able to build such a crane including the Counter-Defendants or their affiliated companies.

2.03    Counter-Defendants and their affiliated companies make tower cranes and offshore cranes.  Counter-Defendants have been making tower cranes and offshore cranes for over 30 years, and are well known for tower cranes and offshore cranes.  Prior to the relationship with the Counter-Plaintiff **DANIEL E. DAVIS**, neither Counter-Defendant made crawler cranes of any type.  Neither

3

CutePDF - www.cutepdf.com

Counter-Defendant nor their affiliated companies have any expertise in crawler cranes of any type. Neither Counter-Defendant nor their affiliated companies have any manufacturing experience in crawler cranes of any type.

2.04    **On or about June 23, 1997,** Counter-Plaintiff **DANIEL E. DAVIS** signed an employment contract with Counter-Defendant **FAVCO HOLDINGS to be Managing Director and President of FAVELLE FAVCO CRANES USA, INC**. in Harlingen, Texas   The contract was for thirty-six (36) months.  Counter-Plaintiff **DANIEL E. DAVIS** was to receive, among other things, the right to purchase ten percent (10%) of the stock of Favco, a monthly salary, a company car, medical benefits and a royalty for any sales of the **Davis Crawler Cranes**.  Counter-Defendant **FAVCO HOLDINGS** agreed to license the manufacture and sale of the **Davis Crawler Cranes**. Counter-Plaintiff **DANIEL E. DAVIS** received ten percent (10%) of the stock of **FAVELLE FAVCO CRANES USA, INC.**.

2.05    As of **June 1997,** no **Davis Crawler Crane** had ever been built because the design had not been finalized.  Much public skepticism existed as to whether any crawler crane design would be functional.   To perfect his crane design, Counter-Plaintiff **DANIEL E. DAVIS** needed to experiment with various aspects of the proposed cranes.  It was understood that Counter-Plaintiff **DANIEL E. DAVIS** was to finalize his design changes as soon as possible after becoming Managing Director and President of **FAVELLE FAVCO CRANES USA, INC.**.  It was important to start the manufacture and sale of the **Davis Crawler Cranes** as soon as possible, and Counter-Plaintiff **DANIEL E. DAVIS** did just that.

2.06    In **August 1997,** Counter-Defendants submitted a Shareholders' Agreement to Counter-Plaintiff **DANIEL E. DAVIS**.   On August 16, 1997, Counter-Plaintiff signed the Shareholders' Agreement and returned it to Favco.  A copy of said **SHAREHOLDERS'**

4

AGREEMENT is attached hereto as **Exhibit "A"**, and incorporated by reference the same as if fully copied and set forth at length. Pursuant to this Shareholders' Agreement, Counter-Defendant **FAVELLE FAVCO CRANES (M) SDN BHD** was to own ninety percent (90%) and Counter-Plaintiff **DANIEL E. DAVIS** was to own ten percent (10%) of **FFC USA**. Also, **FFC USA** was to have an initial authorized share capital of Three Million and no/100ths Dollars ($3,000,000.00) divided into 3,000,000 ordinary shares of the par value of one Dollar ($1.00) per share. Additionally, this Shareholders' Agreement includes language to the effect that Counter-Defendant **FAVELLE FAVCO CRANES (M) SDN BHD** shall for a period of three (3) years from August 16, 1997 pay Counter-Plaintiff **DANIEL E. DAVIS** royalty fee of one percent (1%) of the sale price for the sale of each crane manufactured or assembled pursuant to Counter-Plaintiff **DANIEL E. DAVIS'** patented invention, namely, the Excavator Upper and Variable Gauge Lower for the making of a Latice and Box Boom Crawler Crane, and whether or not the sale took place before or after the termination of the Shareholders' Agreement. (See **SHAREHOLDERS' AGREEMENT, Exhibit "A"**).

2.07   In **March 1999**, Counter-Plaintiff **DANIEL E. DAVIS** presented his new line of crawler cranes at Conexpo in Las Vegas, Nevada. These cranes were met with extreme praise by the public. Such cranes had not before been known or used. However, much skepticism continued with respect to whether the **Davis Crawler Cranes** would function as required and as expected.

2.08   About **April 1999**, Counter-Defendants requested Counter-Plaintiff **DANIEL E. DAVIS** to agree to changes in the Shareholder's Agreement dated August 16, 1997, and to execute a **"New Shareholder's Agreement for FFC-USA."** Counter-Defendants by and through their agent employee, and/or representative, **Yee Yang Chien**, requested that the New Shareholder's Agreement for FFC-USA include, among other things, the following term:

CMPDF - www.festo.com

"... 3) **Patent to Crawler crane design**

Mr. Daniel Davis is the inventor and the owner of the patents to the design. The rights to use the designs and drawings are to be licensed to FFC-USA  In return, Mr. Daniel Davis is to derive a royalty of _____ over a period of _____ years  "

A true and correct copy of said **"Issues to be incorporated in the New Shareholder's Agreement for FFC-USA",** prepared by Counter-Defendants and submitted to Counter-Plaintiff **DANIEL E. DAVIS** is attached hereto as **Exhibit "B"**, and incorporated by reference the same as if fully copied and set forth at length.  **Yee Yang Chien** writes in his own handwriting **"Danny, Attached the issues to be addressed in the new agreement."**  Clearly, even Counter-Defendants agree or acknowledge that Counter-Plaintiff **DANIEL E. DAVIS** is the owner of the **Davis Crawler Cranes**, the patent and all associated technology and drawings.

2.09    About **May 1999**, Counter-Plaintiff **DANIEL E. DAVIS** through **FAVELLE FAVCO CRANES USA, INC**. sold three (3) **Davis Crawler Cranes** to Mustang Equipment in Houston, Texas. Although there continues to be known skepticism as to whether the **Davis Crawler Cranes** work, the three (3) **Davis Crawler Cranes** sold to Mustang Equipment have been and continue to work without problems.  Thereafter, additional customers requested **Davis Crawler Cranes**.  Counter-Plaintiff **DANIEL E. DAVIS** sought to get funding and equipment from Counter-Defendants to build the additionally requested **Davis Crawler Cranes**.  Counter-Defendants refused to fund the manufacture of the **Davis Crawler Cranes** requested.  This refusal has caused and continues to cause Counter-Plaintiff to suffer damages, which are described herein below.

2.10    At the same time Counter-Defendants refused to fund the manufacture of **Davis Crawler Cranes** requested by customers, Counter-Defendants requested that Counter-Plaintiff **DANIEL E. DAVIS** assign all or half of his patent rights to them.  Counter-Plaintiff refused the request, and referred Counter-Defendants to the Shareholder's Agreement dated August 16, 1997.

The Favco Shareholder's Agreement recites in paragraph 7.1 that Favco shall pay Counter-Plaintiff a royalty for cranes sold under Counter-Plaintiff **DANIEL E. DAVIS'** patented invention. (See **SHAREHOLDERS' AGREEMENT, Exhibit "A"**.)

2.11   On **September 8, 1999**, the Counter-Defendants terminated Counter-Plaintiff **DANIEL E. DAVIS**, without cause. Further, Counter-Defendants sought to take for their own the intellectual property owned by Counter-Plaintiff in the form of the **Davis Crawler Cranes**, including the trade secrets embodied in the manufacturing processes, drawings, engineering, know how, designs, and information contained in Counter-Plaintiff **DANIEL E. DAVIS'** patent application. However, Counter-Defendants know or have acknowledged that Counter-Plaintiff **DANIEL E. DAVIS** is the inventor and the owner of the patent, the designs, the drawings and all technology related to the **Davis Crawler Cranes**.

2.12   Many crane and excavator entities and engineers have tried to implement the type of crane design that Counter-Plaintiff **DANIEL E. DAVIS** has successfully invented. None have been able to accomplish this prior to Counter-Plaintiff. Many crane and excavator engineers still refuse to believe that the **Davis Crawler Cranes** are effective and reliable devices. Counter-Plaintiff must consistently work to overcome this skepticism to insure that the concept of the crawler cranes as embodied in Counter-Plaintiff's invention - **the Davis Crawler Cranes** - is accepted in industry practice. These efforts are absolutely essential to Counter-Plaintiff, and the success of the **Davis Crawler Cranes**. Counter-Defendants are seeking to sell cranes, and to Counter-Plaintiff's knowledge and belief, has sold said crawler cranes. This action on the part of Counter-Defendants violates Counter-Plaintiff **DANIEL E. DAVIS'** trade secret rights.

7

## III.

## CAUSES OF ACTION

**A.    FIRST CAUSE OF ACTION**:  BREACH OF EMPLOYMENT CONTRACT

3.01  As alleged beforehand, on or about June 23, 1997, Counter-Plaintiff **DANIEL E. DAVIS** entered into an **EMPLOYMENT CONTRACT** with Counter-Defendant **FAVCO HOLDINGS**.    Pursuant to this said **EMPLOYMENT CONTRACT**, Counter-Plaintiff was employed as a Managing Director and President of **FAVELLE FAVCO CRANES USA, INC.** in its Harlingen, Cameron County, Texas facility.  This said **EMPLOYMENT CONTRACT** was for a term period of thirty-six (36) months.   A true and correct copy of said **EMPLOYMENT CONTRACT** is attached hereto as **Exhibit "C"**, and incorporated herein by reference the same as if fully copied and set forth at length.   This **EMPLOYMENT CONTRACT** was executed by **DANIEL E. DAVIS** and **Mac Ngan Boon**, Managing Director of **MUHIBBAH ENGINEERING**, as well as by **Cheam Tek Siong**, General Manager of the **Favelle Favco Group**.

3.02  Counter-Plaintiffs would show this Honorable Court and Jury pursuant to the **EMPLOYMENT CONTRACT**, Counter-Plaintiff **DANIEL E. DAVIS** was to be compensated at a monthly salary of **EIGHT THOUSAND AND NO/100THS DOLLARS ($8,000.00)**, and provided a company car, worker's compensation benefits, and a health insurance plan.  The Counter-Plaintiffs would show this Court and Jury that after Counter-Plaintiff **DANIEL E. DAVIS** was hired as Managing Director and President of **FFC USA**, he began to faithfully execute his duties and responsibilities and fulfilled all his duties and obligations.

3.03  Thereafter, on or about **September 8, 1999**, Counter-Defendants terminated Counter-Plaintiff **DANIEL E. DAVIS** from his employment with Counter-Defendant **FFC USA** without cause.  This action on the part of Counter-Defendants amounts to a breach of contract, i.e. **the Employment Contract**.

8

3.04 Counter-Plaintiff **DANIEL E. DAVIS** would show this Honorable Court and Jury that as a direct and proximate result of Counter-Defendants' breach of contract, he has suffered damages, included but not limited to loss of wages, loss of car allowance, and loss of health insurance coverage. Counter-Plaintiff seeks to recover these said damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court.

**B. SECOND CAUSE OF ACTION: BREACH OF SHAREHOLDERS AGREEMENT**

3.05 As alleged beforehand, on or about **August 16, 1997**, Counter-Defendants **FAVCO** submitted a **"SHAREHOLDERS' AGREEMENT"** to Counter-Plaintiff **DANIEL E. DAVIS**. On or about said date, Counter-Plaintiff **DANIEL E. DAVIS** executed the **SHAREHOLDERS' AGREEMENT** and returned same to Counter-Defendants **FAVCO**. A true and correct copy of said **SHAREHOLDERS' AGREEMENT** is attached hereto as **Exhibit "A"**, and incorporated by reference the same as if fully copied and set forth at length. Pursuant to this Shareholders' Agreement Counter-Defendant **FAVELLE FAVCO CRANES (M) SDN BHD** was to own ninety percent (90%) and Counter-Plaintiff **DANIEL E. DAVIS** was to own ten percent (10%) of **FFC USA**. Also, **FFC USA** was to have an initial authorized share capital of Three Million and no/100ths Dollars ($3,000,000.00) divided into 3,000,000 ordinary shares of the par value of one Dollar ($1.00) per share. Additionally, this Shareholders' Agreement includes language to the effect that Counter-Defendant **FAVELLE FAVCO CRANES (M) SDN BHD** shall for a period of three (3) years from August 16, 1997 pay Counter-Plaintiff **DANIEL E. DAVIS** royalty fee of one percent (1%) of the sale price for the sale of each crane manufactured or assembled pursuant to Counter-Plaintiff **DANIEL E. DAVIS'** patented invention, namely, the Excavator Upper and Variable Gauge Lower for the making of a Latice and Box Boom Crawler Crane, and whether or not the sale took place before or after the termination of the Shareholders' Agreement.   (See **SHAREHOLDERS' AGREEMENT, Exhibit "A").**

3.06 Thereafter, on or about **April of 1999**, Counter-Defendants **FAVCO**, by and through their agent, employee, and/or representative, **Yee Yang Chien,** requested Counter-Plaintiff **DANIEL E. DAVIS** to agree to changes in the **SHAREHOLDER'S AGREEMENT** dated August 16, 1997 and to execute a "**New Shareholder's Agreement for FFC-USA**". Counter-Defendants by and through their agent, employee and/or representative, **Yee Yang Chien**, requested that the **"New Shareholder's Agreement for FFC-USA"** include, among other issues, the following issue:

"... **3) Patent to Crawler crane design**

Mr. Daniel Davis is the inventor and the owner of the patents to the design. The rights to use the designs and drawings are to be licensed to FFC-USA. In return, Mr. Daniel Davis is to derive a royalty of _____ over a period of _____ years..."

This particular issue is included in a document entitled "Issues to be incorporated in the New Shareholder's Agreement for FFC-USA". A true and correct copy of said "**Issues to be incorporated in the New Shareholder's Agreement for FFC-USA**" is attached hereto as **Exhibit "B"**, and incorporated herein by reference the same as if fully copied and set forth at length. Counter-Defendants' agent, employee, and/or representative, **Yee Yang Chien,** writes in his own handwriting "... **Danny, Attached the Issues to Be Addressed in The New Agreement...**" Counter-Plaintiff **DANIEL E. DAVIS** contends that this conduct on the part of Counter-Defendants clearly demonstrate that they consider him to be the owner of the **Davis Crawler Cranes**, the patent and all associated technology and drawings.

3.07 As alleged beforehand, **on or about May 1999**, Counter-Plaintiff **DANIEL E. DAVIS** through Favco sold three (3) **Davis Crawler Cranes** to Mustang Equipment in Houston, Texas. Although there continues to be known skepticism as to whether the **Davis Crawler Cranes** work, the three (3) **Davis Crawler Cranes** sold to Mustang Equipment have been and continue to work without problems. Thereafter, additional customers requested **Davis Crawler Cranes**. Counter-

10

Plaintiff **DANIEL E. DAVIS** sought to get funding and equipment from Counter-Defendants to build the additionally requested **Davis Crawler Cranes**. Counter-Defendants refused to fund the manufacture of the **Davis Crawler Cranes** requested. This refusal has caused and continues to cause Counter-Plaintiff **DANIEL E. DAVIS** to suffer damages, which are described herein below.

3.08 At the same time Counter-Defendants **FAVCO** refused to fund the manufacture of **Davis Crawler Cranes** requested by customers, Counter-Defendants requested that Counter-Plaintiff **DANIEL E. DAVIS** assign all or half of his patent rights to them. Counter-Plaintiff **DANIEL E. DAVIS** contends that these demands on the part of Counter-Defendants were unreasonable. Counter-Plaintiff refused the request, and referred Counter-Defendants to the Shareholder's Agreement dated August 16, 1997. The Favco Shareholder's Agreement recites in paragraph 7.1 that Favco shall pay **MR. DAVIS** a royalty for cranes sold under Davis' patented invention. (See **"SHAREHOLDER'S AGREEMENT", Exhibit "A".**) Counter-Defendants refused to pay any royalties to Counter-Plaintiff **DANIEL E. DAVIS**. Counter-Plaintiffs contends that this conduct on the part of Counter-Defendants amounts to a breach of the **SHAREHOLDERS' AGREEMENT**.

3.09 Counter-Plaintiff **DANIEL E. DAVIS** would show this Honorable Court that as a direct and proximate result of Counter-Defendants' breach of the **SHAREHOLDERS' AGREEMENT**, he has suffered damages including but not limited to loss of royalty monies. Counter-Plaintiff seeks to recover these said damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court.

C.     THIRD CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS,
PROPRIETARY INFORMATION AND CONFIDENTIAL INFORMATION

3.10 As alleged beforehand, Counter-Plaintiff **DANIEL E. DAVIS** has diligently pursued the

conception and development of his unique and singular crawler crane design.  Further, Counter-

Plaintiff has taken the necessary precautions to protect the manufacturing methodology of his crawler

crane as well as all associated designs, schematics, graphics, drawings and blueprints.  Further, no

production, manufacture or sale of the aforementioned **Davis Crawler Crane** had taken place prior

to entry by the parties in the aforementioned **SHAREHOLDERS' AGREEMENT (Exhibit "A")**

and **EMPLOYMENT CONTRACT (Exhibit "C")**.

3.11 Further, such information pertaining to the production, manufacture and sale of the

**Davis Crawler Cranes** that is currently being used and distributed worldwide by the Counter-

Defendants was obtained by and came into Counter-Defendants' possession as a result of a

confidential relationship with Counter-Plaintiff **DANIEL E. DAVIS**.  Therefore, Counter-Defendants

have committed a breach of confidence and misappropriated proprietary information confidential

information and trade secrets based upon Counter-Defendants' use, continued use and distribution

worldwide of Counter-Plaintiff's trade secret methodology as it pertains to the production,

manufacture and sale of the Counter-Plaintiff's crawler cranes (**Davis Crawler Cranes**) and the

associated designs, schematics, graphics, drawings and blueprints.

3.12 Therefore, Counter-Plaintiffs would show this Honorable Court that as a direct and

proximate result of the Counter-Defendants' misappropriation of trade secrets, proprietary

information and confidential information, Counter-Plaintiff **DANIEL E. DAVIS** has suffered

damages including and not limited to lost royalties, lost profits and lost business opportunities.

Counter-Plaintiff **DANIEL E. DAVIS** seeks to recover these damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court.

**D.    FOURTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP**

3.13  As alleged beforehand, Counter-Plaintiff has developed his ideas and concepts concerning a new and unique line of crawler cranes (**Davis Crawler Cranes**). However, after Counter-Defendants terminated Counter-Plaintiff **DANIEL E. DAVIS** from his employment with **FFC USA,** they sought to take for their own Counter-Plaintiff **DANIEL E. DAVIS'** ideas and concepts.

3.14 As further alleged beforehand, **on or about May 1999,** Counter-Plaintiff **DANIEL E. DAVIS** sold three (3) of the Davis Crawler Cranes to Mustang Equipment in Houston, Texas. Thereafter, additional customers requested Davis Crawler Cranes. Counter-Plaintiff **DANIEL E. DAVIS** sought to get funding and equipment from Counter-Defendants to build the requested additional **Davis Crawler Cranes.** However, Counter-Defendants refused to fund the manufacture of the **Davis Crawler Cranes.**

3.15  Counter-Plaintiffs would show this Court and Jury that instead of funding the manufacture of additional **Davis Crawler Cranes,** Counter-Defendants terminated Counter-Plaintiff **DANIEL E. DAVIS** from his employment with **FFC USA.** After Counter-Defendants terminated Counter-Plaintiff **DANIEL E. DAVIS,** they sought to interfere with the prospective buyers of **Davis Crawler Cranes** by launching or initiating this lawsuit over the rights to the **Davis Crawler Cranes** ideas and concepts and preventing him from selling the crawler cranes. Counter-Plaintiffs contend that this conduct on the part of Counter-Defendants amounts to tortious interference with Counter-

13

Plaintiff **DANIEL E. DAVIS'** business relationships. Moreover, Counter-Plaintiffs contend that this conduct on the part of Counter-Defendants also amounts to tortious interference with the business relationship between Counter-Plaintiff **DANIEL E. DAVIS** and Counter-Defendants.

    3.16 Counter-Plaintiffs would show this Honorable Court that as a direct and proximate result of Counter-Defendants' tortious interference with Counter-Plaintiff **DANIEL E. DAVIS'** business relationships, Counter-Plaintiff **DANIEL E. DAVIS** has suffered damages including, but not limited to economic damages, lost profits, lost royalties, and lost business opportunities. Counter-Plaintiff **DANIEL E. DAVIS** seeks to recover these damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court.

E.    <u>**FIFTH CAUSE OF ACTION:**</u> **MISREPRESENTATION OF BUSINESS RELATIONSHIP**

    3.17 Counter-Plaintiffs would show this Court and Jury that Counter-Defendants had a business relationship with Counter-Plaintiff **DANIEL E. DAVIS** by the two (2) existing contracts between them, to-wit: (1) **EMPLOYMENT CONTRACT (Exhibit "C")'** and (2) the **SHAREHOLDERS' AGREEMENT (Exhibit "A")**. Counter-Plaintiff **DANIEL E. DAVIS** was led to believe by Counter-Defendants that he was the owner of the **Davis Crawler Cranes**, the patent, and all associated technology and drawings. He was also led by Counter-Defendants to believe that he was going to receive or be paid a royalty fee of one percent (1%) of the sale price for the sale of each crane manufactured or assembled pursuant to his invention.

    3.18 However, such was not the case in that Counter-Defendants initiated this lawsuit against Counter-Plaintiff **DANIEL E. DAVIS** alleging that the had no patentable design for crawler cranes and that the sole owner of the patents involving the **Davis Crawler Cranes** are Counter-Defendants.

14

As such, Counter-Defendants either intentionally or negligently misrepresented their business relationship with Counter-Plaintiff **DANIEL E. DAVIS** to him. Counter-Plaintiff **DANIEL E. DAVIS** relied on this misrepresentation or representation to his detriment.

3.19 Counter-Plaintiffs would show this Honorable Court that as a direct and proximate result of Counter-Defendants' misrepresentation of their business relationship with Counter-Plaintiff **DANIEL E. DAVIS**, Counter-Plaintiff **DANIEL E. DAVIS** has suffered damages including, but not limited to economic damages, lost profits, lost royalties, and lost business opportunities. Counter-Plaintiff **DANIEL E. DAVIS** seeks to recover these damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court.

**F.     SIXTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY**

3.20 Counter-Plaintiffs would show the Court and Jury that on or about **August 16, 1997**, Counter-Defendants **FAVCO** submitted a **SHAREHOLDERS' AGREEMENT (Exhibit "A")** to Counter-Plaintiff **DANIEL E. DAVIS. MR. DAVIS** executed the **SHAREHOLDERS' AGREEMENT** and returned it to Counter-Defendants. **MR. DAVIS** was at that point working for Counter-Defendants at **FFC USA** under an **EMPLOYMENT CONTRACT** dated June 23, 1997.

3.21 Counter-Plaintiffs contend that Counter-Defendants had a fiduciary duty to Counter-Plaintiff **DANIEL E. DAVIS** which resulted form the **SHAREHOLDERS' AGREEMENT** as well as the **EMPLOYMENT CONTRACT**. Counter-Plaintiffs would show the Court that Counter-Defendants breached their fiduciary duty to Counter-Plaintiff **DANIEL E. DAVIS** when they terminated him from his employment and began using his trade secrets, proprietary information, and confidential information to manufacture and sell the **Davis Crawler Cranes**, both domestic and foreign.

15

3.22 Counter-Plaintiffs would show this Honorable Court that as a direct and proximate result of Counter-Defendants' breach of fiduciary duty to Counter-Plaintiff **DANIEL E. DAVIS**, Counter-Plaintiff **DANIEL E. DAVIS** has suffered damages including, but not limited to economic damages, lost profits, lost royalties, and lost business opportunities. Counter-Plaintiff **DANIEL E. DAVIS** seeks to recover these damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court.

G.　**SEVENTH CAUSE OF ACTION:** FRAUD

3.23 Counter-Plaintiffs hereby incorporate the allegations set forth in the foregoing paragraphs 2.01 through 2.12, respectively. As alleged beforehand, Counter-Plaintiff **DANIEL E. DAVIS** had two existing contracts with Counter-Defendants, to-wit: (1) the **EMPLOYMENT CONTRACT (Exhibit "C")**; and (2) the **SHAREHOLDERS' AGREEMENT (Exhibit "B")** At the time of the signing of these contracts and/or agreements, Counter-Defendants knowingly made false representations as to material facts or knowingly concealed all or part of material information from Counter-Plaintiffs with the intent of inducing Counter-Plaintiff **DANIEL E. DAVIS** to enter and/or sign said Contract and/or Agreement. Counter-Defendants knew the representations made to Counter-Plaintiff **DANIEL E. DAVIS** were false when they made them or made them recklessly without any knowledge of their truth and as positive assertions. Furthermore, Counter-Defendants, by and through their agents, employees, and/or representations, made said representations with the intention that they be acted upon by Counter-Plaintiffs, including Counter-Plaintiff **DANIEL E. DAVIS**. **MR. DAVIS** did, in fact, act and signed the said Contract and/or Agreement in reliance upon such representations.

3.24 Counter-Plaintiffs would show the Court and Jury that Counter-Defendants made the following representations or knowingly concealed the following information; including, but not limited to:

CUtePDF - www.tavia.com

(1)     **MR. DAVIS** was to be employed as Managing Director and President of **FFC USA**;

(2)     **MR. DAVIS** was to be paid his salary, home leave benefits, and other benefits accured if he was discharged for cause;

(3)     **MR. DAVIS** would have a ten percent (10%) ownership in **FFC USA**;

(4)     **MR. DAVIS** would receive a royalty fee of one percent (1%) of the sale price for the sale of each crane manufactured or assembled pursuant to his patented invention, namely, the Excavator Upper and Variable Gague Lower for the making of a lattice and box boom Crawler Crane, and whether or not the sale took place before or after the termination of the Shareholders' Agreement;

(5)     **MR. DAVIS** would be acknowledged as the inventor of and owner of the trade secrets to the **DAVIS CRAWLER CRANES**; and

(6)     **MR. DAVIS** would be acknowledged as the owner of all technology and drawings associated with the **Davis Crawler Cranes**.

3.25 Counter-Plaintiffs further allege that each and every one of the representations set forth above were more than mere opinions, predictions, or expectations, but concerned material facts for the reason that Counter-Plaintiff **DANIEL E. DAVIS** would not have signed the **EMPLOYMENT CONTRACT** and/or **SHAREHOLDERS' AGREEMENT**.   Each and every one of the representations was relied on by Counter-Plaintiffs to Plaintiffs' substantial injuries and damages as described more fully below.   Plaintiffs' damages and/or injuries have occurred as a direct and proximate result of Counter-Defendant's fraudulent representations and/or actions.   As such, Counter-Plaintiffs seek damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court.

## IV.

## DAMAGES SOUGHT BY COUNTER-PLAINTIFFS

4.01 Based upon the aforementioned paragraphs 2.01 - 2.12 and 3.01 - 3.24, Counter-Plaintiff **DANIEL E. DAVIS** has suffered emotional distress and/or mental anguish in the future, and will continue to suffer emotional distress and/or mental anguish, and seeks to recover these damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court..

17

4.02 Based upon the aforementioned paragraphs 2.01 - 2.12 and 3.01 - 3.24 Counter-Plaintiff **DANIEL E. DAVIS** has suffered damage to his reputation, and seeks to recover these damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court.

4.03 Based upon the aforementioned paragraphs 2.01-2.12 and 3.01 3.24. Counter-Plaintiff has suffered damage to his business reputation, and seeks to recover these damages from Counter-Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court.

4.04 Based upon the aforementioned paragraphs 2.01 - 2.12 and 3.01 - 3.24, Counter-Plaintiff **DANIEL E. DAVIS** has suffered economic damages, including, but not limited to lost wages, lost income, and lost royalties, and seeks to recover these damages from Counter-Defendants jointly and severally

## V.

## EXEMPLARY DAMAGES

5.01 Counter-Plaintiffs will further show the Court and Jury that all of the foregoing conduct of the Counter-Defendants constitutes malice in that such conduct was either a specific intent by the Counter-Defendants to cause substantial injury to Counter-Plaintiff **DANIEL E. DAVIS** or an act or omission by Counter-Defendants which when viewed objectively from the standpoint of the Counter-Defendants at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others and of which the Counter-Defendants have actual subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

5.02 As a direct and proximate result of Counter-Defendants' malicious conduct, Counter-Plaintiffs seek to recover exemplary and/or punitive damages from Counter-Defendants, jointly and severally in an amount to be determined by the jury or trier of fact.

CutePDF - www.texas.com

# VI.

## ATTORNEY'S FEES

6.01 As a further result of Counter-Defendants' actions and practices, Counter-Plaintiffs have been compelled to engage the services of the law firm whose name is subscribed to this pleading and has agreed to pay such attorneys for legal services rendered and to be rendered in the preparation and trial of this cause. As such, Counter-Plaintiffs seek to recover reasonable attorney's fees in relation to the work performed and to be performed in this cause of action.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED** Counter-Plaintiffs pray that Counter-Defendants **FAVELLE FAVCO CRANES USA, INC., FAVELLE FAVCO CRANES (M) SDN BHD, and FAVELLE FAVCO HOLDINGS SDN BHD** be cited to appear and answer, that a trial by jury be had on the merits, and that on final trial, Counter-Plaintiffs have the following:

(1)     Judgment against Counter-Defendants, jointly and severally for actual damages in a sum within the minimum jurisdictional limits of this Court;

(2)     Prejudgment and post judgment interest as provided by law;

(3)     Reasonable attorney's fees;

(4)     An award of exemplary and/or punitive damages against Counter-Defendants, jointly and severally, in a sum to be determined by the trier of fact;

(5)     Costs of suit; and

(6)     Such other and further relief to which Counter-Plaintiffs may be justly entitled.

Respectfully submitted,

LAW OFFICES OF
ERNEST GAMEZ, JR., P.C
777 E. Harrison Street
Brownsville, Texas 78520
TEL/ (956) 541-3820
FAX/ (956) 541-7694

BY: _____
ERNESTO GAMEZ, JR.
State Bar No 07606600
County Id No. 9901

VICTOR QUINTANILLA
State Bar No. 00786181
County Id. No. 9917

Attorneys for Counter-Plaintiffs
**DANIEL E. DAVIS, DAVISCO,
INC. and COBURN
INTERNATIONAL, LTD.**

## CERTIFICATE OF SERVICE

I, **VICTOR QUINTANILLA**, hereby certify that on this 6th day of November, 2000, a true

and correct copy of **Defendants' First Amended Counterclaim** was served **CM RRR # 7099 3220**

**0006 2777 5370** on Counter-Defendants' counsel of record, Hon. Gary Gurwitz, **ATLAS & HALL**,

**L.L.P.**, P.O. Drawer 3725, 818 Pecan, McAllen, Texas, 78502.

_____
VICTOR QUINTANILLA

20

CAUSE NO. 99-10-4467-C

| | | |
|---|---|---|
| **FAVELLE FAVCO CRANES USA, INC** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **VS.** | § | |
| | § | |
| **DANIEL E. DAVIS, DAVISCO, INC.,** | § | |
| **and COBURN INTERNATIONAL LTD.** | § | |
| | § | **CAMERON COUNTY, TEXAS** |
| **VS.** | § | |
| | § | |
| **FAVELLE FAVCO CRANES USA, INC.,** | § | |
| **FAVELLE FAVCO CRANES (M) SDN** | § | |
| **BHD and FAVELLE FAVCO HOLDINGS** | § | |
| **SDN BHD** | § | **197TH JUDICIAL DISTRICT** |

# EXHIBIT "A"

## SHAREHOLDERS' AGREEMENT

THIS AGREEMENT is made the ...16th... day of ...Aug.t 19.97. Between:-

1.    FAVELLE FAVCO CRANES (M) SDN. BHD., a company incorporated in Malaysia with its registered office at ..... ("the First Party") of the one part; and

2.    DANIEL B. DAVIS] (Passport No. .....) of ...USA. ("the Second Party") of the other part.

IT IS AGREED as follows:-

1.1    The parties hereto shall within .... days from the date of this Agreement form a corporation in the State of Texas, United States of America ("the Company").

1.2    The Constitution of the Company shall be in the form and content of the draft annexed hereto and initialled by the parties for the purposes of identification. In the event of a conflict between the provisions of this Agreement and the Constitution of the Company, the provisions of this Agreement shall prevail and the parties shall cause the necessary amendments to be made to the Constitution.

1.3    The Company shall have an initial authorised share capital of United States Dollars Three Million (US$3,000,000/-) divided into 3,000,000 ordinary shares of the par value of United States Dollars One (US$1) per share. The initial issued and paid up capital of the Company shall be United States Dollars Five Hundred Thousand (US$500,000/-).

1.4    Unless otherwise varied by written agreement, the issued and paid up capital of the Company shall be held by the parties in the following proportions:

The First Party 90 %

The Second Party 10 %

1.5    If the Second Party is desirous of disposing any or all of his shares, the First Party hereby agrees to take up the said shares within thirty (30) days of being so notified by the Second Party. If the First Party is desirous of disposing any or all of his shares, it must first make the offer to the Second Party and if the Second Party does not take up all or any of the said shares within thirty (30) days of being so offered, then the First Party may sell them to a third party and in any event in accordance with the terms of the Company's Constitution PROVIDED that if the First Party is desirous of disposing more than 50% of its total shareholdings in the Company it may not sell them to a third party unless the third party also make an offer to the Second Party to purchase all his shares. The parties hereto hereby agree that the purchase price for

*Exhibit 2*

DBD.

the sale and purchase of shares pursuant to this Clause 1.5 shall be determined in accordance with Clause 6.4.2.

1.6   Any party will have a right of pre-emption in case any shares are issued whether from the unissued authorised capital or from any increase in the authorised capital.

2.1   The composition of the board of directors of the Company ("Board") shall be as follows:

The First Party .....

The Second Party .....

2.2   All resolutions of the Board shall be approved by a simple majority of the Board.

3.1   All matters raised at a meeting of the Company shall, unless otherwise required by the laws of the State of Texas, be decided by a simple majority of the shareholders present at the meeting.

4.1   The parties hereto agree that unless otherwise varied in writing, the business of the Company shall be restricted and confined to the following:-

   (a)   sales and marketing arm for Favelle Favco Cranes (M) Sdn. Bhd. ("FFC") in the United States of America, Mexico, Central and South America;

   (b)   buy parts and materials for FFC and arrange for the shipping thereof to Malaysia or such other location as designated by FFC;

   (c)   if requested by FFC, buy used crawler cranes and or foundation equipment for Asia and or the Middle East;

   (d)   quote manitex offshore spare parts and establish parts supplier in the United States of America;

   (e)   quote new manitex offshore pedestal cranes;

   (f)   fabricate towers and booms and Kroll tower cranes for FFC;

   (g)   sell the whole of the West Manitowoc cranes in Mexico, central and south America; and

   (h)   finalise, conceptualise, design and manufacture Excavator Upper and Variable Gauge Lower for the manufacture of Lattice and Box Boom Crawler Crane.

5.1   The Second Party hereby agrees with the First Party that he shall not, during the subsistence of this Agreement and for a period of three years after the determination of this Agreement for

whatever reasons, directly or indirectly enter into any agreement, arrangement, partnership or otherwise in competition with the business carried on or proposed to be carried on by the Company unless the termination of this Agreement is pursuant to Clauses 6.2.2 or 6.3.

6.1   This Agreement shall continue in full force and effect until terminated in accordance with the provisions of this clause.

6.2   Either of the parties to this Agreement shall be entitled to terminate this Agreement immediately by notice in writing to the defaulting party ("Defaulting Shareholder(s)") if any of the events set out below shall occur. The said events are:-

6.2.1   If the Defaulting Shareholder(s) shall commit any material breach of any of its obligations under this Agreement and shall fail to remedy such breach (if capable of remedy) within fourteen (14) days after being given notice by the other parties hereto so to do; or

6.2.2   If one or more parties hereto (being a Company) shall go into liquidation whether compulsory or voluntary (except for the purposes of a bona fide reconstruction or amalgamation with the consent of the other parties hereto such consents not to be unreasonably withheld) or if one or more of the parties hereto shall have an administrator appointed or if a receiver administrative receiver or manager shall be appointed over any part of the assets or undertakings of that party or if a petition shall be presented or an order made for the appointment of a trustee in bankruptcy; or

6.2.3   If one (1) party acquires all the shares of the Company.

6.3   This Agreement shall terminate immediately if an effective resolution is passed to wind up the Company or if a liquidator is otherwise appointed (but without prejudice to any rights of the parties hereto may have against the other party prior to such termination).

6.4.1   If either of the parties hereto shall serve a valid notice of termination under Clause 6.2 that party ("the Terminator(s)") shall be entitled by that notice to require the Defaulting Shareholder(s) ("the Terminatee(s)") either to purchase all (but not some only) of his or its shares in the Company of the Terminator(s) or to sell to the Terminator all (but not some only) of the shares of the Terminatee(s) in the Company in either case at a price determined in accordance with the provisions of Clause 6.4.2. Upon exercise of any such right by the Terminator(s) it and the Terminatee(s) shall become bound respectively to sell or purchase on the terms set out below. If in a valid termination notice to such power of sale or purchase is exercised by the Terminator(s) the parties shall procure that the Company shall be immediately wound up.

6.4.2    The purchase price of the shares to be bought and sold pursuant to Clauses 6.4.1 and 1.5 shall be their fair value as agreed between the parties to such sale and purchase or in default of agreement within fourteen (14) days after the service of the notice of termination such sum shall be certified (at the request of either such parties) by the auditors for the time being of the Company to be the fair value of such share on the date when the termination notice was served. In so certifying the auditors are irrevocably instructed to value the ordinary shares to be bought and sold as the same proportion of the market value of the Company as a whole on that date as the relevant ordinary shareholding bears to the whole issued ordinary share capital of the Company on that date but otherwise they shall take into accounts all such circumstances as shall seem to them relevant.  In so acting such auditors are instructed to act as experts and not as arbitrators and their decision shall (save in respect of manifest error) be final and binding on the parties to such sale and purchase for all purposes and their costs shall be borne in equal shares by such parties.

6.4.3    Completion of the sale and purchase of shares pursuant to the provisions of Clause 6.4.1 shall take place at the registered office of the Company on the 3rd business day after the price payable for such shares has been agreed or determined in accordance with the provisions of Clause 6.4.2 (or such other time and/or place in respect of which the provisions of 6.4.4, 6.4.5, 6.4.6 and 6.4.7 shall then have effect).

6.4.4    At any completion of the sale and purchase of shares pursuant to Clause 6 in return for bankers draft drawn on a United States clearing bank (or such other means of payment which is agreed by the seller) for the full amount of the purchase money for the shares being bought and sold and such other amounts as are referred to in Clause 6.4.5 the seller shall deliver to the purchaser duly executed share transfers for the shares being sold in favour of the purchaser or as it may direct together with the relevant share certificate(s).

6.4.5    The parties hereto shall exercise all voting and other rights available to them to ensure the implementation of the preceding provision of this clause and that any provisions contained in the articles of association of the Company restricting transfers of shares shall be waived or suspended to allow such sales and purchases to proceed as provided above and the shareholders shall procure the registration of any transfer of any shares in the Company pursuant to this Agreement accordingly.

7.1    The First Party shall for a period of three years from the date of this Agreement pay to the Second Party a royalty fee of 1 of the sale price for the sale of each crane manufactured o assembled pursuant to the Second Party's patented invention namely, the Excavator Upper and Variable Guage Lower for the makin of a Latice and Box Boom Crawler Crane, and whether or not the sal took place before or after the termination of this Agreement.

D.i.D.

8.1 This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, United States of America and the parties expressly submit to the non-exclusive jurisdiction of the courts of that country.

IN WITNESS WHEREOF the parties hereto have hereunto caused their respective duly authorised representatives to set their hands the day and year first above written.

SIGNED by )
for and on behalf of )
FAVELLE FAVCO CRANES )
(M) SDN. BHD. in the )
presence of: )

SIGNED by the said )
DANNIEL E. DAVIS )
in the presence )
of:- )

D.S.D.

CAUSE NO. 99-10-4467-C

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO, INC., | § | |
| and COBURN INTERNATIONAL LTD. | § | |
| | § | CAMERON COUNTY, TEXAS |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN | § | |
| BHD and FAVELLE FAVCO HOLDINGS | § | |
| SDN BHD | § | 197TH JUDICIAL DISTRICT |

# EXHIBIT "B"

*FAVELLE FAVCO CR.    (USA) INC.*

FFC-USA will be the appointed the sales representative for FFC Holdings on its range of Favelle Favco and Kroll cranes. Geographical markets will be in North, Central and South America only. Sales into markets outside these predefined markets will be subjected to approval from FFC Holdings. All drawings and designs associated with the Favelle Favco and Kroll range of offshore remains the property of Favelle Favco.

### Crawler cranes
FFC-USA is to license the rights to assemble the cranes to FFC-Malaysia for a predefined market (to be specified) for a predefined period in return for a royalty of ___%.

### 7) Termination
In the event of a termination of this agreement, the right to the name and all associated drawings and designs of Favelle Favco, Kroll and Manitex range of products are to be returned to FFC- Holdings. Likewise, all information and rights to the crawler cranes are to be returned to FFC-USA.

In the event that the termination was triggered by one party intending to sell out, the other party is to granted the first right of refusal to acquire the equity stake on the party that is selling out.

### 8) Non competition
In the event of a termination, FFC-Holdings will undertake not to compete with FFC-USA on its range of crawler cranes (either through its own designs or through collaboration with new partners) for a period of ___years. Likewise, FFC-USA will undertake not to compete with FFC-Holdings on its range of offshore and tower cranes (either through its own design or through collaboration with new partners for the same period of years.

### 9) The name of FFC-USA
Following the execution of this agreement, FFC-USA is to adopt a new name to reflect the new partnership.

As the owner of the patent to the crawler crane, Mr Daniel Davis will reserve the right the adopt a new name for the range of crawler cranes which may or may not adopt the new name of the company.

*DANNY,*
*ATTACHED THE ISSUES TO*
*BE ADDRESSED IN THE*
*NEW AGREEMENT.*
*IF YOU HAVE OTHER*
*POINTS TO ADD, PLEASE*
*LET ME KNOW.*
*I WILL THEN FAX THIS*
*LIST TO DENNIS TO*
*DRAFT THE AGREEMENT.*
*YEE*

## CAUSE NO. 99-10-4467-C

| | | |
|---|---|---|
| **FAVELLE FAVCO CRANES USA, INC** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **VS.** | § | |
| | § | |
| **DANIEL E. DAVIS, DAVISCO, INC.,** | § | |
| **and COBURN INTERNATIONAL LTD.** | § | |
| | § | **CAMERON COUNTY, TEXAS** |
| **VS.** | § | |
| | § | |
| **FAVELLE FAVCO CRANES USA, INC.,** | § | |
| **FAVELLE FAVCO CRANES (M) SDN** | § | |
| **BHD and FAVELLE FAVCO HOLDINGS** | § | |
| **SDN BHD** | § | **197TH JUDICIAL DISTRICT** |

# EXHIBIT "C"

**THIS EMPLOYMENT CONTRACT**, made and entered into, between **FAVELLE FAVCO HOLDINGS** (herein sometimes " Employer ") and Daniel E Davis (hereinafter " Employee ") employed as a Managing Director to perform on behalf of Employer work at its facility in USA, herein provides for the employment of Employee on the following terms and conditions to which Employer and Employee hereby agree :

1.  ASSIGNMENT OF WORK

Employee shall be employed in the above named country by Employer in the classification above specified. Employee expressly represents to Employer that he is fully qualified to perform that class of work and that he is bondable.

Employer may require Employee to render services in a classification other than that specified above, provided that Employee's salary rate shall not be reduced below that provided herein. However, if Employee is not, in the sole judgement of Employer's Managing Director qualified to perform the work falling within the classification stated above, this Employment Contract may be terminated by Employer or the parties may agree in writing upon the assignment of Employee to a classification of work carrying a lower salary rate.

2.  TERM OF AGREEMENT

This Employment Contract is for a period of thirty-six (36) months, except as provided in the following subparagraphs (a) and (b). Employee's actual assignment in USA will take place approximately

(a) Renewal of Agreement

This agreement shall be automatically renewed for a term of twelve (12) months unless either party gives the other written notice received three (3) months prior to the expiration of this Employment Contract.

(b) Termination by Employer

(1) If Employer gives written notice of termination for its convenience (including medical discharge as provided in Article 10 hereof), this Employment Contract shall terminate upon the date specified in that notice, Employee shall thereupon be entitled to any accrued salary and home leave, and other benefits which may have accrued prior to that date and, in addition, Employer shall pay cost of return transportation and expenses. However, should the Employer give notice of termination for its convenience prior to completion of this contract, the Employee will receive twenty four (24) months base salary or payment of Employee's base salary through the end of this Contract, whichever is less. This separation payment will be the full and final settlement of all wages due Employee.

1

(2) If Employer discharges Employee for cause, this Employment Contract shall terminate at the moment of discharge, and Employee shall thereupon be entitled to salary, home leave and other benefits accrued prior to that date and, in addition, Employer shall pay cost of return transportation and expenses as prescribed in Appendix "A" hereto. Discharge for cause shall include but not be limited to incompetence; participation in any black market activity, wilful or grossly negligent misconduct the use of narcotics trafficking in illicit drugs or other contraband; the contraction of venereal diesel insubordination, failure to observe safety rules after written warning; refusal to work; engaging in conduct prejudicial to the interests of the Employer or the Governments of the United States or China; or any other act of substantial misconduct.

(c) **Termination by Employee**

(1) If Employee has completed his scheduled assignment and elects not to reconstruct, Employee shall be paid return transportation to his point of origin.

(2) If Employee quits before completing his assignment, this Employment Contract shall terminate on the date the Employee quits. Payments of salary, home leave and other benefits therefore accrued will not be made until Employer is satisfied that all Employee's obligations to Employer have been fulfilled.

3. **WAGES, ALLOWANCE AND HOURS**

(a) Employee shall be compensated at a monthly salary of US$8,000.00 .

(b) The compensation shall be payable monthly in US$ and deposited in the bank of Employer's choice for the account of the Employee  The Employer my make payments through a third party payroll administrator if the Company deems appropriate. Deductions will be made for required or authorised deductions.

(c) Income Tax imposed shall be the responsibility of the employee.

(d) The payments provided for in the foregoing subparagraph (a) shall constitute the entire compensation (except as otherwise provided in this Employment Contract) for the entire period of service unless otherwise agreed to in writing between the parties.

(e) Employee shall work such days, hours and shifts as may be required by Employer and shall be on 24 hour call in case of emergency as determined by Employer. Employee is aware that the workweek is Monday through the ensuing Friday, however, the workweek is subject to change as may be determined by Employer.

2

4   **ABSENCES**

Deductions from Employee's compensation will be made in the event of unexcited absences, including but not limited to injury or illness occasioned by neglect of Employee, use of alcohol or narcotics, or other unexcited failure or refusal to work or other cause for which termination could result.

5   **COMPANY VEHICLE**

(a) Employer shall provide company car.
(b) Employee shall be responsible for it's traffic offences fine.

6   **PERSONAL PROPERTY**

Employer shall not be responsible for Employee's clothing or other personal effects, and any loss thereof or casualty thereto, whether occurring in transit or otherwise, shall be for the account of Employee. Employee and Employer specifically agree that in no event, notwithstanding the foregoing, shall Employer reimburse Employee for such losses or casualties in an amount exceeding $500.00 in the aggregate.

7.  **COMPLIANCE WITH LAWS AND REGULATIONS**

(a) Employee understands that he shall not engage in black market or other illegal transactions in currency or to the commodities and that he must conform to all laws and controls of the country in which he is working. Employer shall have no responsibility for the conduct of defence of any prosecution of Employee brought about by his alleged violation of those laws. If Employee is arrested by reason of any such alleged violation, upon his release by the authorities Employer may return him to point of origin at his own expense.

(b) Employee shall comply with such rules and regulations as Employer may establish from time to time with respect to personnel employed by Employer. Employee agrees to account for all property which may be issued to him to work and live in harmony with his co-workers employed on the work, and at all times to conduct himself in an orderly manner, which due regard to the comfort and convenience of his co-workers.

8   **COMPENSATION DURING ILLNESS OR INJURY**

Employer will provide Worker's Compensation benefits. Workers' Compensation benefits will be provided for any injury or illness arising out of or in the course of employment tuned this Employment Contract, in accordance with provisions of the Employer's contract's with FAVELLE FAVCO CRANES HOLDING SDN BHD.

3

Case 1:00-cv-00003   Document 103   Filed in TXSD on 08/03/2001   Page 96 of 150

9   **MEDICAL DISCHARGE OF EMPLOYEES**

Should the health of Employee become impaired, as determined by Employer based upon such examinations and tests as Employer may require, and that impaired health is due to no fault of Employee, Employer may terminate Employee's services for Employer's convenience in accordance with the provisions of Article 2 hereof.

10.  **GROUP HOSPITAL-MEDICAL**

Employee will be provided for a health plan in USA

11.  **DISPOSITION OF EMPLOYEE'S REMAINS**

If Employee dies during the term of this Agreement, Employer shall use its best efforts to dispose of Employee's remains in compliance with any known directives or desires of Employee and, lacking any such knowledge, in accordance with instruction of Employee's next of kin, and shall pay the cost of any necessary transportation of remains to the Point of Origin or any equally distant point indicated by the next of kin.

12.  **ALLOTMENT OF DEPOSITS**

By execution of an appropriate instrument furnished by Employer, Employee may authorise all or any part of his earnings under this Contract to be paid to a designated beneficiary. Only one such authorisation shall be in effect any time, once such instrument has been executed by Employee and accepted in writing by Employer, it shall remain in effect until cancelled or superseded by another instrument similarly executed and accepted. Except as above provided or required by law, no allotments, assignments or transfers of any amounts payable to Employee hereunder will be accepted or recognised by Employer.

Employee shall also by execution of an appropriate instrument, arrange with Employer for the deposit by Employer of the portion of his salary payable in U.S Dollars in a bank designated by Employee in the United States for this purpose.

13.  **CLAIMS**

Any claims arising out of this Contract or in connection with employment under this Contract, expect claims for Workers' Compensation as provided in Article 9 hereof, shall be submitted by Employee by written notice to Employer within sixty (60) days after such claim or claims arise. Such written notice shall set forth in detailed the nature of the claim and the amount claimed by Employee. The giving of such written notice in the manner and at the time herein provided shall be a condition precedent to any rights of action on any claim arising out of this Contract in connection with employment under this Contract and any such right of action shall be limited to the matter setter forth in said written notice. Any right of legal action for a determination a

4

claim under this section shall waived unless such legal action shall be commenced within six (6) months after termination of employment under this Contract.

On the termination of the Contract and payment to Employee of all amounts due to him hereunder, Employee shall execute and deliver to Employer upon form prepared by its, a receipt for said amounts and a release of all claims other than those claims which may have been submitted to Employer pursuant to the provisions hereof and which may still remain unsettled.

## 14  POINT OF HIRE : CHOICE OF LAW

The parties agree that this Employment Contract has been formed in the United States of America, which is Employee's point of hire, notwithstanding that his point of origin may be located elsewhere, and that this Employment Contract shall be interpreted and construed according to the laws of the United States of America, and more specifically, the State of Texas.

## 15. PASSPORTS, VISAS, HEALTH REQUIREMENTS

Employee shall obtain a passport. Any necessary visa in connection therewith will be the responsibility of the Employer. Medical examination, inoculations, and vaccinations, as specified by Employer, are also required. The cost of all such requirements, including 6th passport shall be borne by Employer.

## 16  CERTIFICATE OF EMPLOYMENT

EMPLOYEE HEREBY CERTIFIES THAT HE HAS READ THE FOREGOING EMPLOYMENT CONTRACT, AND THAT HE FULLY UNDERSTAND ITS TERMS AND CONDITIONS, AND EMPLOYEE FURTHER CERTIFIES THAT :

THE FOREGOING TERMS AND CONDITONS CONSTITUTE HIS ENTIRE EMPLOYMENT CONTRACT WITH FAVELLE FAVCO CRANES HOLDING SDN BHD AND THAT

NO STATEMENTS, PROMISES OR UNDERSTANDING, EITHER ORAL OR WRITTEN, HAVE BEEN MADE OTHER THAT THOSE STATED ABOVE

THIS CONTRACT SHALL BE SUBJECT TO MODIFICATION ONLY BY WRITTEN INSTRUMENT SIGNED BY BOTH EMPLOYEE AND EMPLOYER.

5

IN WITNESS WHEREOF, this Employment Contract is executed by the parties named herein.


MAC NGAN BOON

DANIEL E. DAVIS
23/6/97

WITNESSETH
CHEAM TEK SIONG
(670329-10-5063)
23/6/97.

6

CVisPDF - www.foxitv.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "I"
# Internal Memorandum
# (May 12, 1997)



FAVELLE FAVCO CRANES (M) SDN. BHD.
(A Subsidiary of Favelle Engineering Pty Ltd)

B, Ground Floor, Jalan SS 15/4,
47500 Subang Jaya,
Selangor Darul Ehsan.
Tel : 603-7342111 / 7328881
Fax : 603-7340610 / 7340707

## INTERNAL MEMORANDUM

To: DANNY DAVIS                          Ref:
From: T.S.CHEAM.                         Date: 12/5/97.

RE: <u>Shareholders Agmt.</u>

TRIED CALLING YOU YESTERDAY
ON YOUR H/P BUT WITH NO SUCCESS.
ANYWAY, PERTAINING THE <u>ABOVE</u>
MENTIONED NG WILL BE FAXING YOU
THE AMMENDED AGMT HOPEFULLY BY
TODAY OR LATEST TOMORROW AS
THE AGMT DRAFTED EARLIER WAS TWO
LONG WINDED. WE ARE TRYING TO
GET IT DOWN TO 2 PAGE AGMT.

REGARDS.

CHEAM
EXHIBIT  30
Pohlrus Reporting Service

005381

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DANIEL E. DAVIS

§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. B-00-003

VS.

FAVELLE FAVCO CRANES
USA, INC. and FAVELLE CRANES
(M) SDN BHD,

FAVELLE FAVCO CRANES USA, INC.

§
§
§
§
§
§
§
§
§
§
§
§

VS.

DANIEL E. DAVIS, DAVISCO INC., and
COBURN INTERNATIONAL, LTD

CIVIL ACTION NO. B-00-184

VS.

FAVELLE FAVCO CRANES USA, INC.,
FAVELLE FAVCO CRANES (M) SDN BHD,
and FAVELLE FAVCO HOLDINGS SDN BHD

# EXHIBIT "J"
# Facsimile Message
# (May 20, 1997)



**FAVELLE FAVCO**
the Cranemakers

**FAVELLE FAVCO CRANES (M) SDN. BHD.**
(A Subsidiary of Muhibbah Engineering (M) Bhd)
(351073-T)
9, Ground Floor, Jalan SS 15/4,
47500 Subang Jaya,
Selangor Darul Ehsan.
Tel: 603-7340612
Fax: 603-7340610, 603-7325737

## FACSIMILE MESSAGE

REF NO        :  _____

TO            :  NEW WORLD HOTEL , HONG KONG

ATTENTION    :  MR DANNY DAVIS   ROOM 1912.

SUBJECT      :  SHAREHOLDERS AGREEMENT.

FROM          :  KATHERINE WONG

NO OF PAGE:  5    DATE: 20/5/97   TIME: 5·30 PM   FAX NO: 852 2369 9387

MESSAGE      :

AS PER TELEPHONE CONVERSATION , FAXING YOU THE
SHAREHOLDERS AGREEMENT.

Regards !

CHEAM
EXHIBIT  31
Pockrus Reporting Service

005382

THIS AGREEMENT is made the ..... day of ..... 19.. Between:-

1. [FAVELLE FAVCO CRANES (M) SDN. BHD., a company incorporated in Malaysia with its registered office at ..... ("the First Party") of the one part; and

2. [DANNY DAVIS] (Passport No. .....) of .... ("the Second Party") of the other part.

IT IS AGREED as follows:-

1.1 The parties hereto shall within .... days from the date of this Agreement form [a corporation] in the State of Texas, United States of America ("the Company").

1.2 The [Constitution] of the Company shall be in the form and content of the draft annexed hereto and initialled by the parties for the purposes of identification. In the event of a conflict between the provisions of this Agreement and [the Constitution] of the Company, the provisions of this Agreement shall prevail and the parties shall cause the necessary amendments to be made to [the Constitution].

1.3 The Company shall have [an initial authorised share capital of United States Dollars .... (US$..../-) divided into .... ordinary shares of the par value of United States Dollars .... (US$ ...) per share].

1.4 Unless otherwise varied by written agreement, the issued and paid up capital of the Company shall be held by the parties in the following proportions:

The First Party .... %

The Second Party .... %

1.5 Any party desirous of disposing any or all of his shares must first make the offer to the other party hereto and if the other party does not take up all or any of the said shares within thirty (30) days of being so offered, then the party selling the shares may sell them to a third party and in any event in accordance with the terms of the Company's [Constitution].

1.6 Any party will have a right of pre-emption in case any shares are issued whether from the unissued authorised capital or from any increase in the authorised capital.

2.1 The composition of the board of directors of the Company ("Board") shall be as follows:

The First Party ....

The Second Party ....

005383

2.3  All resolutions of the Board shall be approved by a simple majority of the Board.

1.1  All matters raised at a meeting of the Company shall, unless otherwise required by the laws of the State of Texas, be decided by a simple majority of the shareholders present at the meeting.

4.1  The parties hereto agree that unless otherwise varied in writing, the business of the Company shall be restricted and confined to the following:-

  (a)  sales and marketing arm for Favelle Favco Cranes (M) Sdn. Bhd. ("FFC") in the United States of America, Mexico, Central and South America;

  (b)  buy parts and materials for FFC and arrange for the shipping thereof to Malaysia or such other location as designated by FFC;

  (c)  if requested by FFC, buy used crawler cranes and or foundation equipment for Asia and or the Middle East;

  (d)  quote manitex offshore spare parts and establish parts supplier in the United States of America;

  (e)  quote new manitex offshore pedestal cranes;

  (f)  fabricate towers and booms and Krull tower cranes for FFC; and

  (g)  sell the bottom half of West Manitowoc cranes in Texas and sell the whole of the West Manitowoc cranes in Mexico, central and south America.

5.1  The Second Party hereby agrees with the First Party that he shall not, during the subsistence of this Agreement and for a period of three years after the termination of this Agreement for whatever reasons, directly or directly enter into any agreement, arrangement, partnership or otherwise in competition with the business carried on or proposed to be carried on by the Company.

6.1  This Agreement shall continue in full force and effect until terminated in accordance with the provisions of this clause.

6.2  Either of the parties to this Agreement shall be entitled to terminate this Agreement immediately by notice in writing to the defaulting party ("Defaulting Shareholder(s)") if any of the events set out below shall occur. The said events are:-

  6.2.1  If the Defaulting Shareholder(s) shall commit any material breach of any of its obligations under this Agreement and shall fail to remedy such breach (if capable of remedy) within fourteen (14) days after being given notice by the other parties hereto so to do; or

005384

6.3.2    If one or more parties hereto (being a Company) shall go into liquidation whether compulsory or voluntary (except for the purposes of a bona fide reconstruction or amalgamation with the consent of the other parties hereto such consents not to be unreasonably withheld) or if one or more of the parties hereto shall have an administrator appointed or if a receiver administrative receiver or manager shall be appointed over any part of the assets or undertakings of that party or if a petition shall be presented or an order made for the appointment of a trustee in bankruptcy; or

6.2.3    If one (1) party acquires all the shares of the Company.

6.3   This Agreement shall terminate immediately if an effective resolution is passed to wind up the Company or if a liquidator is otherwise appointed (but without prejudice to any rights of the parties hereto may have against the other party prior to such termination).

6.4.1    If either of the parties hereto shall serve a valid notice of termination under Clause 6.2 that party ("the Terminator(s)") shall be entitled by that notice to require the Defaulting Shareholder(s) ("the Terminatee(s)") either to purchase all (but not some only) of his or its shares in the Company of the Terminator(s) or to sell to the Terminator all (but not some only) of the shares of the Terminatee(s) in the Company in either case at a price determined in accordance with the provisions of Clause 6.4.2. Upon exercise of any such right by the Terminator(s) it and the Terminatee(s) shall become bound respectively to sell or purchase on the terms set out below. If in a valid termination notice to such power of sale or purchase is exercised by the Terminator(s) the parties shall procure that the Company shall be immediately wound up.

6.4.2    The purchase price of the shares to be bought and sold pursuant to clause 6.4.1 shall be their fair value as agreed between the parties to such sale and purchase or in default of agreement within fourteen (14) days after the service of the notice of termination such sum shall be certified (at the request of either such parties) by the auditors for the time being of the Company to be the fair value of such share on the date when the termination notice was served. In so certifying the auditors are irrevocably instructed to value the ordinary shares to be bought and sold as the same proportion of the market value of the Company as a whole on that date as the relevant ordinary shareholding bears to the whole issued ordinary share capital of the Company on that date but otherwise they shall take into accounts all such circumstances as shall seem to them relevant. In so acting such auditors are instructed to act as experts and not as arbitrators and their decision shall (save in respect of manifest error) be final and binding on the parties to such sale and purchase for all purposes and their costs shall be borne in equal shares by such parties.

6.4.3   Completion of the sale and purchase of shares pursuant to the provisions of Clause 6.4.1 shall take place at the registered office of the Company on the 3rd business day after the price payable for such shares has been agreed or determined in accordance with the provisions of Clause 6.4.2 (or such other time and/or place in respect of which the provisions of 6.4.4, 6.4.5, 6.4.6 and 6.4.7 shall then have effect).

6.4.4   At any completion of the sale and purchase of shares pursuant to Clause 6 in return for bankers draft drawn on a United States clearing bank (or such other means of payment which is agreed by the seller) for the full amount of the purchase money for the shares being bought and sold and such other amounts as are referred to in Clause 6.4.5 the seller shall deliver to the purchaser duly executed share transfers for the shares being sold in favour of the purchaser or as it may direct together with the relevant share certificate(s).

6.4.8   The parties hereto shall exercise all voting and other rights available to them to ensure the implementation of the preceding provision of this clause and that any provisions contained in the articles of association of the Company restricting transfers of shares shall be waived or suspended to allow such sales and purchases to proceed as provided above and the shareholders shall procure the registration of any transfer of any shares in the Company pursuant to this Agreement accordingly.

7.1   This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, United States of America and the parties expressly submit to the non-exclusive jurisdiction of the courts of that country.

IN WITNESS WHEREOF the parties hereto have hereunto caused their respective duly authorised representatives to set their hands the day and year first above written.

SIGNED by                    )
for and on behalf of         )
FAVELLE FAVCO CRANES         )
(M) SDN. BHD. in the         )
presence of:                 )

SIGNED by the said           )
DANNY DAVIS in the           )
presence of:                 )

005380

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "K"
## Letter dated
## (May 28, 1997)

Daniel E. Davis
4 Pandan Valley
#13-416 Eugenia Court
Singapore 597628


28 May 1997

Favelle Favco Cranes (M) Sdn Bhd
8 Ground Floor, Jalan SS 15/4
47500 Subang Jaya
Selangor Darul Ehsan

Attn: Mr Mac Ngan Boon

Dear Sirs

**SHAREHOLDERS AGREEMENT**

I refer to the above draft Agreement faxed to me on 20 May 1997.  My comments are as follows:-

1.    Clause 1.4

a)  Please state the amount of the issued and paid-up capital in Clause 1.4.

b)  As agreed, my holdings in the company shall be 10% of the paid-up capital, the consideration of which shall be paid by you.  Please reflect the above in Clause 1.4.

*No on a loan out basis*

2.    Clause 1.5

Please amend Clause 1.5 as follows:-

"If the Second Party is desirous of disposing any or all of his shares, the First Party shall take up the said shares within thirty (30) days.  If the First Party is desirous of disposing any or all of its shares it must first make the offer to the Second Party and if the Second Party does not take up the said shares within thirty (30) days  of being so offered, then the First Party may sell them to a third party in accordance with the terms of the Company's Constitution PROVIDED that if the First Party is desirous of disposing more than 50% of its total shares it may not do so unless an offer is also made to the Second Party by the third party to buy his shares, the price of which shall be governed by Clause 6.4.2."

3.    Clause 4.1

Please delete the following from (g):-

"sell the bottom half of West Manitowoc Cranes in Texas and"

005387

MAC

EXHIBIT ____3/1

Pockrus Reporting Service

4.  Clause 4.1

    Please add (h):-

    "(h) finalise, concept, design and manufacture of Excavator Upper and Variable Gauge Lower for the manufacture of a Lattice and Box Boom Crawler Crane."

5.  Clause 5.1

    Please add the following phrase at the end of Clause 5.1:-

    "..... Company, unless the termination of this Agreement is pursuant to Clause 6.2.2 or 6.3"

6.  Clause 6.2

    Please add "and only if" in line 3 after the word "if".

7.  I would like Muhibbah Engineering (M) Bhd to stand as a guarantor to guarantee that in the event of your company going into liquidation as provided in Clauses 6.2.1, 6.2.2 or 6.3 thereby terminating the Agreement, Muhibbah Engineering (M) Bhd shall pay me a sum equivalent to my total holdings in the Company or a sum equivalent to 2 years of my gross salary whichever is greater.

    There will need to be a separate guarantee to be signed by Muhibbah Engineering (M) Bhd. Please let me have the draft for perusal.

8.  Please add a new clause in the Agreement relating to royalty payments for the sale of every crane that is manufactured pursuant to my invention, as follows:-

    "The First Party shall pay a royalty fee of $_____ for the sale of each crane manufactured or assembled pursuant to the Second Party's patented invention, namely; the Excavator Upper and Variable Gauge Lower for the making of a Lattice and Box Burn Crawler Crane, whether the sale is before or after the termination of this Agreement."

9.  Clause 6.4.2

    Please add in line 2 "and Clause 1.5" after the phrase "Clause 6.4.1".


Please let me have your amended Agreement.


Yours faithfully


Daniel E. Davis

005388

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "L"
# Letter dated
# (June 10, 1997)

*Avco Holdings*
*Attorneys in*
*Malaysia*
*02*
*292900*
李祥
師
行

# MICHAEL CHEN & LEE

PEGUAMBELA & PEGUAMCARA
ADVOCATES & SOLICITORS

5TH FLOOR, BANGUNAN BANGKOK BANK
NO. 105, JALAN TUN H. S. LEE
50000 KUALA LUMPUR.
TEL: 03-2328424 (8 LINES)

曼谷銀行大厦五樓

RECEIVED
1 0 JUN 1997
FAVELLE
FAVCO
(MALAYSIA)

16

FAX: 03-2302832

**PARTNERS**
DATO MICHAEL CHEN
Y.M. CHIN (MISS)
GAN SUAT KHIM (MISS)

**ASSISTANTS**
WINSTON CHEN E-MENG
FRANCIS S. WING
ARTHUR M. W. WANG
LEE KEAN KHEY
PAULINE LEE AI LEEN

REBECCA T. H. LIAN
LIM FANG SIN
KUAN WAI YIN
KUTBUDDIN BIN ASGAR AI
AU SENG HENG

*TO: DANNY.*
*25 Pages.*

Our Ref    9720980 (WEM)

Your Ref:

10th June 1997

-Favelle Favco Cranes (M) Sdn Bhd
No 9 Ground Floor,
Jalan SS 15/4,
47500 Subang Jaya,
Selangor Darul Ehsan.

| Victor Ng | | |
|---|---|---|
| D. Moss | | |
| Neol | | |
| R. Chen | | |
| Syd | | |
| C. K. Ng | | |
| Weison | | |
| Y. S. Ooi | | |
| Halim | | |
| Mazlan | | |
| C. Y. Wong | | |
| Chua | | |
| JCB FILE | | |

Attention: Mr Cheam

Dear Sirs

Re: Shareholders Agreement

Please find enclosed herewith the following draft documents
for your perusal:-

1.    Shareholders Agreement;

2.    Loan Agreement;

3.    Memorandum of Deposit; and      *-012-1030?3*

4.    Power of Attorney.

Kindly be reminded that the abovementioned documents would
need to be reviewed by US lawyers (in particular, Texas
Lawyers).

Regards,

*Michael Chen & Lee*

WC/il
encs


EXHIBIT
**I**
tabbies

# SHAREHOLDERS' AGREEMENT

THIS AGREEMENT is made the .../6th.. day of August 1997 Between:-

1.   FAVELLE FAVCO CRANES (M) SDN. BHD., a company incorporated in Malaysia with its registered office at ..... ("the First Party") of the one part; and

2.   DANIEL E. DAVIS] (Passport No. .....) of USA. ("the Second Party") of the other part.

IT IS AGREED as follows:-

1.1  The parties hereto shall within .... days from the date of this Agreement form a corporation in the State of Texas, United States of America ("the Company").

1.2  The Constitution of the Company shall be in the form and content of the draft annexed hereto and initialled by the parties for the purposes of identification. In the event of a conflict between the provisions of this Agreement and the Constitution of the Company, the provisions of this Agreement shall prevail and the parties shall cause the necessary amendments to be made to the Constitution.

1.3  The Company shall have an initial authorised share capital of United States Dollars Three Million (US$3,000,000/-) divided into 3,000,000 ordinary shares of the par value of United States Dollars One (US$1) per share. The initial issued and paid up capital of the Company shall be United States Dollars Five Hundred Thousand (US$500,000/-).

1.4  Unless otherwise varied by written agreement, the issued and paid up capital of the Company shall be held by the parties in the following proportions:

The First Party 90 %

The Second Party 10 %

1.5  If the Second Party is desirous of disposing any or all of his shares, the First Party hereby agrees to take up the said shares within thirty (30) days of being so notified by the Second Party. If the First Party is desirous of disposing any or all of his shares, it must first make the offer to the Second Party and if the Second Party does not take up all or any of the said shares within thirty (30) days of being so offered, then the First Party may sell them to a third party and in any event in accordance with the terms of the Company's Constitution PROVIDED that if the First Party is desirous of disposing more than 50% of its total shareholdings in the Company it may not sell them to a third party unless the third party also make an offer to the Second Party to purchase all his shares. The parties hereto hereby agree that the purchase price for

DED.

the sale and purchase of shares pursuant to this Clause 1.5 shall be determined in accordance with Clause 6.4.2.

1.6   Any party will have a right of pre-emption in case any shares are issued whether from the unissued authorised capital or from any increase in the authorised capital.

2.1   The composition of the board of directors of the Company ("Board") shall be as follows:

The First Party .....

The Second Party .....

2.2   All resolutions of the Board shall be approved by a simple majority of the Board.

3.1   All matters raised at a meeting of the Company shall, unless otherwise required by the laws of the State of Texas, be decided by a simple majority of the shareholders present at the meeting.

4.1   The parties hereto agree that unless otherwise varied in writing, the business of the Company shall be restricted and confined to the following:-

> (a)   sales and marketing arm for Favelle Favco Cranes (M) Sdn. Bhd. ("FFC") in the United States of America, Mexico, Central and South America;

> (b)   buy parts and materials for FFC and arrange for the shipping thereof to Malaysia or such other location as designated by FFC;

> (c)   if requested by FFC, buy used crawler cranes and or foundation equipment for Asia and or the Middle East;

> (d)   quote manitex offshore spare parts and establish parts supplier in the United States of America;

> (e)   quote new manitex offshore pedestal cranes;

> (f)   fabricate towers and booms and Kroll tower cranes for FFC;

> (g)   sell the whole of the West Manitowoc cranes in Mexico, central and south America; and

> (h)   finalise, conceptualise, design and manufacture Excavator Upper and Variable Gauge Lower for the manufacture of Lattice and Box Boom Crawler Crane.

5.1   The Second Party hereby agrees with the First Party that he shall not, during the subsistence of this Agreement and for a period of three years after the determination of this Agreement for

whatever reasons, directly or indirectly enter into any agreement, arrangement, partnership or otherwise in competition with the business carried on or proposed to be carried on by the Company unless the termination of this Agreement is pursuant to Clauses 6.2.2 or 6.3.

6.1   This Agreement shall continue in full force and effect until terminated in accordance with the provisions of this clause.

6.2   Either of the parties to this Agreement shall be entitled to terminate this Agreement immediately by notice in writing to the defaulting party ("Defaulting Shareholder(s)") if any of the events set out below shall occur. The said events are:-

   6.2.1      If the Defaulting Shareholder(s) shall commit any material breach of any of its obligations under this Agreement and shall fail to remedy such breach (if capable of remedy) within fourteen (14) days after being given notice by the other parties hereto so to do; or

   6.2.2      If one or more parties hereto (being a Company) shall go into liquidation whether compulsory or voluntary (except for the purposes of a bona fide reconstruction or amalgamation with the consent of the other parties hereto such consents not to be unreasonably withheld) or if one or more of the parties hereto shall have an administrator appointed or if a receiver administrative receiver or manager shall be appointed over any part of the assets or undertakings of that party or if a petition shall be presented or an order made for the appointment of a trustee in bankruptcy; or

   6.2.3      If one (1) party acquires all the shares of the Company.

6.3   This Agreement shall terminate immediately if an effective resolution is passed to wind up the Company or if a liquidator is otherwise appointed (but without prejudice to any rights of the parties hereto may have against the other party prior to such termination).

6.4.1      If either of the parties hereto shall serve a valid notice of termination under Clause 6.2 that party ("the Terminator(s)") shall be entitled by that notice to require the Defaulting Shareholder(s) ("the Terminatee(s)") either to purchase all (but not some only) of his or its shares in the Company of the Terminator(s) or to sell to the Terminator all (but not some only) of the shares of the Terminatee(s) in the Company in either case at a price determined in accordance with the provisions of Clause 6.4.2. Upon exercise of any such right by the Terminator(s) it and the Terminatee(s) shall become bound respectively to sell or purchase on the terms set out below. If in a valid termination notice to such power of sale or purchase is exercised by the Terminator(s) the parties shall procure that the Company shall be immediately wound up.

6.4.2    The purchase price of the shares to be bought and sold pursuant to Clauses 6.4.1 and 1.5 shall be their fair value as agreed between the parties to such sale and purchase or in default of agreement within fourteen (14) days after the service of the notice of termination such sum shall be certified (at the request of either such parties) by the auditors for the time being of the Company to be the fair value of such share on the date when the termination notice was served. In so certifying the auditors are irrevocably instructed to value the ordinary shares to be bought and sold as the same proportion of the market value of the Company as a whole on that date as the relevant ordinary shareholding bears to the whole issued ordinary share capital of the Company on that date but otherwise they shall take into accounts all such circumstances as shall seem to them relevant.   In so acting such auditors are instructed to act as experts and not as arbitrators and their decision shall (save in respect of manifest error) be final and binding on the parties to such sale and purchase for all purposes and their costs shall be borne in equal shares by such parties.

6.4.3    Completion of the sale and purchase of shares pursuant to the provisions of Clause 6.4.1 shall take place at the registered office of the Company on the 3rd business day after the price payable for such shares has been agreed or determined in accordance with the provisions of Clause 6.4.2 (or such other time and/or place in respect of which the provisions of 6.4.4, 6.4.5, 6.4.6 and 6.4.7 shall then have effect).

6.4.4    At any completion of the sale and purchase of shares pursuant to Clause 6 in return for bankers draft drawn on a United States clearing bank (or such other means of payment which is agreed by the seller) for the full amount of the purchase money for the shares being bought and sold and such other amounts as are referred to in Clause 6.4.5 the seller shall deliver to the purchaser duly executed share transfers for the shares being sold in favour of the purchaser or as it may direct together with the relevant share certificate(s).

6.4.5    The parties hereto shall exercise all voting and other rights available to them to ensure the implementation of the preceding provision of this clause and that any provisions contained in the articles of association of the Company restricting transfers of shares shall be waived or suspended to allow such sales and purchases to proceed as provided above and the shareholders shall procure the registration of any transfer of any shares in the Company pursuant to this Agreement accordingly.

7.1   The First Party shall for a period of three years from the date of this Agreement pay to the Second Party a royalty fee of 1% of the sale price for the sale of each crane manufactured or assembled pursuant to the Second Party's patented invention, namely, the Excavator Upper and Variable Guage Lower for the making of a Latice and Box Boom Crawler Crane, and whether or not the sale took place before or after the termination of this Agreement.

8.1 This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, United States of America and the parties expressly submit to the non-exclusive jurisdiction of the courts of that country.

IN WITNESS WHEREOF the parties hereto have hereunto caused their respective duly authorised representatives to set their hands the day and year first above written.

SIGNED by                       )
for and on behalf of )
FAVELLE FAVCO CRANES )
(M) SDN. BHD. in the )
presence of:                   )


SIGNED by the said )
DANNIEL F. DAVIS )
in the presence )
of:-                                 )

D.5D.

THIS AGREEMENT is made the 16 day of August 1997 Between:-

1       FAVELLE FAVCO CRANES (M) SDN. BHD., a company incorporated in Malaysia with its registered office at .... ("the Lender") of the one part; and

2.      DANIEL E. DAVIS] (Passport No. .....) of .... ("the Borrower") of the other part.

WHEREAS :

(A)     The Borrower is desirous of subscribing for . ... ordinary shares of US$.. /- (hereinafter referred to as "the said Shares") in the issued share capital of ....., a company incorporated in the State of Texas, United States of America with its registered office at ..... (hereinafter referred to as "the Company") at a total subscription price of United States Dollars ..... (US$....) only.

(B)     At the request of the Borrower, the Lender has agreed to grant to the Borrower a loan of United States Dollars ..... (US$.....) only to assist the Borrower in subscribing for the said Shares.

NOW THEREFORE the parties agree as follows:

1.      THE AMOUNT OF LOAN

1.1     The Lender hereby agrees to lend to the Borrower United States Dollars ..... (US$.....) (hereinafter referred to as "the Loan") upon the security, terms and conditions hereinafter contained. The Loan shall be disbursed and paid directly to the Company upon being so notified by the Borrower.

2.      INTEREST

2.1     The Loan shall be interest free

3.      REPAYMENT

3.1     Subject as hereinafter provided the Borrower shall repay the Loan within .... from the date of disbursement of the same.

4       SECURITY

4.1     In order to secure the due and punctual payment of the Loan, the Borrower agrees to charge all of the said Shares to the Lender and therefore agrees to execute the following documents ("Security Documents") simultaneously with the execution of this Agreement:

        (a)     Memorandum of Deposit

        (b)     Power of Attorney

        (c)     and other documents as the Lender may from time to time request to perfect his security hereunder.

4.2     The foregoing Security Documents and the promises and obligations of the Borrower and rights of the Lender contained therein shall constitute an integral and principal part of this Agreement and shall not be terminated or cancelled by whatever reason until the Loan has been fully paid pursuant to Clause 3 hereof.

5     REPRESENTATIONS AND WARRANTIES

5.1     The Borrower hereby represents and warrants that he is a ..... citizen holding Passport No ... and that he shall be the legal and beneficial owner of the said Shares.

6     TAXES

6.1     The ..... shall bear and promptly pay all present or future taxes, fees, charges or duties assessed or imposed by the Government of the State of Texas, United States of America or by any other government or taxing authority levied, assessed or payable with respect to the execution or performance of this Agreement, or any agreement referred to herein, and the payment of the indebtedness. In the event the Borrower is required to withhold any taxes from payments due hereunder, then.

    (i)     the Borrower shall pay such taxes on behalf of the Lender or reimburse the Lender the amount thereof plus any amount required to be withheld as a consequence of such payment or reimbursements; or

    (ii)     the amount of such payment due shall be increased so that the Lender receives the amount that it would have otherwise received had such taxes not been withheld. The Borrower shall promptly provide the Lender with official receipts or other evidence satisfactory to the Lender establishing payment of such taxes.

7.     EVENTS OF DEFAULT

7.1     Upon the occurrence of any of the following events (each of such events being hereinafter individually referred to as an "Event of Default"):-

    (a)     failure by the Borrower to pay the Loan upon demand for repayment of the Loan being made by the Lender;

    (b)     failure by the Borrower to perform or breach by the Borrower of any obligation hereunder or under any of the Security Documents or any other agreement referred to herein, which failure has not been corrected within fourteen (14) days;

    (c)     should any of the representations, warranties or covenants contained herein or in any certificate required to be provided hereunder or pursuant to any agreement referred to herein be or be shown to be untrue, inaccurate or misleading;

    (d)     should the Borrower no longer be eligible to own the Shares;

    (e)     a finding by any court or other government agency that any of the Security Documents are null and void or otherwise unenforceable;

    (f)     the Borrower committing any act of bankruptcy or the filing of any petition against the Borrower for bankruptcy, and the Borrower failing to have any such petition filed by any other party discharged within thirty (30) days from the date of filing (or such longer period acceptable to the Lender);

    (g)     the Borrower applying for or consenting to the appointment of a receiver or trustee for bankruptcy, admitting in writing its inability to pay its debts; or the entering of any court order or judgement confirming the bankruptcy or insolvency of the Borrower, or upon death or incapacity of the Borrower, or

(h)    if in the Lender's sole opinion the Borrower is not capable of performing any of its obligations under this Agreement or any Security Document,

then immediately upon any such Event of Default the Loan shall become due and payable and the Lender may take whatever action it deems necessary pursuant to this Agreement, the Security Documents or any other agreement or document referred to herein or therein or in accordance with applicable laws and regulations, to secure the payment of the Loan.

8      GENERAL

8.1    (a)    Assignment

The Borrower shall not be entitled to assign its rights or obligations hereunder, except with the prior written consent of the Lender.

(b)    Cost and Expenses

The ...... agrees to pay any and all expenses (including legal fees and stamp duty) incidental to the execution and enforcement of any of the provisions of this Agreement or any of the Security Documents or any other agreement referred to herein or therein.

(c)    Changes, amendments, modifications

Any changes, amendments or modifications to this Agreement shall be valid only if agreed in writing and signed by both parties hereto.

(d)    Severability

If one or more of the provisions hereof shall be invalid, illegal or unenforceable in any respect under any applicable law or decision, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected or impaired in any way. The Borrower shall in any such event execute such additional documents as the Lender may request in order to give effect to such invalid, illegal or unenforceable provision hereof.

(e)    Notices

(aa)    All notices and/or communications to either party under the terms of this Agreement shall be in writing and addressed to their addressee at their address stated herein or such addresses as the parties may specify from time to time by written notice.

Notice and/or Communication may be in any of the following manners and shall be deemed to have been received as follows:-

If by personal delivery, when delivered.

If by post, seven (7) days after posting, postage prepaid.

If by fax, when sent provided that a copy of the notice sent by fax shall be immediately posted to the addressee of the notice sent by fax

(f)     Governing Law and Jurisdiction

This Agreement and the performance hereof shall be governed by the laws of the State of Texas, United States of America and the parties hereto submit to the non-exclusive jurisdiction of the Courts of that country.

IN WITNESS WHEREOF the parties hereto have hereunto set their hands the day and year first above written.

D.5 D.

FAVELLE FAVCO CRANES (M) SDN. BHD.

RECEIVED
1 0 JUN 1997
FAVELLE
FAVCO
(MALAYSIA)

1.    I, DANIEL E. DAVIS (Passport No......) of USA.. have this
...\16 day of August, 199.7. deposited with and charged to FAVELLE
FAVCO CRANES (M) SDN. BHD., a company incorporated in Malaysia
and having its registered address at ..... (hereinafter referred
to as "the Lender") the securities mentioned in the Schedule
hereto (hereinafter referred to as "the charged securities") to
be retained by the Lender as security for payment to the Lender
on demand of all sums of monies (whether principal, interest,
fees or otherwise) whatsoever which are or any time may be or
become due or owing to the Lender from me under or in connection
with the Loan Agreement dated the ..... th day of ..... 199..
entered into between the Lender and me (hereinafter referred to
as "the Loan Agreement") for the grant of a Loan of an amount in
United States Dollars ..... (US$..... ), as set out in the Loan
Agreement.

2.    The charge hereby created shall affect and the charged
securities subject hereto shall include in addition to the
securities mentioned in the Schedule hereto any securities
substituted therefor and or additional thereto and all dividends
or interest paid or payable after the date hereof and all shares
(and the dividends or interest thereon) rights, monies or
property accruing or offered at any time by way of redemption,
bonus preference, option or otherwise to or in respect of any
securities hereby charged.

3.    If any monies hereby secured shall not be duly paid by me
on demand the Lender may forthwith without notice to me sell,
assign, transfer or otherwise dispose of the charged securities
or any of them at such price and upon such conditions and to such
persons as the Lender in its absolute discretion may think fit
and may apply the net proceeds in or towards the discharge of the

- 2 -

costs incurred thereon and of the monies hereby secured and the residue (if any) shall be paid to me or to any other person legally entitled thereto.

4.    Any dividends, interest or other payments which may be received or receivable by the Lender in respect of the charged securities may be retained by it and held in suspense for so long as the Lender thinks fit and shall be utilised by the Lender towards discharge of any money or liabilities due or incurred by me to the Lender. Notwithstanding any such payment, in the event of any proceedings in or analogous to bankruptcy, liquidation, composition or arrangement being brought against me, the Lender may prove for and agree to accept any dividend or composition in respect of the whole or part of such money and liabilities in the same manner as if this security had not been created.  If I shall fail to pay further secure or satisfy to the Lender on demand any money or liability hereby secured they may be applied by it as though they were proceeds of sale hereunder.

5.    Immediately upon the execution of this Memorandum of Deposit and at any time or times hereafter prior to the discharge of all the moneys hereby secured the Lender may without notice to me register all charged securities held by the Lender in the Lender's name or in the name of its nominee or nominees.  I or my successors-in-title will upon demand and at my or their own cost execute and undertake to do all such transfers, assurances and things for assuring and vesting the full legal title to the charged securities or any of them to and in the Lender's name or that of its nominees or any purchaser.

6.    I declare that I have and shall have a good title to the charged securities and a good right to deposit with and/or transfer the charged securities to the Lender or its nominees and the Lender or its nominees may exercise at the Lender's discretion (in our name or otherwise) at any time whether before or after any demand for payment hereunder and without any further

0.6 D-

CUXPDF - www.fenhu.com

- 3 -

consent or authority on my part in respect of any of the charged
securities and all the powers given to a trustee in respect of
securities or property subject to a trust and any powers or
rights which may be exercised by the person or persons in whose
name or names the securities are registered under the terms
thereof or otherwise.

7.  Without prejudice to the rights and obligations hereby
created any dividends, interests or other monies payable in
respect of the charged securities which may be received by me
after the power of sale hereunder has arisen shall be held in
trust for the Lender and paid over to it on demand.

8.  This security shall not be considered as satisfied by any
conditional payment or satisfaction of the whole or any part of
any sum or sums of money owing as aforesaid or by any payment
made to be held in suspense but shall be a continuing security
and extend to cover all or any sum or sums of money which shall
for the time being constitute the balance due from me to the
Lender on any account or otherwise as hereinbefore mentioned.

9.  It shall be lawful for the Lender at any time or times
hereafter during the continuance of this security without any
notice to or any further consent or concurrence by me to sell,
realise the charged securities or any of them in such manner and
upon such terms and conditions generally as they shall think fit
and to apply the net proceeds of any such sale in or towards the
discharge of the moneys hereby secured.  The Lender shall not be
responsible for any loss from or through any brokers or others
employed in the sale of the charged securities or for any loss
or depreciation in value of any of such charged securities
arising from or through any cause whatsoever.

10.  This security shall be in addition to and shall not be in
any way prejudiced or affected by any collateral or other
security now or hereafter held by the Lender for all or any part

CfdPDF - www.fdnu.com

- 4 -

of the moneys hereby secured nor shall such collateral or other
security or any lien to which the Lender may be otherwise
entitled (including any security, charge or lien prior to the
date of these presents on the charged securities) or the
liability of any person or persons not parties hereto for all or
any part of the moneys hereby secured be in any way prejudiced
or affected by this security. The Lender shall have full power
at their discretion to give time for payment to any such other
person or persons without prejudice to my liability hereunder.
All moneys received by the Lender from me or any person or
persons liable to pay the same may be applied by the Lender to
any account or item of account or any transaction to which the
same may be applicable.

11.   The security hereby created shall not be discharged or in
any way affected by:-

    (i)   any time, indulgence, waiver or consent at any time
    given or settlement with any other guarantor or any other
    person;

    (ii) any amendment to any provision of the Loan Agreement
    or to any other security, guarantee or indemnity;

    (iii) the making or absence of any demand on any guarantor
    or any other person for payment;

    (iv) the enforcement or absence of enforcement of the Loan
    Agreement, any other security, guarantee or indemnity;

    (v)  the release of, exchange, modification or abstaining
    from perfecting or enforcing any security, guarantee or
    indemnity;

    (vi) a bankruptcy, petition or order being made against me;
    or

- 5 -

(vii)    the illegality, invalidity or unenforceability of
or any defect in any provision of the Loan Agreement, any
other security, guarantee or indemnity or any of the
obligations of any party thereunder.

12.  The security hereby created shall not be affected by any
failure by the Lender to take any security or by any invalidity
of any security taken or by any existing or future agreement by
it as to the application of any advances made or to be made to
me or by the availability to and the use by me of any grounds of
defence enabling me to rebut or deny any liability to the Lender
whether on the basis of fact or law.

13.  I hereby represent to the Lender that the mortgaged
securities are legally and beneficially owned by me and are fully
paid-up and that I shall not withdraw the mortgaged securities
and I have not and shall not mortgage, charge, pledge or
otherwise encumber or assign, transfer or otherwise deal with or
grant or allow to arise any third party rights over or against
the whole or any part thereof, or purport so to do without the
prior consent of the Lender.

14.  I and my successors-in-title during the continuance of this
security will pay all calls or other payments due in respect of
any of the charged securities and in the event of default the
Lender may if it thinks fit make such payments on my behalf.  Any
sums so paid by the Lender shall be repayable by me or my
successors-in-title and pending such repayment shall be a charge
on the securities subject hereto.

15.  A certificate by an officer of the Lender as to the money
and liabilities for the time being due or incurred to the Lender
from or by me or any judgment obtained against or admission by
me of any sum owing pursuant to the Loan Agreement shall, in the
absence of manifest error, be conclusive evidence against me in
any legal proceedings.

- 6 -

16.  The security hereby created is in addition to any other guarantee or security given by me or her third party or parties pursuant to the Loan Agreement now or hereafter.

17.  I hereby agree to execute a Power of Attorney in favour the Lender containing such terms and conditions as the Lender may stipulate.

18.  All words and expressions defined in the Loan Agreement shall have the same meanings when used herein.

19.  This Memorandum shall be governed by and construed in all respects in accordance with the laws of the State of Texas, United States of America and the Borrower hereby submits to the non-exclusive jurisdiction of the Courts of that country.

Dated this   16th   day of  August                    1997.

```
SIGNED by              )
DANIEL E. DAVIS        )
(Passport No... )      )
in the presence of:-   )
```

D.E.D.

SCHEDULE

LIST OF CHARGED SECURITIES


..... shares in ...... a company incorporated in the State of Texas, United States of America with its registered office at ..... .

D.7.D.

BY THIS POWER OF ATTORNEY given on the ..... day of .....
199.. , I, DANIEL E. DAVIS (Passport No. .....) of .....
(hereinafter referred to as "the Borrower") pursuant to the
Memorandum of Deposit dated the ..... day of ..... 199..
(hereinafter referred to as "the Memorandum of Deposit") do
hereby irrevocably constitute and appoint FAVELLE FAVCO CRANES
(M) SDN. BHD., a company incorporated in Malaysia with its
registered office at ....., my Attorney for and on my behalf and
in my name or otherwise with the following powers and authorities
exercisable in the United States of America:-

1.    To sign, execute and deliver any deed or contract or other
document including share transfer forms relating to and where
necessary to complete the transfer and registration of the shares
that are covered by or subject to the Memorandum of Deposit from
time to time (hereinafter referred to as "the said Shares").

2.    To sell, transfer, exchange or otherwise dispose of all or
any part of the title to and interest in and any rights attaching
to all or any of the said Shares for such consideration (which
may comprise or include shares or debentures) and upon such terms
and generally in such manner as the Attorney may in its absolute
discretion think fit and for this purpose to enter into any
contract for such sale or disposition on such terms (including
the giving of such warranties and indemnities) and subject to
such conditions as the Attorney shall in its absolute discretion
think fit.

3.    To receive all dividends including without limitation shares
in the form of bonus, dividends or however described (hereinafter
referred to as "the Dividends") from time to time paid or to be
paid by the Company in respect of the said Shares and to sign and
deliver any receipts to the Company for the Dividends as may be
required.

4.    To receive or authorise the receipt of the consideration for
such sale, transfer, exchange or disposition as is referred to
in (2) above for the Attorney's own benefit.

5.    To execute and deliver all and any other or further
instrument of transfer and other documents that the Borrower is
at any time and from time to time obliged to execute pursuant to
the Memorandum of Deposit and to effect all such registration and
do all such other things as may be necessary or as may seem to
the Attorney advisable in order properly to give effect thereto
and to execute all such documents and to do all such other acts
and things in relation to all or any stock or shares the subject
of any such further or other trust, as the Attorney is by this
Deed entitled or empowered to execute or do in relation to the
said Shares.

6.    With full power from time to time and at any time to appoint
one or more substitutes to exercise all or any of the rights,
powers and authorities hereby conferred on the Attorney on such
terms and conditions as the Attorney shall think fit, and to
revoke any such appointment, and to delegate to an agent or
agents the exercise of any such right, power or authority.

AND the Borrower undertakes to indemnify the Attorney and
any substitute or agent of the Attorney acting hereunder against
all costs, claims, expenses and liabilities incurred by the
Attorney or such substitute or agent in connection with the
exercise in good faith of any right, power or authority hereby
granted or purported to be granted, and agrees that this Power
of Attorney shall be irrevocable until all obligations of the
Borrower shall have been discharged.

AND in favour of the Attorney or his substitute or agent
hereunder, and any person, firm or company dealing with any of
them and the successors and assigns of any of them or any such
person, firm or company, all acts done and documents executed or
signed by the Attorney or such substitute or agent in the
exercise or purported exercise of any power conferred or
purported to be conferred by this Deed shall for all purposes be
valid and binding on the Borrower and his successors-in-title,
personal representatives, administrators and permitted assigns.
The Borrower undertakes from time to time and at all times to
ratify and confirm whatsoever the Attorney or any duly appointed
substitute or agent shall lawfully do or cause to be done in
exercise or purported exercise of any of the rights, powers and
authorities conferred hereby.

The Deed is governed by and shall be construed in accordance
with the laws of the State of Texas, United States of America.

IN WITNESS WHEREOF I the said Borrower have hereunto set my hand
and seal this  16  day of August         199 7 .

SIGNED, SEALED and DELIVERED
by the said DANIEL E. DAVIS
(Passport No......)
in the presence of:-

Witness my hand.

Advocate & Solicitor

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "M"
# Shareholders' Agreement
# (August 16, 1997)

## SHAREHOLDERS' AGREEMENT

THIS AGREEMENT is made the .16th. day of August 1997 Between:-

1.   FAVELLE FAVCO CRANES (M) SDN. BHD., a company incorporated in Malaysia with its registered office at ..... ("the First Party") of the one part; and

2.   DANIEL E. DAVIS] (Passport No. .....) of U.S.A. ("the Second Party") of the other part.

IT IS AGREED as follows:-

1.1   The parties hereto shall within .... days from the date of this Agreement form a corporation in the State of Texas, United States of America ("the Company").

1.2   The Constitution of the Company shall be in the form and content of the draft annexed hereto and initialled by the parties for the purposes of identification. In the event of a conflict between the provisions of this Agreement and the Constitution of the Company, the provisions of this Agreement shall prevail and the parties shall cause the necessary amendments to be made to the Constitution.

1.3   The Company shall have an initial authorised share capital of United States Dollars Three Million (US$3,000,000/-) divided into 3,000,000 ordinary shares of the par value of United States Dollars One (US$1) per share. The initial issued and paid up capital of the Company shall be United States Dollars Five Hundred Thousand (US$500,000/-).

1.4   Unless otherwise varied by written agreement, the issued and paid up capital of the Company shall be held by the parties in the following proportions:

The First Party 90 %

The Second Party 10 %

1.5   If the Second Party is desirous of disposing any or all of his shares, the First Party hereby agrees to take up the said shares within thirty (30) days of being so notified by the Second Party. If the First Party is desirous of disposing any or all of his shares, it must first make the offer to the Second Party and if the Second Party does not take up all or any of the said shares within thirty (30) days of being so offered, then the First Party may sell them to a third party and in any event in accordance with the terms of the Company's Constitution PROVIDED that if the First Party is desirous of disposing more than 50% of its total shareholdings in the Company it may not sell them to a third party unless the third party also make an offer to the Second Party to purchase all his shares. The parties hereto hereby agree that the purchase price for

DED.

the sale and purchase of shares pursuant to this Clause 1.5 shall be determined in accordance with Clause 6.4.2.

1.6   Any party will have a right of pre-emption in case any shares are issued whether from the unissued authorised capital or from any increase in the authorised capital.

2.1   The composition of the board of directors of the Company ("Board") shall be as follows:

The First Party .....

The Second Party .....

2.2   All resolutions of the Board shall be approved by a simple majority of the Board.

3.1   All matters raised at a meeting of the Company shall, unless otherwise required by the laws of the State of Texas, be decided by a simple majority of the shareholders present at the meeting.

4.1   The parties hereto agree that unless otherwise varied in writing, the business of the Company shall be restricted and confined to the following:-

    (a)   sales and marketing arm for Favelle Favco Cranes (M) Sdn. Bhd. ("FFC") in the United States of America, Mexico, Central and South America;

    (b)   buy parts and materials for FFC and arrange for the shipping thereof to Malaysia or such other location as designated by FFC;

    (c)   if requested by FFC, buy used crawler cranes and or foundation equipment for Asia and or the Middle East;

    (d)   quote manitex offshore spare parts and establish parts supplier in the United States of America;

    (e)   quote new manitex offshore pedestal cranes;

    (f)   fabricate towers and booms and Kroll tower cranes for FFC;

    (g)   sell the whole of the West Manitowoc cranes in Mexico, central and south America; and

    (h)   finalise, conceptualise, design and manufacture Excavator Upper and Variable Gauge Lower for the manufacture of Lattice and Box Boom Crawler Crane.

5.1   The Second Party hereby agrees with the First Party that he shall not, during the subsistence of this Agreement and for a period of three years after the determination of this Agreement for

950

whatever reasons, directly or indirectly enter into any agreement, arrangement, partnership or otherwise in competition with the business carried on or proposed to be carried on by the Company unless the termination of this Agreement is pursuant to Clauses 6.2.2 or 6.3.

6.1   This Agreement shall continue in full force and effect until terminated in accordance with the provisions of this clause.

6.2   Either of the parties to this Agreement shall be entitled to terminate this Agreement immediately by notice in writing to the defaulting party ("Defaulting Shareholder(s)") if any of the events set out below shall occur. The said events are:-

> 6.2.1     If the Defaulting Shareholder(s) shall commit any material breach of any of its obligations under this Agreement and shall fail to remedy such breach (if capable of remedy) within fourteen (14) days after being given notice by the other parties hereto so to do; or
>
> 6.2.2     If one or more parties hereto (being a Company) shall go into liquidation whether compulsory or voluntary (except for the purposes of a bona fide reconstruction or amalgamation with the consent of the other parties hereto such consents not to be unreasonably withheld) or if one or more of the parties hereto shall have an administrator appointed or if a receiver administrative receiver or manager shall be appointed over any part of the assets or undertakings of that party or if a petition shall be presented or an order made for the appointment of a trustee in bankruptcy; or
>
> 6.2.3     If one (1) party acquires all the shares of the Company.

6.3   This Agreement shall terminate immediately if an effective resolution is passed to wind up the Company or if a liquidator is otherwise appointed (but without prejudice to any rights of the parties hereto may have against the other party prior to such termination).

6.4.1     If either of the parties hereto shall serve a valid notice of termination under Clause 6.2 that party ("the Terminator(s)") shall be entitled by that notice to require the Defaulting Shareholder(s) ("the Terminatee(s)") either to purchase all (but not some only) of his or its shares in the Company of the Terminator(s) or to sell to the Terminator all (but not some only) of the shares of the Terminatee(s) in the Company in either case at a price determined in accordance with the provisions of Clause 6.4.2. Upon exercise of any such right by the Terminator(s) it and the Terminatee(s) shall become bound respectively to sell or purchase on the terms set out below. If in a valid termination notice to such power of sale or purchase is exercised by the Terminator(s) the parties shall procure that the Company shall be immediately wound up.

6.4.2     The purchase price of the shares to be bought and sold pursuant to Clauses 6.4.1 and 1.5 shall be their fair value as agreed between the parties to such sale and purchase or in default of agreement within fourteen (14) days after the service of the notice of termination such sum shall be certified (at the request of either such parties) by the auditors for the time being of the Company to be the fair value of such share on the date when the termination notice was served. In so certifying the auditors are irrevocably instructed to value the ordinary shares to be bought and sold as the same proportion of the market value of the Company as a whole on that date as the relevant ordinary shareholding bears to the whole issued ordinary share capital of the Company on that date but otherwise they shall take into accounts all such circumstances as shall seem to them relevant.   In so acting such auditors are instructed to act as experts and not as arbitrators and their decision shall (save in respect of manifest error) be final and binding on the parties to such sale and purchase for all purposes and their costs shall be borne in equal shares by such parties.

6.4.3     Completion of the sale and purchase of shares pursuant to the provisions of Clause 6.4.1 shall take place at the registered office of the Company on the 3rd business day after the price payable for such shares has been agreed or determined in accordance with the provisions of Clause 6.4.2 (or such other time and/or place in respect of which the provisions of 6.4.4, 6.4.5, 6.4.6 and 6.4.7 shall then have effect).

6.4.4     At any completion of the sale and purchase of shares pursuant to Clause 6 in return for bankers draft drawn on a United States clearing bank (or such other means of payment which is agreed by the seller) for the full amount of the purchase money for the shares being bought and sold and such other amounts as are referred to in Clause 6.4.5 the seller shall deliver to the purchaser duly executed share transfers for the shares being sold in favour of the purchaser or as it may direct together with the relevant share certificate(s).

6.4.5     The parties hereto shall exercise all voting and other rights available to them to ensure the implementation of the preceding provision of this clause and that any provisions contained in the articles of association of the Company restricting transfers of shares shall be waived or suspended to allow such sales and purchases to proceed as provided above and the shareholders shall procure the registration of any transfer of any shares in the Company pursuant to this Agreement accordingly.

7.1   The First Party shall for a period of three years from the date of this Agreement pay to the Second Party a royalty fee of 1% of the sale price for the sale of each crane manufactured or assembled pursuant to the Second Party's patented invention, namely, the Excavator Upper and Variable Guage Lower for the making of a Latice and Box Boom Crawler Crane, and whether or not the sale took place before or after the termination of this Agreement.

D19.

8.1 This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, United States of America and the parties expressly submit to the non-exclusive jurisdiction of the courts of that country.

IN WITNESS WHEREOF the parties hereto have hereunto caused their respective duly authorised representatives to set their hands the day and year first above written.

SIGNED by                  )
for and on behalf of )
FAVELLE FAVCO CRANES )
(M) SDN. BHD. in the )
presence of:               )

SIGNED by the said )
DANNIEL F. DAVIS     )
in the presence       )
of:-                          )

D.S.D.

CM/PDF - www.texisc.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "N"
# Affidavit of Willie C. Jones
# (July 31, 2001)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS, | § | |
| Plaintiff/Counter-defendant, | § | |
| | § | |
| v. | § | Civil Action No. B-00-003 |
| | § | (Consolidated with B-00-184) |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| and | § | Hon. Hilda Tagle |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| Defendants/Counter-plaintiffs. | § | |

## AFFIDAVIT

**BEFORE ME,** the undersigned Notary Public, on this day personally appeared, MR. BILL JONES, who being duly sworn on oath stated that he is above the age of 18 and is authorised in all respects to make this affidavit; that he has not been convicted of a felony and is competent to make this affidavit; that he has read the following affidavit, and it is true and correct, and that every statement contained herein is within his personal knowledge

I have worked in the crane and related industries for many years. During 1996, I worked for the Manitowoc crane company. In late 1996 or early 1997, I had a meeting in Wisconsin with Danny Davis and Mac Boon. Danny Davis had developed some crawler cranes designs. Danny, Mac and I met to discuss Danny's crawler crane design. Danny, Mac and I discussed that Mac wanted the design to look like the Manitowoc West crane, but Danny's design used Caterpillar parts which were for an excavator.

In late 1996 or early 1997, I saw an engineering report done by Jim Rusk at Danny's request. The report was called the Caterpillar-Manitex Crawler Proposal. The cranes in the Caterpillar Manitex Crawler report were the same cranes that Danny, Mac and I discussed at the meeting in Wisconsin. Mac had purchased cranes from Danny in the past and we discussed Mac purchasing some of the cranes described in the Caterpillar-Manitex Crawler Proposal.

1

CVisPDF - www.texisa.com

The cranes described in the Caterpillar-Manitex Crawler Proposal were fully engineered. Jim Rusk had done the engineering with Danny telling him what to do. Also, Joe Conway, who ran Manitex, had one of his engineers check and confirm the engineering that had been done by Rusk on Danny's crane design.

I later worked for Favelle Favco Cranes USA, Inc., who did not build any crawler cranes before Danny brought his designs to them. Some of the crawler cranes that were built by Favelle Favco Cranes USA, Inc. were the same crawler cranes that Rusk had engineered in the Caterpillar-Manitex Crawler Proposal and that Danny, Mac and I discussed at our meeting in Wisconsin in 1996. Danny brought his crane designs which had been engineered by Jim Rusk when he came to Favelle Favco Cranes USA, Inc. Also, the crawler cranes in the Caterpillar-Manitex Crawler Proposal are the same designs that were in Danny's patent (U.S. Patent 6,003,252).

Further affiant sayeth not.



BILL JONES

SUBSCRIBED AND SWORN TO BEFORE ME on the 31st day of July, 2001, to certify which witness my hand and official seal.

Notary Public, State of Texas

ELIZABETH A. VASQUEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp 07-14-2004

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **DANIEL E. DAVIS** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. B-00-003** |
| | § | |
| | § | |
| **FAVELLE FAVCO CRANES** | § | |
| **USA, INC. and FAVELLE CRANES** | § | |
| **(M) SDN BHD,** | § | |

| | | |
|---|---|---|
| **FAVELLE FAVCO CRANES USA, INC.** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **DANIEL E. DAVIS, DAVISCO INC., and** | § | |
| **COBURN INTERNATIONAL, LTD** | § | |
| | § | **CIVIL ACTION NO. B-00-184** |
| **VS.** | § | |
| | § | |
| **FAVELLE FAVCO CRANES USA, INC.,** | § | |
| **FAVELLE FAVCO CRANES (M) SDN BHD,** | § | |
| **and FAVELLE FAVCO HOLDINGS SDN BHD** | § | |

# EXHIBIT "O"
# Affidavit of Joe Conway
# (August 1, 2001)

# AFFIDAVIT

BEFORE ME, the undersigned Notary Public, on this day personally appeared, MR. JOE CONWAY, who being duly sworn on oath stated that he is above the age of 18 and is authorized in all respects to make this affidavit; that he has not been convicted of a felony and is competent to make this affidavit; that he has read the following affidavit, and it is true and correct, and that every statement contained herein is within his personal knowledge.

1.    I have worked in the crane industry for six years. In 1996 and 1997, I was Executive Vice President and General Manager of Manitex Inc. In 1996, Danny Davis came to me wanting Manitex Inc. to develop and market a new line of crawler cranes that Davis had conceived. Davis already had drawings of his crane designs. The Davis crawler cranes used excavator concepts in conjunction with conventional crane design. Particularly, Davis was using Caterpillar excavator lowers. This was a new concept that had never been done before. Manitex Inc. elected not to develop and market Davis' crawler cranes.

2.    After Manitex Inc. elected not to pursue Davis' crawler crane design, Davis wanted Manitex Inc. to sell him booms to go on crawler cranes he would build or have someone else build for him. Before Manitex Inc. would sell booms to Davis, we wanted to confirm the integrity of the design. There, the entire crane needed to be engineered because Davis was going to use our piece, the boom, into his crane which was a new concept that had never been done before. Manitex Inc. required that Davis provide sufficient engineering to assure his design had integrity.

3.    Davis employed the services of crane engineer Jim Rusk. I was aware of Jim Rusk because he had previously provided engineering services for Manitex Inc. Jim Rusk was and is a well respected crane engineer for all crane applications. I supported the use of Jim Rusk as the engineer to assure the design integrity of the Davis crawler cranes. Rusk began his engineering work on the Caterpillar-Manitex crawler cranes designed by Davis in 1996. As Rusk performed his engineering services, I had a Manitex engineer check Rusk's calculations and engineering to assure the accuracy and results of the engineering. All of Rusk's engineering was confirmed by the Manitex engineer.

1

4.      In late 1996 or early 1997 at Davis' request, Rusk presented an engineering report on the Davis crawler cranes entitled "Caterpillar-Manitex Crawler Proposal." The Caterpillar-Manitex Crawler Proposal assured us at Manitex Inc. that the Davis crawler crane design would work and confirmed the integrity of Davis' design. All the test numbers provided by Rusk for the Davis crawler cranes looked good.

5.      Based upon the Caterpillar-Manitex Crawler Proposal, Manitex Inc. agreed to sell Davis booms for his crawler crane design. Further, Manitex Inc. agreed to sell booms to Davis at a specific price.

6.      Because of the prior working relationship between Manitex Inc. and Jim Rusk, Rusk requested that Manitex Inc. release him from any prior obligations or contracts that may or may not exist with respect to the Davis crawler cranes. Manitex Inc. provided this release.

Further affiant sayeth not

_____
JOE CONWAY

SUBSCRIBED AND SWORN TO BEFORE ME on the _____1_____ day of July, AUGUST 2001 to certify which witness my hand and official seal.

_____
Notary Public, State of Texas

JOHN A. KELLY
MY COMMISSION EXPIRES
September 22, 2001

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "P"
# Letter dated
# (January 20, 1999)

January 20, 1999

Mr. Mac Boon

RE:    Favelle/Favco Cranes USA, Inc.

Dear Mac:

I am writing you this letter because I want to avoid any misunderstandings with you and because I value our friendship. When we had first discussed the formation of the Texas company and at the time that I was hired to form and organize the Texas company, I told you that I was in the process of developing a patent for the cranes. The agreement that we reached was that I would acquire a ten percent (10%) interest in the Texas company, that I would proceed to develop the patents, and that I would then license the patent to Favco and receive a royalty fee of one percent (1%) in return for Favco's agreement to financially help in the engineering costs incurred in obtaining the patent.

I have worked extremely hard in forming and organizing the Texas company. I believe that this company is now the most productive and profitable asset in the Favco group. Additionally, this Texas company has exceeded all of the other groups in parts sales. I have also been a very productive salesperson for the Favco group. Several weeks ago when we talked, you were upset that the patent had been obtained in my name and not transferred to the company. As you will recall, the patent was my idea and there was never an agreement for me to transfer one-half of the patent to Favelle/Favco. There was an agreement for me to license the patent for at least three years as was set out in the Shareholders' Agreement prepared by your lawyers.

Caterpillar has asked for a copy of the Licensing Agreement between me and Favco and have insisted that this be produced within the next few weeks. I am afraid that if the Licensing Agreement is not provided, that this will severely jeopardize the ability of Favco to market the crane at the Con Expo in March.

I have consulted with a patent attorney who has prepared a Licensing Agreement in conformance with the Shareholders' Agreement. I would ask that you review it, and that Favco approve the Licensing Agreement so that we can continue with our marketing efforts.



Mr. Mac Boon
January 20, 1999
Page 2

_____

The future looks extremely good for Favco in terms of sales of these units.  I have
formulated some other ideas regarding cranes which I would like to patent.  In order to avoid any
misunderstanding with Favco, I would like to offer Favelle/Favco the right to participate in the
development of the patent in exchange for my agreement to license these patents to
Favelle/Favco under specified terms.  If Favelle/ Favco does not want to participate in the
development of these additional ideas, then I will utilize my own resources to engineer the
designs.  If I do this, however, I will be free to license these new ideas and patents to other
companies.

I very much want to keep my relationship with Favelle/Favco and would prefer to deal
with you on all of these matters.  I believe that if you allow me to continue to develop the U.S.
company and pursue these new patents ideas, that Favelle/Favco could grow into a large
productive and profitable venture.

Sincerely yours,

Daniel E. Davis

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-184 |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "Q"
# Affidavit of Daniel E. Davis
# (August 3, 2001)

Case 1:00-cv-00003   Document 103   Filed in TXSD on 08/03/2001   Page 146 of 150

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS, | § | |
|     Plaintiff/Counter-defendant, | § | |
| | § | |
| v. | § | Civil Action No. B-00-003 |
| | § | (Consolidated with B-00-184) |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| and | § | Hon. Hilda Tagle |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
|     Defendants/Counter-plaintiffs. | § | |

## AFFIDAVIT

**BEFORE ME**, the undersigned Notary Public, on this day personally appeared, MR. DANIEL E. DAVIS, who being duly sworn on oath stated that he is above the age of 18 and is authorised in all respects to make this affidavit; that he has not been convicted of a felony and is competent to make this affidavit; that he has read the following affidavit, and it is true and correct, and that every statement contained herein is within his personal knowledge.

    1.    I was President of Favelle Favco Cranes USA Inc. from September 4, 1997 when the company was formed until September 8, 1999. In 1996 before I ever began working with Favelle Favco Cranes USA Inc., I had conceived, developed and had detailed engineering for the unique crawler cranes that I had thought of. The engineering was done by Jim Rusk, a crane engineer, and was checked by another engineer that worked for Manitex Inc. A formal report was issued on February 20, 1997. Joe Conway, Executive Vice President and General Manager of Manitex Inc., oversaw the project which was required to confirm that my crane design would be fully functional, and without problems, before Manitex Inc. would agree to sell me booms.

    2.    Prior to May 1997, Mac Boon and I agreed to create Favelle Favco Cranes USA Inc., which would be owned 90% by one of Mac's companies and 10% by me. Our agreement provided that one of Mac's companies would put $3,000,000 into Favelle Favco Cranes USA Inc. and I would bring the crawler cranes which I had already developed and engineered, but had not built. Further, our agreement provided that I would retain ownership of any patents, and would license my crawler crane designs to Favelle Favco Cranes USA Inc. for a nominal royalty of 1% for the first 3 years as an incentive for them to pay for building the crawler cranes that I

1

had already designed and engineered   After 3 years, we would enter into another license agreement when both of us knew how well my crawlers would do.  All this was to be put into a written Shareholders Agreement.

3.    On May 12, 1997, Cheam faxed me stating that the Shareholders Agreement was being prepared as previously agreed to between me and Mac.  On May 20, 1997, Wong who works with Mac faxed me the Shareholders Agreement.  On May 28, 1997, I wrote Mac a letter changing some of the terms of the Shareholders Agreement received from Wong.  For example, I made it clear that Mac's company would capitalize Favelle Favco Cranes USA Inc. with $3,000,000 so that the company would have sufficient money to operate and I was to retain ownership of any patents, and would license the my crawler crane designs to Favelle Favco Cranes USA Inc. for a nominal royalty of 1% for the first 3 years as an incentive for it to pay for the building of the first crawler cranes built under my design and engineering.  On June 10, 1997, Cheam forwarded to me a Shareholders Agreement that Mac's attorneys sent to him incorporating the changes I previously requested with additional documents where I had to put $60,000 into Favelle Favco Cranes USA Inc.  I relied on Mac having reviewed the Shareholders Agreement, Cheam having reviewed the Shareholders Agreement, and now Mac's lawyers sent me the Shareholders Agreement incorporating my requested changes.  Relying on the fact that we had a written Shareholders Agreement with all the terms meeded, I signed the Employment Contract on June 23, 1997.  On August 16, 1997, I signed the Shareholders Agreement prepared by Mac's lawyers and sent it to him.

4.    On many occasions, I requested a copy of the executed Shareholders Agreement. I was never told there was a problem with the Shareholders Agreement, but rather it was coming, not to worry, we have a deal, and things like that.  On January 20, 1999, I wrote Mac a letter clarifying the agreement that they had made and my reliance on the representations Mac had made in the Shareholders Agreement.  Even though the Shareholders Agreement was prepared at Mac's request, reviewed by Cheam, reviewed by Mac, rewritten by Mac's lawyers, changed to include funding requirements ($3,000,000) and that I would retain ownership of my crane designs and engineering, and that Favelle Favco Cranes USA Inc. would license the designs from me, Mac never signed his own Shareholders Agreement.  Now, Mac wants to take the patent rights he knows are mine.  Even as late as several months before I was fired, Mac instructing his attorney, Dennis Sanchez, to prepare a document that would sell the company to me.  The sale

2

CutePDF - www.fastio.com

document expressly stated that I was the owner of the patent. And, there were many drafts of the sale document with all the drafts expressly acknowledging that I owned the patent. On occasion, I met with Sanchez and with Mac and discussed that the patent was mine. Mac knew that the patent was mine from the beginning.

5.    Not long after Favelle Favco Cranes USA Inc. was formed, Mac refused to fund the company as he had agreed. The total lack of financial support by Mac required me to take money out of my own pocket to make payroll on several occasions. However, the Mac did do enough to coerce me into bringing my crawler cranes to the company. Because they allowed me to purchase 10% of the company, they made me Managing Director, they started the company and opened a facility, I thought they would do the other things they promised and wrote in the Shareholders Agreement. But, they never allowed the company to prosper because they refused to pay vendors. Eventually, we were on a "COD basis" with all our vendors and business was essentially stopped. I was spending a significant part of my time keeping vendors so they would even deal with us.

Further affiant sayeth not.

_____
DANIEL E. DAVIS

**SUBSCRIBED AND SWORN TO BEFORE ME** on the 3rd day of August, 2001, to certify which witness my hand and official seal.



_____
Notary Public, State of Texas

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-003 |
| | § | |
| | § | |
| FAVELLE FAVCO CRANES | § | |
| USA, INC. and FAVELLE CRANES | § | |
| (M) SDN BHD, | § | |

| | | |
|---|---|---|
| FAVELLE FAVCO CRANES USA, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| DANIEL E. DAVIS, DAVISCO INC., and | § | |
| COBURN INTERNATIONAL, LTD | § | |
| | § | CIVIL ACTION NO. B-00-184 |
| VS. | § | |
| | § | |
| FAVELLE FAVCO CRANES USA, INC., | § | |
| FAVELLE FAVCO CRANES (M) SDN BHD, | § | |
| and FAVELLE FAVCO HOLDINGS SDN BHD | § | |

# EXHIBIT "S"
# Affidavit of Greta L. Sullivan
# (August 3, 2001)

FROM :                          FAX NO. :                          Aug. 03 2001 11:39AM   P1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DANIEL E. DAVIS,                              §
    Plaintiff/Counter-defendant,          §
                                          §
v.                                           §   Civil Action No. B-00-003
                                          §   (Consolidated with B-00-184)
FAVELLE FAVCO CRANES USA, INC.,              §
and                                          §   Hon. Hilda Tagle
FAVELLE FAVCO CRANES (M) SDN BHD,            §
    Defendants/Counter-plaintiffs.        §

## AFFIDAVIT

**BEFORE ME,** the undersigned Notary Public, on this day personally appeared, MS. GRETA SULLIVAN, who being duly sworn on oath stated that he is above the age of 18 and is authorised in all respects to make this affidavit; that he has not been convicted of a felony and is competent to make this affidavit; that he has read the following affidavit, and it is true and correct, and that every statement contained herein is within his personal knowledge.

I worked for Favelle Favco Cranes USA Inc. from September 1998 until March 2000 as their Accountant. From the time I started working at Favelle Favco Cranes USA Inc. in September of 1998 until approximately September of 1999, we had constant problems paying our vendors. The funding company in Malaysia would only send money when we were desperate. We were in a situation that our vendors made us pay COD and some vendors did not want to sell to us. We had problems doing business because of not being properly funded. We were so short on money that on occasion Mr. Davis had to use his own money to make payroll.

However, after Mr. Davis left, we started to receive additional money to resolve our cash flow problems and some of the vendors were paid directly from Malaysia.

Further affiant sayeth not.

_Greta L. Sullivan_
GRETA SULLIVAN

**SUBSCRIBED AND SWORN TO BEFORE ME** on the 3rd day of August, 2001, to certify which witness my hand and official seal.



PATSY L. ROSAS
Notary Public, State of Texas
My Commission Expires 1-4-2003

_Patsy L. Rosas_
Notary Public, State of Texas